IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **SUSAN ABULHAWA** )<br>Yardley, PA ) | |
| )<br>**AVRAHAM PELED, a.k.a. MIKO PELED** )<br>San Diego, CA ) | |
| )<br>**DOA'A ABU AMER** )<br>Gaza, Palestine ) | |
| )<br>**PEGGY AHWESH** )<br>New York, NY ) | |
| )<br>**JAMES ANDERSON** )<br>Mountain Home, AR ) | Case No. 1:15-cv-2186-RDM |
| )<br>**REV. DANNY AWAD** )<br>Bethlehem, Palestine ) | |
| )<br>**ALICE BACH** )<br>Cleveland, OH ) | |
| )<br>**ANTOINE BOGHOSSIAN** )<br>Watertown, MA ) | |
| )<br>**GLORIA BOGHOSSIAN** )<br>Watertown, MA ) | |
| )<br>**TANIA BOGHOSSIAN** )<br>Watertown, MA ) | |
| )<br>**JOHN BOYD** )<br>Kenner, LA ) | |
| )<br>**MARINA BUHLER-MIKO** )<br>Washington, D.C. ) | |
| )<br>**JAMES COBEY** )<br>Washington, D.C. ) | |
| )<br>**JOHN DOE** )<br>Washington, D.C. ) | |
| ) | |

**ABDUR-RAHIM DUDAR**                    )
Atlanta, GA                             )
                                        )
**TY EBRIGHT**                          )
Cambridge, MA                           )
                                        )
**ABBAS HAMIDEH**                       )
Mayfield Heights, OH                    )
                                        )
**STEVEN GOOSSEN**                      )
Dinuba, CA                              )
                                        )
**RAY GORDON**                          )
Venice, FL                              )
                                        )
**LINDA KATEEB**                        )
Chicago, IL                             )
                                        )
**LINDA MANSOUR**                       )
Toledo, OH                              )
                                        )
**DONNA NASSOUR**                       )
New York, NY                            )
                                        )
**ROBIN NICHOLAS**                      )
Cape Cod, MA                            )
                                        )
**ALAN NOFAL**                          )
Lorton, VA                              )
                                        )
**MICHAEL RABB**                        )
Boulder, CO                             )
                                        )
**MARY SCHULTZ**                        )
Lincoln, RI                             )
                                        )
**LYNN SCHULTZ**                        )
Lincoln, RI                             )
                                        )
**MICHAEL SEVERAL**                     )
Los Angeles, CA                         )
                                        )
**RICH SIEGEL**                         )
Teaneck, NJ                             )
                                        )
**GRANT SMITH**                         )
Washington, D.C.                        )
                                        )

2

| | |
|---|---|
| **MICHAEL SMITH**<br>New York, NY | ) |
| | ) |
| | ) |
| **LOU STONE**<br>Inchelium, WA | ) |
| | ) |
| | ) |
| **ROBIE TENORIO**<br>Garberville, CA | ) |
| | ) |
| | ) |
| **JOHN VAN WAGONER**<br>Washington, D.C. | ) |
| | ) |
| | ) |
| **LINDA VASQUEZ**<br>Chicago, IL | ) |
| | ) |
| | ) |
| **WENDELL WOODS**<br>Pontiac, MI | ) |
| | ) |
| | ) |
| **AHMED AL-ZEER**<br>Deir Jarir, Palestine | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF THE TREASURY** | ) |
| | ) |
| and | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF THE TREASURY SECRETARY JACOB LEW**<br>In his official capacity | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

### DECLARATORY JUDGMENT ACTION FOR
### MANDAMUS RELIEF UNDER 28 U.S.C. § 1361
### AGAINST UNITED STATES DEPARTMENT OF THE TREASURY

### TABLE OF CONTENTS

I.      INTRODUCTION……………………………………...……………………….…...…….4
II.     JURISDICTION……………………………………………………....……………7

III.     VENUE………………………………………………………………………...7
IV.      PARTIES……………………………………………………………………….8
V.       HISTORY OF SETTLEMENT EXPANSION FUNDED BY U.S. DONORS AND
         TAX-EXEMPT ENTITIES………………………………………………….13
VI.      UNITED STATES PUBLIC POLICY REGARDING SETTLEMENT
         EXPANSION ACTIVITY AND THEFT OF PRIVATE PROPERTY……...……..23
VII.     ISRAELI PUBLIC POLICY CONCERNING INTRUSIONS ON PRIVATE
         PROPERTY AND SETTLEMENT EXPANSION IN THE OPT……..………..27
VIII.    STATUTORY VIOLATIONS………………………………………………….39
IX.      ADDITIONAL STATUTORY VIOLATIONS…………………………………45
X.       COUNT I: DECLARATORY JUDGMENT……………………………....47
         a.  Granting of Tax-Exempt Status……………………………………….48
         b.  Treasury Regulations Pertaining to Tax-Exempt Entities………………………49
         c.  Treasury regulations pertaining to contributions directly made by U.S. taxpayers
             to Israel-based charities………………………………………………….52
         d.  Pro-settlement Tax-Exempt Entities Which Transmit Monies Overseas Have
             Flagrantly Abused U.S. Tax Laws And Treasury Regulations…………………..53
XI.      RELIEF REQUESTED…………………………………………………..…74

COME NOW the Plaintiffs herein, most American citizens and taxpayers, and hereby

complain of Defendants United States Department of Treasury and Secretary Jacob Lew (together

referred to herein as "Defendant Treasury" or "Treasury") as follows:

I.     **INTRODUCTION**

For at least 40 years, perhaps more, Treasury officials have turned a blind eye towards the

criminal conduct that approximately 200 U.S. pro-Israeli-settlement 501(c)(3)s have either funded or

engaged in. These entities have been the primary source of funding to expand settlements[1] in the

Occupied Palestinian Territories ("OPT") in the West Bank and East Jerusalem ("EJ")[2], and in the

process, have financed ethnic cleansing, theft of private property, and malicious property

destruction. Because of that funding, tens of thousands of Palestinians have had their homes either

---

[1] The term "settlements" includes all Israeli civilian communities built on lands occupied by Israel since the 1967
Six-Day War, including those mentioned herein by name.
[2] For the purposes of this lawsuit, the term "OPT", while generally referring to the West Bank and EJ, is meant to
be inclusive and, as context requires, include Gaza and other Palestinian territory conquered and occupied since
1967. Though a more correct rendering is "1967 OPT," it is abbreviated to "OPT" herein.

confiscated or demolished by settlers armed with sophisticated military hardware purchased with funds coming from these U.S. tax-exempt entities. The settlers use the military hardware to threaten and intimidate their Palestinian neighbors, in some cases murdering them, hoping that they will abandon their homes and olive groves.

Most of these tax-exempt entities are known as financial "pass-throughs" or "funnels" which wealthy U.S. donors have made extensive use of. The donors' goal is simple—fund the forcible expulsion of indigenous non-Jewish Palestinians in the OPT to recruit and house the ever-growing numbers of new settlers, who now number approximately 750,000, based on satellite imaging technology. As detailed herein, the majority of these entities have also engaged in money laundering activity in violation of 18 U.S.C. 1956(a)(2). The reason is that U.S. individuals and entities which fund criminal activities abroad (theft of private property) violate that statute every time they complete an international wire transfer form. It does not matter that they are transferring "clean" funds overseas that were earned in legitimate business pursuits because they were knowingly funding criminal activity abroad. Without the tax-exempt entities' massive funding, which now totals at least $1 billion per year, the original settlers would have abandoned their tent encampments at least thirty years ago. The original settlers had to live in tents, had no landline telephones, had no indoor plumbing, had no electric/water hookups, and had no commuter bus link to urban employment centers. Extraordinary financial assistance like the $1 billion dollars being transferred on an annual basis today provided by U.S. 501(c)(3)s changed all that.

Despite the rampant criminal activities detailed herein which the entities characterize as being either "charitable" or "educational" in nature on their annual 990 tax forms, Treasury has not challenged or revoked their tax-exempt status. The entities have: (a) promoted religiously- and racially-discriminatory practices, i.e., funding segregated "Jewish-only" settlements and highways, for example; (b) violated numerous other 501(c)(3) regulations; (c) funded the violent expulsion of

indigenous non-Jews living near the settlements[3], i.e., classic ethnic cleansing[4]; and (d) violated at least eight federal criminal statutes, including conspiring to commit income tax fraud and the federal perjury statute. Nor has Treasury's Financial Crimes Enforcement Network ("FinCEN"), been asked to investigate the donors/entities for money laundering activity, which is FinCEN's area of expertise.

The relief that the plaintiffs seek by filing this Declaratory Judgment action is an order requiring Treasury, its IRS, OFAC and FinCEN divisions to investigate the criminal activities that these tax-exempt entities have been funding or engaging in for at least the last 40 years. Besides violating numerous Treasury regulations and engaging in money laundering activity, they have defrauded the IRS, and in some cases have not even filed for 501(c)(3) certification, even though they are openly soliciting tax-deductible contributions for the various settlements they have chosen to adopt. Without a court order, such an investigation will never take place, for two reasons. First, Treasury has adopted a double standard when it comes to monitoring and/or investigating the activities of pro-settlement 501(c)(3)s. Second, it has an abysmal track record in terms of designating pro-settlement tax-exempt officials or their donors for promoting violence in the Middle East.

Zealous pro-Zionists and advocates like Moskowitz and Adelson trying to take advantage of tax-exemption rules and regulations is nothing new. For example, in 1932, a pro-Zionist association sought, but did not receive, tax-exempt status from the U.K. Charity Commission.[5] The association's mission was to populate the state of Palestine with "Jewish-only" enclaves. In applying for tax-

---

[3] The land on which the settlements are built often is owned by the non-Jews they have expelled, either personally or through the *waqf* system.
[4] The U.S. State Department defines ethnic cleansing as "the systematic and forced removal of the members of an ethnic group from communities in order to change the ethnic composition of a given region." Ilan Pappé, "The 1948 Ethnic Cleansing of Palestine," Journal of Palestine Studies (Vol. 36, No. 1, Autumn 2006), pages 6-7. The Court will see herein that many media, government, and research sources have been cited in the footnotes to this Complaint. These footnotes are not exhaustive, as the Plaintiffs expect to further substantiate the claims herein through discovery. The sources cited are simply intended to assist the Court in finding *prima facie* plausibility per *Iqbal*.
[5] *Keren Kayemeth Le Jisroel Ltd. v. Comm'rs of Inland Revenue* 17 TC 27 (1932).

exempt status, the association was seeking to have British taxpayers, rather than American taxpayers, subsidize the association's activities. The Commission, in denying tax-exempt status, stated that the main object of the association was not to assist poverty-stricken Jews, but rather to change the demographic makeup of the Holy Land.[6] As explained in that opinion, the association wanted to fund activities in "Jewish-only" enclaves consistent with the activities engaged in by the settlements referenced herein.

## II.   <u>JURISDICTION</u>

1.  28 U.S.C. § 1331 is invoked against Defendant Treasury in connection with the Declaratory Judgment Action filed herein.

2.  28 U.S.C. § 1361 provides that "the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." As shown herein, Treasury will not investigate, on its own initiative, the criminal activity which pro-settlement 501(c)(3)s have funded, nor their donors, and will need to be compelled to do so. That is why this suit has been filed, essentially requesting the Court to order senior Treasury officials to do their jobs.

3.  5 U.S.C. § 702 provides that a person suffering legal wrong that is adversely affected by agency action is entitled to judicial review.

---

[6] Id.

### III.    <u>VENUE</u>

4.   Venue is proper under 28 U.S.C. 1391 because all of the activity, events, intentional acts, and omissions complained of herein on the part of Defendant Treasury occurred in this judicial district.

5.   This case primarily concerns records maintained by Treasury for the last 30 years, including the 990 tax forms, applications for 501(c)(3) status, and any other reports filed by the tax-exempt entities referenced herein. Thus venue is appropriate because the important documents (annual 990 forms) regarding allegations made herein against Treasury and pro-settlement tax-exempt entities are all located in this judicial district, i.e., they have been, or should have been, filed with the IRS. As shown herein, pro-settlement tax-exempt entities are not terribly concerned about filing complete 990 tax forms. That is the reason why the IRS has no idea how much money is actually going into Israeli bank accounts to fund settlement expansion and ethnic cleansing of the Palestinian population in the OPT.

### IV.    <u>PARTIES</u>

6.   All Plaintiffs share mutual concerns which have prompted them to join in this litigation. Those concerns are based upon the funding of wholesale violence due to explosive settlement expansion, all funded by pro-settlement tax-exempt entities and their donors. Their conduct violates U.S. and Israeli criminal statutes, the public policy of both countries, and international convention principles like Hague and Geneva[7] (see Exhibit A attached). These entities and donors have also engaged in money laundering and malicious destruction and theft of private property. They have defrauded the IRS by encouraging their donors to take illegal tax write-offs and have also defrauded local military and/or municipal authorities in the OPT by submitting

---

[7] The Fourth Geneva Convention is abbreviated herein as "GCIV".

false affidavits in order to secure illicit construction permits to build segregated "Jews-only"
housing projects on Palestinian land in the OPT. Each Plaintiff has prepared an explanation as
to why he or she has joined in this lawsuit. They each have, in their own words, explained how
Treasury's failure to monitor and/or prevent the criminal activity these entities have been
funding has impacted their lives.

7.   Plaintiff John Doe is a resident of the District of Columbia, and seeks from this Court an order
requiring Treasury to investigate the entities and their donors, and where appropriate, strip the
entities of their tax-exempt status. He has been concerned about Treasury's failure to monitor
these tax-exempt entities for a number of years. He has heard from various Palestinian friends
and neighbors the atrocities that are being committed in the OPT, and he has recently learned
that this criminal activity has been largely subsidized by the American taxpayer. Of course, the
taxpayers do not know that this is happening, and it is the result of Treasury's obvious failure to
regulate the tax-exempt entities and, where appropriate, strip them of their tax-exempt status.

Plaintiff John Doe's rationale for joining the lawsuit is:

> "As a human rights activist, I stand firmly to defend the rights of oppressed people
> everywhere. The forced dislocation of Palestinians from their historic homes and villages
> and the seizure of their homes and lands in the occupied Palestinian territory contradict all
> human rights principles and international conventions which stipulate that 'Everyone is
> entitled to all the rights and freedoms set forth in this Declaration, without distinction of any
> kind, such as race, color, sex, language, religion, political or other opinion, national or social
> origin, property, birth or other status.' All that I want is justice for those who have been
> forced by the Israeli settlers to give up their houses and lands and continue to lead a
> miserable life. I do not know who is responsible for funding settlement expansion and all the
> crimes detailed herein, but I would like a court to bring them to justice."

8.   Plaintiff John Doe comes from Egypt, and personally witnessed the atrocities that the Mubarak
regime inflicted on ordinary Egyptian citizens. Much like the Palestinians in the OPT, they are
incarcerated for no reason, their private property is destroyed, and they face lengthy prison
terms for their political activities. He recalls some Egyptian colleagues telling him that state
agents required them to either choose lack of access to medical care or becoming a snitch and

informing the state about the activities of all political activists. Palestinian prisoners, of course, have faced the same dilemma for at least 40 years. His fervent hope is that once more Americans learn what Treasury's failure to regulate these pro-settlement tax-exempt entities has meant in terms of denying Palestinian citizens significant civil liberties guaranteed by the Hague and Geneva conventions, that they will also become plaintiffs herein.

9.  Plaintiff Abulhawa is a resident of Pennsylvania, and is concerned about Treasury's ongoing failure to monitor and prevent the criminal activities engaged in by these pro-settlement tax-exempt entities. Her rationale for joining in this lawsuit is:

> "The trajectory of my life has been determined and shaped by Israel's theft of my home and heritage; by Israel's dislocation of me, from my birthright to life-long exile.  I want accountability and restitution from those who dismantled my family, stole my inheritance, claimed my history, and made of me a placeless person…I want a court, somewhere, somehow, to declare that it was not okay to remove me from the only place where I belong in the world, and replace me with foreigners insistent upon an entitlement to have an extra country; to affirm that I am a native of Jerusalem on the Mount of Olives where my family has dwelt for centuries upon centuries, and that as an indigenous person who belongs to that patch of earth, it is my birthright to inhabit it still as all my ancestors did before me.  **I want a court, somewhere, somehow, to hold accountable those who have financed my pain of dispossession and exile; to hold accountable the financiers of Israel's wholesale theft of another people's historic, material, spiritual, and emotional presence in the world."**

The bottom line for Plaintiff Abulhawa is a request that this Court order senior Treasury officials to basically do their job, i.e., investigate these entities and their donors, and where appropriate, strip the entities of their tax-exempt status.

10. Plaintiff Several seeks relief from the failure of the Department of the Treasury to enforce its regulations on non-profit foundations and organizations that provide financial support to settlements established by the Israeli government in the OPT. He has visited Israel on many occasions and seen first-hand what settlement expansion has meant to the ordinary Palestinian citizen. He believes that the settlements have "poisoned the political culture in Israel" and has "killed the possibility of a two-state solution." He has done significant research on U.S. donors

and pro-settlement tax-exempt entities which have provided financial support to the settlement enterprise.

11. He firmly believes that financial support rendered by pro-settlement tax-exempt entities and their donors has: (a) undermined American policy supporting a viable Palestinian State by entrenching the Israeli occupation of the OPT (b) damaged American security by creating resentment and anger arising from the failure to apply laws and regulations against the actions and activities of Israel that violate international law; (c) promoted widespread violence against Palestinians; and (d) perpetuated the environment and conditions that gives rise to violent resistance to the Israeli occupation.

12. Plaintiff Several remains hopeful that if Treasury addresses how non-profit foundations and organizations have abused their tax-exempt status by financing rampant criminal activity, tax-exempt funding of the settlements will cease.

13. Many of the Plaintiffs have suffered direct and substantial injury to person or property because of Treasury's failure to perform the duties it owes to them. For example:

    (a) Plaintiff Linda Kateeb, an American citizen, owns six plots of land in the West Bank, with deeds to the plots in her name and in her possession. However, an Israeli settler organization which is, based upon information and belief, supported by funds provided by U.S. tax-exempt entities, recently purported to purchase two of those plots from violent Israeli settlers who had set up outposts on the land. There are now Israeli settlers living on those two plots. She is worried that if Treasury continues to allow so-called tax-exempt funds to flow to the organization, she will lose her remaining four plots of land. Plaintiff Abbas Hamideh similarly has lost, and fears he will continue to lose, family land in the West Bank as long as organizations such as Christian Friends of Israeli

Communities and the One Israel Fund are permitted to provide funds to violent settlers in violation of U.S. federal statutes and IRS regulations.

(b) Plaintiff Doa'a Abu Amer lost fourteen family members when the Israeli army bombed the daycare center in which they sought refuge during Israel's 2014 Gaza bombing campaign. The Israeli army receives not less than $100 million in annual tax-exempt funds from the Friends of the Israel Defense Forces (FIDF). If Treasury had enforced its rules and regulations, the FIDF would not have been able to send that money to a foreign army, and that foreign army would have had less capability to indiscriminately bomb a densely-populated civilian urban center, and her family members may still be alive today.

(c) Plaintiff Ahmed Al-Zeer was viciously beaten by violent settlers while on his own property outside the segregated settlement of Ofra. He suffered bleeding on the brain, a skull fracture, broken bones, other internal bleeding, and is now handicapped in a wheelchair. If Treasury had enforced its rules and regulations, the American Friends of Ulpana Ofra and other U.S. tax-exempt entities would not have been able to send funds to the Ofra settlers. As a result, they would have never been able to construct and/or expand their settlement, and they would not have been provided with sophisticated military hardware, which they used when they viciously attacked Plaintiff Al-Zeer on his own land. Without that funding and that military hardware, Plaintiff Al-Zeer today would most certainly not be confined to a wheelchair, and would still be practicing as an attorney.

(d) As a specific and direct result of Treasury's failure to enforce its own tax-exemption regulations, Plaintiff Reverend Danny Awad would not have lost the Christian center (and his parish) known as Beit el-Baraka. He lost the Christian center as a direct result of

a straw purchase transaction whereby a settler organization and its U.S. backers, the American Friends of the Everest Foundation and billionaire Irving Moskowitz, were able to secure ownership of the Christian center. That illegal transaction had profound consequences for Reverend Awad, his parishioners, and members of some ten other churches in the region who used to use the center for worship and retreat. Reverend Awad, his parishioners, and other Christians can no longer enter the premises, fearing they would be physically attacked by irate Jewish settlers and fired upon by IDF soldiers.

(e) Recently, three Palestinians from Aroub refugee camp in that area were murdered by the IDF simply for participating in a demonstration objecting to the illegal acquisition of the center. As Reverend Awad has observed, his center has been converted illegally into an IDF military barracks compound and housing accommodations for Jewish-only settlers.[8] If Treasury had been enforcing its tax-exemption regulations from 2010-2012, Moskowitz would have never been able to take a tax deduction on any donation to the American Friends of the Everest Foundation. As a result, the foundation would not have received approximately $10 million from Moskowitz, and therefore would never have been able to transfer those funds to a straw purchaser in order to effectuate a fraudulent purchase. In that case, Reverend Awad and his congregation would still have access to their Christian center today, and so would all Christian churches in the community. As a result of the illegal confiscation of the center, Palestinian Christians and other inhabitants in the area will no longer have access to Bethlehem, as the center sits on the sole road between Hebron and Bethlehem.

---

[8] http://mondoweiss.net/2015/05/settlement-clandestine-international/.

14. Defendant Treasury owes these Plaintiffs, all American citizens[9], and any individual to whom it is reasonably foreseeable that injury may inure in the case of Treasury's failure to enforce its tax-exemption regulations, a duty to monitor the activities of all tax-exempt charities and, when it learns that the charities have violated Treasury regulations or federal statutory provisions, it has an obligation to the aforementioned individuals to investigate the matter. The reason why it owes those duties is that it is a federal agency committed to promotion of law enforcement objectives, especially in the area of money laundering and financing of international terrorism. It also has an obligation to the American citizens and to Congress to secure as much revenue as it possibly can in terms of tax collections and, where appropriate, secure fines and penalties from delinquent taxpayers and/or taxpayers who seek to avoid their honest obligations. As detailed herein, Defendant Treasury has breached these various duties owed to the Plaintiffs and American taxpayers by failing to monitor and prevent the criminal activities detailed herein and failing to recoup nearly $1 trillion in lost tax revenue. Treasury has an obligation, as evidenced by the 1995 Executive Order 12947 which it helped to prepare, to investigate the source of funding of violence in the Middle East and, when appropriate, designate the individuals responsible therefor and freeze their bank accounts. Up until now, Treasury has chosen to take a "hands-off" approach on the issue, despite being urged by a number of American citizens and entities to address this problem. If Treasury is truly serious about reducing violence in the Middle East, it should welcome the investigation requested by the Plaintiffs, which is long overdue.

15. Defendant Department of the Treasury is an executive department administered by Secretary Jack Lew, with responsibility, *inter alia*, for regulating U.S. tax-exempt entities under Internal

---

[9] Most Americans have no idea that: (a) their hard-earned dollars have subsidized criminal activity in the OPT for at least 40 years; (b) this activity violates at least eight different federal criminal statutes and at least five applicable Treasury regulations; and (c) if Treasury would start enforcing its own tax regulations governing these tax-exempt entities, it would be able to recoup at least $1 trillion in back taxes, penalties, and interest. After reading this complaint, it is hoped that more Americans will join in this suit to reiterate the request that senior Treasury officials simply do their job.

Revenue Code 26 U.S.C. § 501(c) *et seq.* The Department's headquarters are located at 1500 Pennsylvania Avenue, N.W., Washington, DC 20220. Treasury is tasked with, and owes American taxpayers the duty of, enforcing federal finance and tax laws; investigating and prosecuting tax evaders, counterfeiters, and forgers; ensuring that the minority of U.S. taxpayers who are unwilling to comply with the tax law pay their fair share; and enforcing the law with integrity and fairness to all.[10] Plaintiffs allege herein that Treasury has failed to perform those duties and responsibilities. They have further alleged that because of Treasury's failure to perform those duties and responsibilities, they have been injured.

16. Defendant Jacob Lew is the Secretary of the Treasury and is responsible for carrying out the powers delegated to the Department by 26 U.S.C. § 501(c). Secretary Lew executes these responsibilities through a delegation of authority to the Internal Revenue Service ("IRS"). Mr. Lew is sued in his official capacity.

17. For the Court's edification, there are tax-exempt entities which are referenced herein, as well as donors like Sheldon Adelson, Irving Moskowitz, and John Hagee who all support settlement expansion and who have all donated millions of dollars to accomplish that goal. They have not been named as defendants herein, but they are mentioned in this lawsuit to provide examples of the serious consequences resulting from Treasury's failure to monitor U.S. tax-exempt entities' money laundering and the other criminal activities that they fund and engage in—all in the name of settlement expansion.


## V.     HISTORY OF SETTLEMENT EXPANSION FUNDED BY U.S. DONORS AND TAX-EXEMPT ENTITIES

---

[10] *See* https://www.treasury.gov/about/role-of-treasury/Pages/default.aspx, https://www.irs.gov/uac/The-Agency,-its-Mission-and-Statutory-Authority, and https://www.irs.gov/Government-Entities/Tax-Exempt-%26-Government-Entities-Division-At-a-Glance, accessed December 15, 2015.

18. As detailed herein, the extraordinary level of financial assistance (now $1 billion per year) provided by U.S. tax-exempt entities and donors has resulted in a constant influx of violent Jewish settlers into the OPT, with tragic consequences: (a) ongoing confiscation of private Palestinian property, i.e., 49,000 homes in the West Bank alone have been confiscated or demolished[11]; (b) thousands of aggressive violence-prone settlers armed with sophisticated military hardware, including sniper scopes; (c) daily violent attacks on Palestinian homeowners and farmers; (d) devastation of the Palestinian agricultural sector; and (e) the forcible expulsion of 400,000-500,000 Palestinians since 1967.[12] As this Court knows, ethnic cleansing is a war crime, not dependent on the number of civilians murdered or forcibly expelled from their homes. Ethnic cleansing violates American and Israel's public policy, Israel's own Declaration, its Basic Law: Human Dignity and Liberty ("BLHDL")[13], and Customary International Law (*see* attachment A).

19. This criminal activity has been subsidized for at least 40 years by the U.S. taxpayer due to Treasury's failure to monitor and prevent the pro-settlement 501(c)(3) entities from engaging in the criminal activities detailed herein. Their donors write off on their tax returns: (a) the purchase of military hardware, night-vision goggles, sniper scopes, and guard dogs; (b) funds expended to set up "sniper" schools; (c) contributions to the Israeli army (the Israel Defense Force or "IDF"). It received in a single month (December 2014) $60 million from the 501(c)(3)

---

[11] This would be equivalent of annexing or demolishing all the homes in Berkeley, California. See http://icahd.org/ (accessed November 9, 2015) putting the specific number at 48,488 as of 11.9.2015. It is very difficult to ascertain the precise number of homes which have been confiscated, damaged and destroyed over the past 30 years. The Israeli government is not keen on letting the world know what that number is, and in the case of the significant Bedouin population, their villages are not even recognized by the Israeli government. Hence, no statistics are available regarding home demolitions or confiscations. If Gaza is included in the figure, during the latest 2014 incursion alone, over 100,000 homes were destroyed or seriously damaged. Whether the number is 49,000 or 100,000 homes, it is wanton property destruction, a criminal activity prohibited by America's 1863 Lieber Code and the Israeli Army's War Manual.

[12] *See* Haaretz October 20, 2014, Israelis Excel at Camouflaging the Expulsion of Palestinians, http://www.haaretz.com/israel-news/.premium-1.621596, accessed December 15, 2015 (discussing various expulsions of Palestinians from the West Bank and EJ.

[13] As confirmed in *Corrie v. State of Israel*, as of Feb 2015, BLHDL was still in force in Israel and the OPT.

entity known as Friends of the IDF ("FIDF");[14] and (d) frequent trips to the OPT to inspect settlement construction activity that their contributions have made possible, and see first-hand how much the settlements they adopted have expanded by virtue of their financial assistance. FIDF donors take substantial tax write-offs every April 15th for subsidizing the criminal activities engaged in by the Israeli army, and so do the donors to 140 other pro-settlement tax-exempt entities. Thus, for 40 years at least, the U.S. taxpayer has been funding and/or subsidizing criminal activity overseas, i.e., murder, arson, malicious property destruction, assault and battery, and ethnic cleansing.

20. As a result, and based on satellite imaging technology, the OPT has experienced explosive settlement growth, i.e., 750,000 settlers now live there.[15] Former Prime Minister Shamir explained why—during peace talks, he continued to secure more Palestinian property.[16] According to Mr. Henry Seigman, former U.S. Jewish Congress CEO—"The Middle East peace process may be the most spectacular deception in modern diplomatic history…[it] served primarily to provide a cover for the systematic confiscation of Palestinian land."[17] This strategy (talk but acquire more Palestinian property at the same time) has proven to be very effective— 56,000[18] new homes and apartments now dot the West Bank landscape, which are occupied by "Jewish-only" settlers. Most of the Palestinian homeowners who have been expelled from the OPT are now refugees living in substandard quarters and surviving on $2 per day provided by

---

[14] See http://www.hollywoodreporter.com/news/haim-saban-helps-raise-31m-837947 and http://www.hollywoodreporter.com/news/haim-saban-raises-34m-support-747379, accessed Nov 19, 2015.

[15] Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010 and http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97, http://www.un.org/press/en/2015/gapal1345.doc.htm (citing the 750,000 figure for settlers in the West Bank and EJ).

[16] International New York Times June 26, 1992 Shamir is said to admit plan to stall talks for ten years. See also "Palestine Inside Out: An Everyday Occupation," Saree Makdisi, 2008 (hereinafter "Palestine Inside Out") Kindle location 1630, and http://articles.sun-sentinel.com/1990-01-18/news/9001190791_1_west-bank-shamir-greater-israel accessed December 4, 2015.

[17] Palestine Inside Out Kindle location 1631.

[18] As of 2009. See Haaretz http://www.haaretz.com/settlements-have-cost-israel-17-billion-study-finds-1.265190.

UN relief agencies. This is only one tragic result of many created by the financial assistance provided by pro-settlement tax-exempt entities as well as Treasury's failure to monitor and prevent the criminal activities engaged in by these entities.

21. In 1978, Housing Minister Sharon, one of the founders of the settlement movement,[19] encouraged five Jewish families to seize hilltops in Palestinian territory now known as Ariel.[20] Ariel now has 25,000 permanent residents[21] because of the massive financial assistance received from its U.S.-based 501(c)(3) entity American Friends of Ariel. But since it was built outside of "Israel proper,"[22] it has a lot of detractors. Israeli Journalist Gideon Levy—"[it] should never have been founded in the first place…it is a blatant violation of GCIV."[23] According to Zahara Gal-on, Israel's Meretz political party spokesperson, Ariel was established on "stolen land."[24] When the government accredited Ariel's university, 165 leading Israeli academics condemned that act, vowing they would not teach there because it was not located in Israel proper.[25] The extent of trespass activity which the original Ariel settlers engaged in, and the settlement leaders' ability to secure illicit building permits from local municipal agencies, has been thoroughly documented in Israeli Comptroller Goldberg's 2003 report, Israeli Special Prosecutor Sasson's 2005 report on illegal settlements, and the government's own comprehensive private databank on settlement activity published in 2009. See paras 23-24 infra.

---

[19] The Settlement Obsession: Both Israel and the United States Miss the Obstacles to Peace" Elliott Abrams, August 2011, p. 148.

[20] http://www.friendsofariel.org/about/about-ariel/, accessed December 15, 2015.

[21] http://mondoweiss.net/2012/07/settler-college-granted-israeli-university-status, accessed December 4, 2015

[22] i.e., Israel's 1948 borders.

[23] Haaretz May 8, 2005 "What Can Israeli Arabs Learn at Ariel?". Mr. Levy was referring to article 49(6) of GCIV, which bars an occupier from sending in or encouraging its own citizens to live in the occupied territory it administers. State Department legal advisor Harold Hansell took the same position in 1978 when asked by the House International Affairs Committee to render an opinion on the applicability of 49(6) to the settlements.

[24] http://mondoweiss.net/2012/07/settler-college-granted-israeli-university-status, accessed December 4, 2015.

[25] *See* Spain Bans Ariel University from International Contest, Jerusalem Post September 22, 2009, http://www.standwithus.com/news/article.asp?id=1179, accessed December 4, 2015.

22. Seizing hilltops owned by Palestinians occurred as well in Ma'ale Adumim in EJ in the 1970s.[26] Planning architect Thomas Leitersdorf's goal was to "capture as much area as possible by placing a few people on numerous hills."[27] He said "the further inside we place settlers, the more land Israel would have when time came to set international borders."[28] That is why then-housing minister Sharon urged his fellow citizens to seize as many hilltops as possible,[29] not concerned that it was private property. Mr. Benvenisti, former deputy mayor of Jerusalem, admitted that the city's 1967 borders were specifically designed to result in "a maximum amount of vacant space and a minimum of Arabs."[30]

23. This strategy has been immensely successful—a substantial and growing "Jewish-only" enclave is now a permanent part of Jerusalem proper, which has been funded by Messrs. Moskowitz and Hagee. They feared that if they did not fund this effort by making significant financial contributions to their U.S. financial pass-throughs, Jerusalem would be "lost," meaning that they could fail to fully colonize this ancient pluralistic city, fabled to three monotheistic faiths, as an exclusively Jewish city. Of course, nothing prevents these donors from making direct contributions to institutions located in East Jerusalem to assist "Jewish-only" citizens. The reason they do not do so, and instead make contributions to friendly 501(c)(3)s, is that they do not secure any tax deductions in making direct donations.

24. In 1982, settlers seized more private Palestinian property now known as Nokdim by setting up a tent encampment of six families[31]. In 2006, Peace Now, an Israeli NGO, claimed and has proof

---

[26] Palestine Inside Out Kindle location 2082
[27] Palestine Inside Out Kindle location 2071.
[28] Palestine Inside Out p. 120.
[29] Ariel Sharon, Israeli Foreign Minister, addressing a meeting of the Tsomet Party, Agence France Presse, Nov. 15, 1998. *See also* "Witness in Palestine: A Jewish American Woman in the Occupied Territories," Anna Baltzer, 2007 (hereinafter "Witness in Palestine") p. 385.
[30] Saree, Makdisi, Palestine Inside Out at 119.
[31] http://peacenow.org.il/eng/sites/default/files/Breaking_The_Law_formal%20data_March07Eng.pdf#page=11, accessed December 2, 2015.

in terms of land registration records that at least 30% of Nokdim is owned by Palestinians.[32] It could be much more, based on Comptroller Goldberg's 2003 report on illegal settlement activity, especially the prevalence of the procurement of illicit building permits by settlement officials. Recently, much to the dismay of Nokdim's governing council, the High Court of Justice ("HCJ")[33] decided to revisit the issue of proper land ownership in Nokdim, amid general allegations that "under-the-table" financing,[34] forged deeds, false affidavits given to area IDF military commanders to justify the seizure of more private property for security reasons, and illicit construction permits were responsible for the explosive growth in settlements.[35] Forged deeds and false affidavits, prepared by settlement officials and designed to justify the further illegal confiscation of more Palestinian property did not concern the U.S. tax-exempt entities and their donors in the least. They have adopted a "by hook or by crook" approach in terms of expanding settlements.

25. That judicial decision came after an embarrassing disclosure made by the government in 2009. The government had maintained its own private comprehensive database on settlement expansion,[36] which detailed the complicity of government officials and private sector companies in widespread illegal construction in West Bank settlements. That database revealed that private construction companies, hired by the settlements and funded by U.S. tax-exempt entities, were

---

[32] Id.

[33] The Supreme Court of Israel is known as the "High Court of Justice" when it convenes on matters of first instance and matters related to the OPT. For the purposes of this lawsuit, the terms "Supreme Court of Israel" and "High Court of Justice (and its abbreviation 'HCJ')" are interchangeable.

[34] http://www.reuters.com/article/us-palestinian-israel-settlements-idUSKBN0EZ0JA20140624, accessed December 4, 2015. ("Money meant to build settlement construction is given 'under the table' with no transparency or oversight."—Former Justice Minister Tzipi Livni)

[35] *See* "The General's Son: Journey of an Israeli in Palestine," Miko Peled, 2010 (hereinafter "General's Son") p. 142; and "Summary of Opinion Concerning Unauthorized Outposts," Prime Minister's Communications Department, Talia Sasson ("Sasson Report"), available at http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf ("the claim that the political approval for establishing outposts was false").

[36] English excerpts available at http://www.yesh-din.org/sys/images/File/SpiegelDatabaseEng.pdf, accessed December 15, 2015.

building numerous housing developments in the West Bank. However, they were widely ignoring the municipality's building code and Israeli law by seizing private property owned either by Palestinians or by the state.[37] This comprehensive 2009 database corroborated the findings made by Israeli Special Prosecutor Talia Sasson four years earlier, i.e., that individuals (settlers) and private construction companies hired by the settlements and funded by U.S. tax-exempt entities had been stealing private property.[38] U.S. tax-exempt entity officials had to know that this was the case, because their number-one priority was settlement expansion. However, there was very little, if any, private property available to confiscate in or near the settlements not owned by Palestinians.[39] Hence, Palestinian homeowners living near the settlements had to be expelled, and if necessary, force would be used to accomplish that.

26. These illegal seizures were not inadvertent or accidental intrusions on private property. They were planned, intentional, and aggressive trespasses encouraged and funded by U.S. donors and tax-exempt entities intent on expanding OPT settlements.[40] Settlement leaders, the donors, and tax-exempt entity officials knew that they could count on the settler population to confiscate more private property, because they were motivated by a "God gave me your property" attitude. One example thereof is the verbally abusive statements made by settlers to British cameramen who were filming a candid day in the life of a typical Palestinian family in Hebron. The BBC film crew was astonished by the display of the ideological fanaticism underlying the settlers' claim to Palestinian property: "we killed Jesus, and we are proud of it. This is our land, you get the fuck

---

[37] Id.

[38] Id.

[39] Sasson Report.

[40] Former Prime Minister Sharon's intentions went much beyond encouraging the expansion of Ariel, as confirmed by his warning to his fellow citizens—"Everybody has to move, run and grab as many (Palestinian) hilltops as they can to enlarge the (Jewish) settlements because everything we take now will stay ours...Everything we don't grab will go to them [Palestinians]." -- Ariel Sharon, Israeli Foreign Minister, addressing a meeting of the Tsomet Party, Agence France Presse, Nov. 15, 1998. See also Witness in Palestine p. 385. This is an admission from Sharon that the settlers were confiscating private property that did not belong to them, i.e., hilltops owned either by the state or by Palestinians.

out of here." The British cameraman shouted back "this is not your land, it belongs to these families here with me." The irate armed settlers in turn responded "we are going to kill you and the Palestinians, you Nazi, you son of a shit, this is my house, this is my land, God gave it to me."[41]

27. The same abusive and venomous verbal attack occurred when David Shulman, a resident of Taayush near the south Hebron hills, brought blankets to Palestinian herders because temperatures in that area dropped significantly at night. Armed settlers who observed him were furious at him, screaming "What kind of Jew are you?" He said "I am a Jew, that is why I am here." He described what Palestinians face every day, i.e., "the settlers displayed pure, rarified, unadulterated, unreasoning, uncontainable human evil.[42] Their goal was to uproot a few thousand cave-dwellers with their babies and their lambs who have never hurt anybody and never posed a security threat. *They led peaceful impoverished lives until the settlers came, and since then there has been no peace.*" This is a common Palestinian complaint which has largely been ignored by the U.S. press, whose focus is only on "Palestinian violence."

28. Mr. Shulman is not the only individual who personally experienced the violent conduct that the settlers are capable of in Kiryat Arba. Ms. Hellala Siew is an Israeli Jew and youth worker who assists Palestinians in their olive harvests. In 2010, she was in a group in the South Hebron Hills confronted by settlers who fired shots from a pistol and an M16 assault rifle, despite the presence of the army and local police. She recalls that it was very hot that day, and one of the soldiers stated: "Look, one of [the settlers] is coming down with a jug of water for you." The settler emptied the jug over her. It was full of human excrement.[43]

---

[41] Palestine Inside Out 138
[42] Palestine Inside Out Kindle location 2326.
[43] http://www.independent.co.uk/news/world/middle-east/jews-protect-palestinians-in-harvest-of-hate-956706.html, accessed December 4, 2015.

29. The extraordinary ongoing financial assistance provided by U.S. tax-exempt entities and their donors has now mushroomed into a significant problem—*total contributions to Israeli NGOs in 2007 were $1.729 billion.*[44] Because applicable tax-exempt entity Treasury regulations were amended in 2008, no one, including the IRS, can actually determine the precise amount of funding going to the settlements.[45] However, since FIDF, one pro-settlement tax-exempt entity out of 140, contributed $104 million to the Israeli army in 2014, $1 billion is not an unreasonable number given the vast number of active friendly pro-settlement tax-exempt entities.

30. This funding has had devastating consequences for the Palestinian population. 190 villages out of 250 villages in northern Palestine have been emptied—and more will definitely follow.[46] Homeowners were forcibly evicted by armed settlers with help from IDF/G4S[47] personnel. The result—220,000 Palestinians became refugees.[48] Forced expulsion and ethnic cleansing also occurred in Kirbet Yerza on a major scale. For one hundred years before the settlers arrived, that village had hundreds of inhabitants. Now there are only 20 families left.[49] The remaining inhabitants have all been served with a demolition order citing bogus "security" reasons based on false affidavits signed by settlement officials desirous of confiscating more Palestinian property. Forced expulsion of these families is: (a) the direct result of Treasury's "hands-off" approach when it comes to monitoring pro-settlement tax-exempt entities; and (b) the

---

[44] "The New Philanthropy: American Jewish Giving to Israeli Organizations", Eric Fleisch, Theodore Sasson, April 2012 p. 9.

[45] *See* IRS 990 Form Schedule F line 3, "activities per region" and instructions (i.e., transactions on overseas activities are aggregated by region, not by country), available at https://www.irs.gov/pub/irs-pdf/i990sf.pdf.

[46] Palestine Inside Out p. 257

[47] Although not named as Defendants, this complaint references several corporations that have assisted the tax-exempt entities and settlements in their money-laundering and tax-evasion scheme. These include, *inter alia*, the security conglomerate G4S PLC and its Israeli subsidiary ("G4S"), Bank Leumi Le-Israel and its American branches ("Bank Leumi"), Hewlett-Packard Company and its Israeli subsidiary ("Hewlett-Packard"), Motorola Solutions, Inc. and its Israeli subsidiary ("Motorola"), RE/MAX Holdings Inc. and its Israeli subsidiary ("RE/MAX"), Africa Israel Investments ("AFI"), and Veolia Environnement S.A. and its Israeli subsidiary, Yrav Sherutei Noy 1985 ("Veolia").

[48] Id. Kindle location 4223.

[49] Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010 and http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97.

extraordinary funding provided by U.S. donors/entities who are intent on the expulsion of the entire Palestinian population of the OPT, an obvious war crime (See Nuremberg Principle VI) and a violation of Israel's own Declaration and its 1992 BLHDL statute.

31. The presence of 750,000 settlers in OPT/EJ and the disappearance of some 400,000-500,000 native Palestinians,[50] is proof that the U.S. tax-exempt entities referenced herein have achieved their donors' objectives—wholesale ethnic cleansing of the Palestinian population and explosive settlement growth to accommodate the needs of the ever-growing settler population. These new settlers are encouraged by the fact that not a single member of Congress or the Knesset has tried to block settlement expansion through available legislative initiatives and sanctions. That is another reason why this Court should seriously entertain entering an order requiring Treasury to investigate all pro-settlement tax-exempt entities and their donors.

32. Kirbet Yerza is not an isolated case, unfortunately. Today, according to official government data, over 11,000 demolition orders affecting some 13,000 structures, including homes, are currently outstanding in Area C of the West Bank.[51] These orders obviously heighten neighborhood tension—thousands of poor Palestinian households are at imminent risk of forcible displacement and have no alternative housing. As a result, at least 50,000 Palestinians joined the already-swollen ranks of homeless refugees.[52] The sister U.S. 501(c)(3) entity that funded this activity violated Treasury regulations in two ways.

---

[50] *See* Haaretz Oct 20 2014, Israelis Excel at Camouflaging the Expulsion of Palestinians; Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010 and http://www.breakingisraelnews.com/26966/jewish-population-in-judea-and-samaria-growing-significantly/#QQTmB6sWCUH3hkU2.97, http://www.un.org/press/en/2015/gapal1345.doc.htm.

[51] http://www.un.org/apps/news/story.asp?NewsID=51826#.VmH2d3arTIU, accessed December 4, 2015. The West Bank is divided by the Oslo Accords into three areas, viz. A, B, and C. Area A is under full civil and security control of the Palestinian Authority. Area B has Palestinian civil control and joint Israeli-Palestinian security control. Area C, which makes up 63% of the land in the West Bank, is under full Israeli civil and security control. https://web.archive.org/web/20021115180646/http://knesset.gov.il/process/docs/heskemb_eng.htm, accessed January 4, 2016.

[52] Palestine Inside Out Kindle location 3836.

33. First, U.S. 501(c)(3)s are expected to lessen the financial burden of a municipal agency coping with a serious homeless population—reduce the homeless population, not increase it.[53] Second, forcible expulsion of a local civilian population, whether that activity is labeled "accelerated displacement" or ethnic cleansing and genocide, is deplorable criminal activity which 501(c)(3)s are not permitted to fund. Moreover, 501(c)(3)s are supposed to lessen neighborhood tension, not increase it. Forcible expulsion of a local civilian population necessarily heightens neighborhood tension, because it makes area homeowners fearful that they will be next.

34. Violent demolition of homes has similarly occurred in the Negev village of Al Araqib where 604 structures and 36 water cisterns were destroyed.[54] The local population had their homes condemned by the Israel Land Administration (ILA).[55] ILA personnel violently demolished tents (with residents inside, on occasion) and structures in Al Araqib at least 13 times in 2012 alone[56] because they were sitting on valuable real estate, on which the U.S. tax-exempt entities wanted to finance the construction of new "Jewish-only" housing projects, shopping malls, and hotels. New state-of-the-art homes for more settlers have already been planned and approved there. U.S. tax-exempt entities, of course, will provide a substantial portion of the funding necessary to build those housing projects. That is the reason why Ariel (and all the other settlements in the OPT) has morphed into a first-class urban corridor with amenities like concert halls, health clubs, theaters, a major university, and a state-of-the-art medical center. Ariel residents would not be able to enjoy those amenities but for the extraordinary financial assistance provided by the 501(c)(3) entity American Friends of Ariel.

---

[53] If the U.S. sister tax-exempt entity which funded that activity engaged in similar conduct here (i.e., threatening inner-city apartment dwellers with bogus eviction orders) it would be quickly stripped of its tax-exempt status by municipal or state tax and housing authorities. This is only one of numerous U.S. policies that Secretary of State Baker stated 30 years ago would not be subsidized by the U.S. tax code.
[54] http://www.amnestyusa.org/research/reports/annual-report-israel-and-the-occupied-palestinian-territories-2013?page=2, accessed December 4, 2015.
[55] Id.
[56] Id.

## VI.   UNITED STATES PUBLIC POLICY REGARDING SETTLEMENT EXPANSION ACTIVITY AND THEFT OF PRIVATE PROPERTY

35. Since 1968, numerous U.S. presidents and Department of State spokespersons have been very

   clear in pronouncing the official U.S. policy on Israel's 50-year military occupation, its duties as

   an occupier, and the daily violence brought on by the spectacular growth of settlements.

   (a) In 1969, almost 50 years ago, Charles Yost, U.S. Permanent Representative to the UN

   under the Nixon administration stated that: "An occupier [referring to Israel] may not

   confiscate or destroy private property," and "an occupier [like Israel] must maintain the

   occupied territory as intact without interference with the customary life of the area."[57]

   The intentional, inhumane, systematic, and reckless destruction of homes, hospitals, and

   schools funded by U.S. tax-exempt entities and donors has completely destroyed the

   "customary life" that all Palestinians enjoyed before Israel's 48-year occupation started.

   (b) In 1980 Cyrus Vance, U.S. Secretary of State, stated: "United States Policy regarding

   settlements is unequivocal and has been a matter of longstanding record…settlements

   are illegal, and Article 49 paragraph 6 of the Geneva Convention is applicable," i.e., "all

   occupiers [like Israel] are bound to preserve private properties for the rightful owners"[58]

   and ensure that their customary life can go on as usual. 25 years later, Israeli Prosecutor

   Sasson echoed that identical sentiment and recommended that: (1) criminal charges be

   filed against government officials for financing illegal settlements and outposts and

   issuing illicit construction permits; and (2) illegal settlements had to be evacuated, since

---

[57] U.S. Policy on the Illegality of Israeli Settlements under International Law, (excerpted from Ambassador Daniel Kurtzer, "Do Settlements Matter? An American Perspective," Middle East Policy, vol. 16, issue 3, fall 2009), J Street. Available at https://s3.amazonaws.com/s3.jstreet.org/images/One_Pager__Illegality_of_Settlements_under_Intl_Law.pdf, accessed December 8, 2015.
[58] http://www.cmep.org/content/us-statements-israeli-settlements_short, accessed December 8, 2015.

they were built on private property owned either by the state or by Palestinians.[59]
Secretary of State Vance had tasked U.S. State Department attorney Herbert J. Hansell
to research the issue of the legality of the settlements. Attorney Hansell, much like
Special Prosecutor Sasson and hundreds of other international legal scholars, concluded
that they violated the terms of the Geneva Convention and contravened clearly-
articulated American public policy.

(c)   In 1989 Thomas Pickering, Permanent U.S. Ambassador to the UN, stated that "Since
the end of the 1967 war, the United States has regarded Israel as the occupying power in
the Occupied Territories, which includes the West Bank, Gaza, EJ, and the Golan
Heights[60]…Israel's occupation is governed by the Hague Convention of 1949 and the
Hague Regulations of 1907."[61]

(d)   24 years ago, in 1991, Secretary of State Baker testified on the Hill and condemned the
settlements and declared that such activity was a violation of U.S. policy. After hearing
his candid assessment of the matter, Congressman Obey, chairman of the Subcommittee
on Foreign Relations Affairs, agreed strongly that "this [settlement] activity is in violation
of U.S. policy." Thus, settlements violate U.S. policy whether they are technically legal or
not. Therefore, even if settlement advocates like Elliott Abrams or their financiers claim
that settlement expansion is legal, that is an irrelevant consideration given the wholesale
violence it promotes: ethnic cleansing, murder, arson, and malicious property
destruction.

(e)   In 1995, Treasury and U.S. President Bill Clinton, in Executive Order 12947, condemned
individuals and entities who finance acts of violence in the Middle East. That executive

---

[59] Sasson Report, available at
http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf.
[60] http://www.cmep.org/content/us-statements-israeli-settlements_short.
[61] Id.

order, much like Plaintiff Several has claimed herein, cited the need to protect national
security, foreign policy, and the U.S. economy. Section 1(c) of Executive Order 12947
forbids any person from engaging in a transaction within the U.S. that either evades,
avoids, or attempts to violate a provision set forth in the Order. Provision 1(b) prohibits
providing financial support for violent acts occurring in the Middle East. Because U.S.
tax-exempt entities and donors have, *inter alia*, intentionally financed the purchase of
sophisticated military hardware which would necessitate the promotion of further
violence in the OPT, and because other 501(c)(3)s (FIDF) have directly funded the
Israeli army's criminal activity[62], they have all encouraged and funded numerous acts of
violence in the Middle East. Thus they have engaged in conduct that directly contravenes
this Executive Order, and they therefore can be designated by Treasury as specially
designated global terrorists. As a result of that designation, their bank accounts can be
frozen and the tax-exempt entities can be stripped of their tax-exempt status, which is
the precise relief that the Plaintiffs have requested herein. Unfortunately, that will never
happen without judicial involvement, which the Plaintiffs have requested as part of the
relief they seek.

(f)  In 2001 the "Mitchell Report," officially the Sharm el-Sheikh Fact-Finding Committee
Report (an international fact-finding committee led by former U.S. Senator George
Mitchell) stated that "The U.S. government [has a] longstanding opposition to Israel's
policies (displacement of the local Palestinian population) and procedures (IDF
confiscation and demolition of homes) regarding settlements in the Occupied
Territories." There are other numerous pronouncements which have similarly

---

[62] A recent example of that criminal activity is the murder of Uday Irshaid by IDF forces in Hebron on December 11, 2015. The 24-year-old Palestinian was shot and killed just six weeks after these same soldiers killed his sister Dania, 17 years old. Amnesty international has stated that the killing appeared to be a "summary execution." *See* http://www.maannews.com/Content.aspx?id=769295, accessed December 14, 2015.

condemned settlement expansion, wholesale violence, and the expulsion of the local Palestinian population.[63] These pronouncements were made by U.S. presidents (Ford, Nixon, Kennedy, Bush I, Bush II, Clinton, and Obama), Senator Fulbright, State Department spokespersons like Richard Boucher, and Secretaries of State (Colin Powell, Condoleezza Rice, Hillary Clinton) and by former U.S. Ambassador to the UN Susan Rice.

36. To ensure that Israel's housing ministry would comply with America's longstanding and emphatic anti-settlement public policy, U.S. officials, including former Secretary of State Baker, repeatedly requested and received verbal assurances from a number of Israeli prime ministers that the government would not use "state" property or spend U.S. aid in the OPT settlements.[64] Settlement leaders dismissed these verbal assurances, and continued to use U.S. aid dollars sent to them by U.S. tax-exempt entities such as CFOIC to continue funding the forcible expulsion of the local Palestinian population, and thus settlement expansion. And, courtesy of America's tax code, they continue to receive millions of dollars every month from these Christian Zionist entities to fund settlement expansion, which necessarily entails ethnic cleansing and further confiscation of private Palestinian property.

37. To sum up, for at least forty years, U.S. presidents, their Secretaries of State, and U.S. House of Representatives leadership have all condemned the criminal activity and settlement expansion that the tax-exempt entities referenced herein have knowingly financed. The reason—such

---

[63] For example, "The Israel Lobby and U.S. Foreign Policy," John J. Mearsheimer and Stephen M. Walt, 2007 (hereinafter "Israel Lobby") p. 367. The U.S. also voted in favor of UN resolutions 672 and 681 in 1990 which criticize Israel's deportation of Palestinians.

[64] In 1991, Prime Minister Yitzhak Shamir promised that any funds received by Israel from America would "not be used in any manner to expand existing settlements or create new settlements in the West Bank." See May 23, 1991 NYT Article "Baker See NYT article Tax-Exempt Funds Aiding West Bank Settlements. See also Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self-defense"). *See also* Letter from Rep. Kucinich to Condoleezza Rice, Secretary of State, January 5 2009. (Citing the AECA, stating Israel's most recent attacks neither further internal security nor do they constitute "legitimate" acts of self-defense).

activity violates clearly-defined U.S. public policy and frustrates U.S. foreign policy objectives in the Middle East. As shown herein, Treasury can do a great deal to rein in this criminal activity, and in the process, deter further settlement expansion, if it only enforced its own tax regulations. Enforcement of those tax regulations would certainly be consistent with U.S. public policy as detailed herein. A court order is necessary, however, in light of Treasury's abysmal track record in terms of investigating and, where appropriate, designating U.S. tax-exempt entities which fund rampant criminal activity in the OPT to promote settlement expansion. If these tax-exempt entities are not shut down and their bank accounts frozen, this criminal activity and settlement expansion in the OPT will continue unabated.

VII.    **ISRAELI PUBLIC POLICY CONCERNING INTRUSIONS ON PRIVATE PROPERTY AND SETTLEMENT EXPANSION IN THE OPT**

38. As shown infra, Israel, like America, has consistently articulated a public policy[65] that condemns theft of private property and intentional illegal intrusions, i.e., outposts and settlements. This practice has been condemned by: (a) former Defense Minister Shaul Mofaz; (b) Israeli Special Prosecutor Sasson; (c) the HCJ (with different rotating members) for 40 years; and (d) by former Prime Minister Rabin, who actually banned settlements in 1993 and eliminated tax breaks for settlement donors.

39. In 1991, consistent with his government's clearly-defined public policy and to satisfy concerns expressed by senior U.S. officials like Secretary of State Baker, Prime Minister Yitzhak Shamir promised that any funds received from America would "not be used in any manner to expand

---

[65] See also Haaretz December 16, 2006 "Making the Law a Laughingstock" (stating "the building spree in West Bank settlements [is] in blatant violation of the law and in complete contradiction to official government policy"). *See also* "this seizure of Palestinian property violates not only Israeli law, but also a fundamental principle of democracy—the protection of private property." Steven Erlanger, New York Times March 14, 2007, "West Bank Sites on Private Land, Data Shows". See also Haaretz March 14, 2007 Haaretz editorial "Legitimization of Land Theft".

existing settlements or create new settlements in the West Bank." See May 23, 1991 NYT Article "Baker See NYT article Tax-Exempt Funds Aiding West Bank Settlements. See also Arms Export Control Act of 1976 (AECA), 22 U.S.C. §2754 (aid must be solely for "internal security" and "legitimate self-defense"). See also Letter from Rep. Kucinich to Condoleezza Rice, Secretary of State, January 5 2009. Citing the AECA, stating that the armed settlers' most recent attacks on Palestinian citizens neither further internal security nor do they constitute "legitimate" acts of self-defense.

40. Shaul Mofaz, Israeli Defense Minister at the time the 2005 Israeli Prosecutor Sasson report was written, succinctly identified what the problem was with settlement expansion—"the real problem on this matter [settlement growth] is not the allocation by the State of private land for settlement, *but the unauthorized seizure by private elements of private and state land that is not theirs*. This [illegal] phenomenon must be combated." The private elements he was making reference to were violent armed settlers and construction companies hired by the settlements who wanted to build homes and apartment buildings on private Palestinian property which had been confiscated by the settlers.

41. He observed that these "private elements," going back to 1990, had been illegally and repeatedly trespassing upon and building residential and infrastructure improvements on private Palestinian property. Thus, ten years ago, based on Defense Minister Mofaz' conclusion, the tax-exempt entities referenced herein, their donors, and the construction companies hired by the settlements had been specifically identified as the "private elements" who had created the "real problem" concerning the explosive growth of illegal settlements, i.e., illegal and ongoing seizure of private property owned either by the state or by Palestinians.

42. According to Israeli Prosecutor Sasson, the government has consistently adhered to a similar anti-settlement public policy, e.g., the establishment of a new settlement built on "state"

property, either in the 1948 borders or in the OPT, requires an official government resolution sanctioning said establishment. The authoritative political echelon is the only body qualified to make such a resolution, and the only body that bears responsibility for such a decision.[66] Approval must be given for every stage of the settlement's planning, including (a) undisputed title in the land to be settled; (b) a building scheme, architectural plans, and legitimate building permits; and (c) precise delineation of the bounds of jurisdiction of the settlement.

43. If any one of the above elements is not approved, her conclusion was that the settlement as a whole had to be considered unauthorized and wholly illegal. There is no such thing as a semi-authorized outpost—"an unauthorized outpost is a settlement which does not fulfill at least one of the above mentioned conditions, and *I must emphasize that an unauthorized outpost is not a semi-legal outpost. Unauthorized means illegal.*" The HCJ shared that sentiment in 1979 when it decided the case of Elon Moreh.[67] Based on that case, the government issued a formal resolution stating that OPT settlements in the future had to secure all necessary approvals (see above) and be established only on State land.[68] Based on Comptroller Goldberg's 2003 report, the 2005 Sasson report, and the government's 2009 databank on settlement activity, it is obvious that U.S. tax-exempt entities and their donors have been violating that government resolution for at least 20 years by funding the illegal confiscation of private property and by urging settlement leaders to continue building housing developments and shopping malls on private Palestinian property.

44. The pre-construction conditions cited by Prosecutor Sasson are only one of many land-title ownership issues that the settlements, which have been adopted by U.S. tax-exempt entities and

---

[66] Sasson Report p. 4.
[67] http://www.archives.gov.il/ArchiveGov_Eng/Publications/ElectronicPirsum/ElonMoreh/, accessed December 14, 2015.
[68] Discovery herein will conclusively establish that the majority of the donors, tax-exempt entities, and recipient settlements referenced herein repeatedly violated this resolution by expanding settlements not on state property, but on private Palestinian property. Discovery will also show that they never secured the necessary approvals which Special Prosecutor Sasson focused on in her 2005 report.

donors, now have to confront. Each settlement must, before construction starts, not only prove

that they secured all of the above-referenced municipal-agency approvals, they also have to

prove that the settlements were built on "state property" rather than private Palestinian

property. That is a tall order, because the bulk of the land in or near the settlements was, and still

is, owned by Palestinian farmers. Furthermore, former Israeli Attorney General Yitzhak Zamir

stated that it was impossible under Jordanian law (the applicable law in the OPT) to expropriate

land for the settlements.[69] Likewise, Eyal Zamir, then assistant to the legal advisor for Judea and

Samaria[70], had concluded 35 years ago that it is not possible to purchase land for a public

purpose in order to covertly establish residential communities in the area.[71] In other words, IDF

military commanders in charge of OPT affairs, after receiving requests from settlement officials

to issue additional orders of property confiscation, could no longer use their standard security

rationale to justify that seizure and further settlement expansion. That rationale, of course, was

the need to protect "Jewish-only" settlers.[72] An example of how the security rationale is abused

occurred in the settlement known as Kiryat Arba. Settlement leaders, citing "security concerns,"

had requested an order from the area military commander justifying the confiscation of

hundreds of acres of private Palestinian property. However, instead of building a security barrier

to protect the concerned settlers, they built a parking lot for "Jewish-only" car owners.[73]

45. The 1979 Elon Moreh opinion posed another problem for the settlements, because the judges

    made it clear that the beneficiaries of those seizure orders had to pay rent to the rightful owners

---

[69] Gideon Alon, "Prof. Zamir in Opinion He will Submit to the Cabinet Today: It is Not Permissible to Act under Jordanian Law to Expropriate Land in Judea and Samaria," Ha'aretz, 11 May 1980. *See also* "The Ofra Settlement, An Unauthorized Outpost," B'tselem, https://www.btselem.org/download/200812_ofra_eng.pdf.
[70] A.k.a. the OPT.
[71] Eyal Zamir, "State Lands in Judea and Samaria: Legal Survey" (Jerusalem Institute for Israel Studies, 1985), 22 [in Hebrew]. See also https://www.btselem.org/download/200812_ofra_eng.pdf.
[72] Given the fact that the separation wall had been built and thousands of concrete military barriers are located all over the OPT, as well as the settlers' ability to use sophisticated tracking and surveillance devices, the security rationale offered was merely a pretext to steal more Palestinian property.
[73] Palestine Inside Out Kindle location 2371.

of that property while they occupied it. This means that every Palestinian property owner whose property was seized for "security" purposes (legitimate or otherwise) during the last 40 years is owed back rent since the date of the first seizure by the parties who currently occupy and make use of the property. Thus, all of the settlements, Ariel University, hotel owners, shopping mall owners, concert hall or theater owners, and the owners of the Tovlan solid waste facility, etc. are all on the hook for billions of dollars in back rent and accumulated interest.

46. Further reaffirming that 1979 ruling, construction of illegal settlements in the OPT was frozen by the Rabin administration in 1993. That government ban did not deter U.S. donors/entities from transmitting funds overseas to various settlements to arm aggressive settlers with sophisticated military hardware and finance the confiscation and demolition of more Palestinian homes. Nor did it deter the construction companies hired by the settlements with funding coming from the U.S. tax-exempt entities to continue building apartment complexes, shopping malls, and other permanent structures on private Palestinian property.

47. The government not only banned settlement activity of any nature in 1993, it also took affirmative steps (no tax write-offs for settlements, no interest-free loans, no free land) to send a clear message to all of its inhabitants and business entity personnel that it no longer supported settlement expansion. Thus, 22 years ago, the tax-exempt entities and donors referenced herein had to know that funding, encouraging, or engaging in settlement expansion violated Israel's criminal statutes, its Declaration, and its 1992 BLHDL statute. That Basic Law protects all "persons," not only Jewish citizens, by affording them significant civil liberties consistent with the ideals adopted by the founding fathers in their 1948 Declaration.

48. Based on: (a) Prime Minister Shamir's 1991 pledge to not use American financial aid to expand existing settlements or build new ones; (b) Prime Minister Rabin's 1993 ban on settlements; (c) the 1995 Interim Peace Agreement; (d) Comptroller Goldberg's 2003 report; (e) Israel's

amended tax regulations; (f) pronouncements made by government officials like Defense
Minister Shaul Mofaz; (g) the 2005 Sasson Report; and (h) the Israeli government's 2009
database on settlement expansion, U.S. tax-exempt entities, the construction companies they
were using to build new housing projects, and their donors knew that encouraging, funding, or
physically annexing private Palestinian property explicitly contravened Israel's well-defined
public policy. And they knew that by engaging in such conduct, they were violating international
convention principles, (Hague and Geneva) Israeli criminal statutes, its Declaration, and its
BLHDL statute. Because of Treasury's concern over control of funds sent overseas, all U.S. tax-
exempt entity officials are presumed to know the law of the host country which is the recipient
of their financial largesse. In order to comply with a number of Treasury regulations, these
officials had to know the laws of the country where their entity operated or where its sister
NGOs were located, i.e., Israel.

49. Although settlement leaders and their supporters like the 501(c)(3) American Friends of Ariel
claim that by continuing to fund settlement expansion they are not violating either GCIV or
Hague convention principles, in 1967 Attorney Theodore Meren, then-legal counsel to the
Foreign Ministry, stated unequivocally that "*my conclusion is that the civilian settlements in the
administered territories contravene the explicit provisions of GCIV*." While that legal opinion was
rendered almost 50 years ago, State Department attorney Herbert Hansell reached the same
conclusion 20 years later. The HCJ in 1979 also made it clear that the Hague Convention
principles similarly apply to West Bank settlements. Therefore, area military commanders in
charge of OPT affairs had to conduct all Israeli army operations, including dealing with requests
from settlement leaders to confiscate more private property, consistent with Hague and Geneva
principles. Those principles, *inter alia*, made it clear that area commanders were supposed to act
as trustees and protect all private property in the area.

50. Israeli Prosecutor Sasson, after reviewing ten years of settlement activity, issued a scathing landmark 2005 analysis of settlement activities. She made a number of significant findings, which were ignored by U.S. tax-exempt entities and their donors and settlement officials in the OPT. Her findings, however, were corroborated just four years later when a 2009 official government database came to light. Her major findings were:

(a) "Every Israeli Supreme Court (with different rotating members) has declared for over four decades that Israel's occupation violates international law."

(b) "The outposts run contrary to international law and established rules in Israeli law."[74]

(c) "GCIV, Article 49, explicitly prohibits the transfer of parts of the population from the occupying power to the occupied territory."[75]

(d) Consistent with Israel's Declaration, its BLHDL, and GCIV/Hague principles, "The occupying power bears an obligation to protect the population of civilians...living in the OPT."

(e) "An outpost constructed on private Palestinian land cannot be approved under any circumstances, even retroactively. *Its only fate can be evacuation.*"

(f) "Establishment of outposts on private land may…constitute a criminal offense liable to lead to criminal prosecution." Thus, U.S. tax-exempt entities and their donors, settlement leaders, and the construction companies they hired to build housing

---

[74] Apparently, it was Prosecutor Sasson's unstated conclusion that if settlements (vis-à-vis outposts): (a) had complied with all local zoning and building requirements; (b) the state, i.e., the area military commander, had lawfully and officially transferred title to them; and (c) the area military commander had executed and recorded the appropriate deeds after the closing took place, then under those conditions, and only those conditions, those settlements could be considered "legal" intrusions on private property. Based on Comptroller Goldberg's authoritative 2003 report, however, and his focus on the prevalence of the issuance of illicit building permits, it does not appear that there are many "legal" settlements in the OPT.

[75] The legislative history of GCIV 49 makes it clear that paragraph (6) was written into the GCIV because of what the Japanese did in Manchuria and the Nazis did in Eastern Europe in terms of removing the indigenous populations of the territories they occupied and replacing them with their own citizens. This is the fundamental reason why the settlement enterprise has been viewed as illegal by most international scholars. *See* https://www.icrc.org/ihl/COM/380-600056.

developments and shopping malls can all be criminally prosecuted because they have conspired to fund, facilitate, trespass on, demolish, and/or confiscate private Palestinian property, all in the name of settlement expansion.

(g) She addressed and specifically repudiated the settlers' mantra, i.e., "God gave me your property." She stated: "ideological crimes motivated by a political world view or by religious belief undermines the very foundation of the principle of the rule of law, and places democracy in tangible danger…posing a real threat to [our] system of government and its values." Her report also served as a forceful rebuttal to arguments made by U.S. tax-exempt entities, their donors, and their advocates like Elliott Abrams, that settlers have the right to, in effect, reclaim private property which was once considered the Jewish ancestral home even if it is now owned and occupied by Palestinians.[76]

(h) Settlement advocates, of course, never address the fact that to ensure that a particular settlement is "legal," each settlement had to comply with local zoning and building requirements. Those requirements included: (1) showing undisputed title in the land; and (2) a comprehensive building scheme, architectural plans, and legitimate building permits. The plans had to precisely delineate the bounds of jurisdiction of the settlement. According to Prosecutor Sasson, these are all preconditions which cannot be waived by area military commanders in the OPT or friendly municipal officials. They have to be satisfied before the state entertains a settlement leader's request to officially transfer ownership of state property to the settlements. Also, the settlements need to prove that there was a lawful transfer of ownership which has been confirmed by a real estate

---

[76] http://mondoweiss.net/2015/12/elliott-abrams-palestine.

settlement company who did the closing where proper deeds were executed and

notarized and eventually recorded in the local land records agency.[77]

51. As noted in the 2005 Sasson Report, the HCJ has consistently held that GCIV and Hague

Convention principles govern the OPT. For example, in May 2004: "IDF military operations in

Rafah to extent they affect civilians, are governed by the Hague convention."; and (b) in June

2004, HCJ ruling, *Re: The West Bank*, "The point of departure of all parties…is that *Israel holds the*

*area in belligerent occupation* and therefore the military commanded authority is anchored in the

GCIV." Thus, based on the international convention principles cited in that opinion, i.e., the

GCIV, IDF military commanders in charge of local military affairs could not: (a) deport the local

population for any reason; (b) incarcerate Palestinian political prisoners in Israel proper; or (c)

allow Israeli citizens to enter the OPT who are intent on becoming permanent settlers and living

on private Palestinian property. As already noted, Israel's Declaration and its BLHDL statute

specifically prohibit these area commanders from denying or abridging the civil liberties afforded

"persons" or "inhabitants" residing in the OPT, even Palestinians.

52. In 1997, Israel's Office of Civil Administration issued a clarifying legal opinion on the subject of

an occupier's duties and responsibilities: "the Custodian of absentee property in the West Bank

is nothing but a trustee looking after the property, so it is not harmed while the owners are

absent…*he may not make any transaction with respect to the asset* that conflicts with his obligation to

protect." Because settlement leaders received financial assistance to expand the settlements from

U.S. tax-exempt entities like American Friends of Ariel and their donors, they have violated

these trusteeship principles every time they executed an international wire transfer, which

funding ensured continued theft of private property.

---

[77] As recited in General's Son, p. 142, settlers convinced that they legitimately owned the property they were occupying, proudly showed the author the supposed deed showing transfer of ownership in the land to them. However, the mayor of the village from whom the land was taken based upon that deed confirmed that the title transfer never took place, and that the deed had been forged. How common this practice is, no one knows.

53. Moreover, officials of the construction companies that settlement officials hired with funds coming from the U.S. tax-exempt entities have all knowingly engaged in profitable real-estate closings for at least 25 years, which clearly are "transactions" barred by these trusteeship principles. Also, every time settlement leaders requested area military commanders in the OPT to issue additional private property confiscation orders, they were engaging in "transactions" which "conflicted with their obligation to protect [Palestinian assets]." The Israeli Office of Civil Administration used the term "any transaction" for a reason, i.e., to make sure that area military commanders and all other Israeli government agents had no leeway in terms of avoiding their trusteeship obligations.

54. In 1948, the HCJ, in the *Shaimshon* and *Stanpfer* cases, held that the fundamental rules of international law have been accepted as binding by all civilized nations and were incorporated into Israel's domestic legal system. That means that the Hague and GCIV Convention principles, the UDHR[78], and the 50-60 UN resolutions concerning Palestine are all now, and have been since 1948, part and parcel of Israel's domestic legal system. In any case, Israel specifically adopted all of the UN Charter principles in 1948 when it signed on as a member state. Thus tax-exempt entity officials, and their donors and officials of the construction companies they hired have all violated the Charter's basic human rights principles on a daily basis.

55. The UN charter, which Israel adopted when it became a UN member, served as a blueprint for Israel's Declaration. That Declaration states that: (a) "Israel will be faithful to the principles of the UN Charter"; (b)"foster the development of the country for the benefit of all of its *inhabitants*." It does not recite "except for non-Jews"; and (c) that it will be based upon freedom

---

[78] UDHR Art. 13 provides that: (1) Everyone has the right to freedom of movement and residence within the borders of each state; and (2) Everyone has the right to leave any country, including his own, and to return to his country. UDHR Art. 9 provides that no one shall be subjected to arbitrary arrest, detention or exile.

justice and peace as envisaged by the prophets of Israel. One appropriate example thereof is contained in Leviticus 19:33 "When there is a stranger in your midst you must protect them." And with respect to all "inhabitants," the Israeli government "will ensure complete equality of social and political rights to all of its inhabitants irrespective of religion, race, or sex." The Declaration also recites that "it will guarantee freedom of religion, conscience, language, education, and culture." Ethnic cleansing, malicious property destruction, settlement expansion, and the arrest, incarceration and torturing of thousands of political prisoners (all funded by the U.S. tax-exempt entities) make a mockery of these recitals, as numerous U.N. resolutions and Amnesty International reports have only confirmed over the years.

56. Israel's founding fathers did not make up the term "inhabitants". That was the term that was incorporated specifically in the unanimous UN resolution 1947 authorizing the establishment of the Israeli state. That resolution recited that "inhabitants" of Eretz Israel were authorized to set up their own state. Respecting the founding fathers' intention that all "inhabitants" would receive and be able to freely exercise these extraordinary civil liberties, the Knesset in 1992 enacted Israel's BLHDL statute. There are various rights accorded to "persons," not just Israeli citizens, pursuant to that law. They have the right to freedom of movement, freedom from arbitrary arrest, freedom from unconsented entry onto private property, freedom from searches of private premises and persons, and the right to protection of their life, liberty, and dignity.[79] Thus, as long as Palestinians are deemed to be either "inhabitants," which they must be, of the OPT, or are deemed to be "persons," Palestinians are afforded all the rights recited in the 1948 Declaration and its 1992 BLHDL statute. Undersigned counsel has not been able to discover any official legislation adopted by the Knesset which prohibits Palestinians residing in the OPT from being considered either "inhabitants" or "persons."

---

[79] http://www.knesset.gov.il/laws/speciaL/eng/basic3_eng.htm, accessed December 14, 2015.

57. Since officials of the U.S. tax-exempt entities and their donors are presumed to know what the law is in the host country where they are operating or sending financial contributions to sister NGOs located there, they have, by funding, encouraging, and physically expanding the settlements, knowingly violated both Israel's Declaration and its BLHDL statute, as well as Treasury regulations. Treasury regulations have been violated because these tax-exempt entities and their donors are knowingly funding activity in the host country which has been deemed to either be illegal or violates the country's clearly-defined public policy.

58. The civil liberties granted to all "inhabitants" of the OPT and "persons" residing there, whether of Palestinian national origin or not, as referenced in the Declaration and Israel's BLHDL statute, pose an additional problem for settlers who are claiming ownership based on adverse possession of private Palestinian property. According to a March 20, 2012 HCJ court ruling written by Dorit Beinisch, former HCJ President, even if a settler illegally intrudes on private Palestinian property and holds it for over a ten-year period, he still cannot advance an adverse possession claim. The reason being that the land had to be "honestly taken" in the first place.[80] And of course, the Sasson report details what steps were necessary to take private property or state property "honestly." Her conclusion—*the majority, if not all, of the settlements, at least as of 2005, had not taken those necessary pre-construction steps.* As earlier noted, based on the Sasson Report, seizing private property "honestly" entailed: (a) preparing and filing a set of architectural plans; (b) a clear delineation of boundaries; (c) notarized affidavits of ownership and all the requisite zoning and building permits. The settlements also had to provide evidence that a formal closing

---

[80] *See* Israel Supreme Court: Settlers can no longer gain possession of land by farming it. March 20, 2012, http://www.haaretz.com/israel-news/israel-supreme-court-settlers-can-no-longer-gain-possession-of-land-by-farming-it-1.419804. Similarly, the reasoning behind adverse possession statutes in U.S. common law is that courts want to maximize the efficient use of property, so if the adverse possessor is using it in an efficient manner and the true owner had neglected it, it should go to the user. At no time were the Plaintiffs neglectful of their olive groves. At all times they were using the property, cultivating their olive crops, and doing everything required of diligent farmers.

had taken place, conducted by a real-estate settlement company, and that legal deeds were executed and recorded in the municipality's land records agency. Based on Comptroller Goldberg's 2003 report, it is obvious that these pre-construction steps were not taken by most, if not all, of the settlements as of 2003, and that very few, if any, formal real-estate closings had taken place, and that formal deeds of conveyance were prepared and recorded.

## VIII.   STATUTORY VIOLATIONS

### a) 18 U.S.C. § 1956(a)(2), Money Laundering

59. The U.S. tax-exempt entities and their donors have all conspired to and did engage in activity which constitutes money laundering under **18 U.S.C. § 1956(a)(2)**, which provides, in pertinent part:

> (2) "Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—

>> (A) with the intent to promote the carrying on of specified unlawful activity…(as detailed infra, see para. 66)

> shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than 20 years, or both.

60. There are a number of U.S. tax-exempt entities and their donors which have engaged in money laundering activities by way of the cross-border transmission of funds by either: (a) receiving donations at their addresses in the United States; or (b) transferring those funds by mail or wire across international borders to various settlements. The tax-exempt entities and donors knew that those funds would be used by settlement leaders to arm the local settlement population and have them engage in ethnic cleansing and wanton property destruction. In the case of the Falic Family Foundation and FIDF, they also sent funds directly to the Israeli army, whose soldiers

have committed many of the atrocities already described herein. Members of Breaking the
Silence, an NGO formed by former Israeli soldiers, have confirmed that these atrocities were an
everyday occurrence in the OPT.

61. Thus, tax-exempt entity officials, their donors, and their accountants not only face possible jail
time, the organization itself can be fined $500,000 for each transaction which resulted in funds
being transferred overseas. Given the fact that FIDF transferred $60 million in one month
(December 2014) to finance IDF operations in the OPT, that means that it can be fined up to
$120 million for that single transaction. That is only one reason why Treasury, if it decided to
investigate the tax-exempt entities and donors referenced herein, would be able to recoup
billions of dollars on behalf of the American taxpayer, because these entities and their donors
have consistently funded ethnic cleansing, wholesale violence, and settlement expansion, and
violated a significant number of tax-exemption regulations. Hence, all deductions taken by
American taxpayers based on the funding of these criminal activities can be "disallowed" by the
IRS, resulting in substantial back taxes, penalties, and interest. Besides going after these
taxpayers, the officials could also designate the donors and entities as global terrorists and freeze
their bank accounts. Without a Court Order, of course, that simply will not happen.

62. Some American citizens have similarly engaged in the cross-border transmission of funds by
donating money directly to the IDF and to various tax-exempt organizations, e.g. the Falic and
Moskowitz Family Foundations. They knew and requested that these entities send the money to
their preferred settlement in order to forcibly expel more non-Jews from the OPT/EJ and
expand settlement boundaries. They were totally indifferent to the violence they knew would
ensue, i.e., malicious destruction of property, wholesale violence, ethnic cleansing, and ongoing
aggravated trespasses by armed settlers assisted by IDF/G4S personnel.  Thus, these individuals

not only face possible jail time, they can be fined \$500,000[81] for each transaction whereby they transferred funds to their preferred settlements or to the Israeli army to promote wholesale violence and other specified unlawful activities. In the case of Adelson, the fine could easily reach \$1 billion if the transfers he made in the last ten years are doubled. As part of Treasury's investigation, IRS agents could quickly figure out the precise amount of the charitable donations taken by Mr. Adelson during the last ten years. They could do that very easily by examining his tax returns. This is not exactly "rocket science."

63. The tax-exempt entities and the individual donors named herein have accomplished the illegal objectives they set out to achieve many years ago when they agreed to start funding settlement expansion. Their financial contributions have promoted ethnic cleansing (400,000-500,000 Palestinians forcibly removed)[82], added at least 750,000 settlers, perhaps more, to the OPT, and has also resulted in a "Jewish-only" enclave being established in EJ, financed in large part by donor Moskowitz through the American Friends of Everest Foundation, of which he is sole owner. Moskowitz' purpose in funding that foundation was to establish a "Jewish-only" enclave.

64. Currently, the Sub Laban family is the last Palestinian family living in a large apartment complex in the formerly all-Muslim quarter of EJ. The settlers, supported by Ateret Cohanim and financed by Irving Moskowitz, are trying to remove that family by cutting off electrical power sources to their apartment and forcibly removing air conditioning equipment to make it appear that the family has abandoned their apartment, invoking the terms of the racist Israeli Absentee Property law. Not only is this another example of criminal activity that U.S. taxpayers are

---

[81] The possibility of these enormous fines, which in the case of Adelson could total \$1 billion, is the reason why it was stated herein that if Treasury officials went back thirty years and dedicated themselves to enforcing tax regulations concerning these tax-exempt entities and their donors, Treasury could recoup the sum of \$1 trillion. This figure is realistic because of huge penalties and interest, and because each international monetary wire transfer would impose a \$500,000 fine on the donor.

[82] *See* Haaretz Oct 20 2014, Israelis excel at camouflaging the expulsion of Palestinians.

subsidizing on a daily basis, it constitutes classic RICO racketeering criminal activity per 18 U.S.C. § 1962(c).

65. The tax-exempt entities have also financed, as of August 2008, the construction of 794 kilometers of bypass roads in the West Bank. The roads all have a 50-75 meter buffer zone on each side. Many settlements which have been funded by the tax-exempt entities referenced herein have been built on key water sources such as the Western Aquifer Basin. As a result, the normal water supply has been curtailed to the Palestinian citizens. *Some 313,000 Palestinians are not even connected to a water network.* Those Palestinians which are connected are only allowed 86 liters per day, while the settlers receive over 200 liters per day. The problem is that of the 86 liters that the Palestinians receive, only 60 are potable. That is the reason why Palestinian children have one of the highest dysentery rates in the world. Unfortunately, that is another tragic result of the extraordinary financial assistance rendered by U.S. tax-exempt entities and their donors, as well as Treasury's failure to investigate the extensive criminal activities funded by these entities.

66. At all relevant times herein, the tax-exempt entities and their donors knew and/or were deliberately indifferent to the fact that the proceeds of the international wire transfers that they or their donors initiated were to be used to promote the carrying on of specified unlawful activity, namely promotion of wholesale violence in the OPT, i.e., home demolitions, murder, mayhem, destruction of valuable agricultural property, illegal arrests, incarceration, torture, and ethnic cleansing on a grand scale.

67. The specified unlawful activities which these funds were intended to promote are *Occupation, incarceration, destruction of homes, and war crimes.*

    (a)  Murder. 18 U.S.C. § 1956(c)(7)(B)(ii).

    (b)  Destruction of property by means of explosive or fire. Id.

    (c)  Crimes of violence. Id.

(d) Offenses with respect to which the United States would be obligated by a multilateral treaty (e.g., Nuremberg Principles or the Law of Nations), either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States. 18 U.S.C. § 1956(c)(7)(B)(vi).

(e) Offenses relating to destruction by explosives or fire of Government property or property affecting interstate or foreign commerce. 18 U.S.C. § 1956(c)(7)(D).

(f) Firearms trafficking. Id.

(g) Conspiracy to kill, maim, or injure property in a foreign country. Id.

(h) Terrorist acts abroad against United States nationals. Id.

(i) International terrorist acts transcending national boundaries. Id.

68. A significant number of OPT settlements received some of the funds transferred across international borders with the intent to use them directly or indirectly to further one or more of the specified unlawful activities stated above. For example, see subsection (g) above—by providing aggressive settlers with sophisticated military hardware, settlement officials conspired to kill or maim and murder Palestinian homeowners to promote settlement expansion and destroy their valuable private property. The reason being that settlement leaders had quickly learned, based on observing the settlers attacking their Palestinian neighbors, that the settlers had no compunction about shooting at Palestinian homeowners, or even murdering them.

69. As a result of that conduct, the settlement officials and the companies they hired, after they received and accepted funds sent overseas by the U.S. tax-exempt entities, either directly or indirectly, had also violated 18 USC § 1956(a)(2), laundering of monetary instruments. The reason being that they knew that some if not all of the funds that they had received from U.S. tax-exempt entities would be used to accomplish one or more of the aforementioned specified unlawful activities in the course of violently expelling all non-Jews from the OPT. While

settlement leaders did not initiate the international wire transfers at issue, they welcomed the
receipt of millions of laundered dollars from their U.S. tax-exempt entities, and they knew
exactly what they were going to do with those funds—confiscate more Palestinian property and
expand the settlements accordingly.

70.  As a result of that conduct, the tax-exempt entities, donors, and settlements referenced herein
have all knowingly and intentionally violated 18 U.S.C. § 1956(a)(2), laundering of monetary
instruments. The transfer of clean funds overseas to accomplish an illegal activity is classic
"money laundering" activity.[83] In 1995, President Clinton and Treasury labeled this conduct as
terrorist activity. Thus, the U.S. donors and tax-exempt entities have been knowingly promoting
terrorist activity in the Middle East for at least 20 years. The Treasury Department has
designated thousands of individuals who have similarly promoted and funded terrorist activity in
the Middle East, most recently Hezbollah financiers like Abd al Nur Shalan on July 21, 2015.
For whatever reason, even though they have compelling evidence to do so, senior Treasury
officials do not appear to be willing to designate pro-settlement tax-exempt entity officials and
freeze their bank accounts. That is why this lawsuit has been filed.


## IX.    ADDITIONAL STATUTORY VIOLATIONS

71.  Based on the activity described *supra* , the tax-exempt entities and donors referenced herein have
all conspired to and did engage in activity which constitutes a violation of the following statutes:

(a)  18 U.S.C.A. § 1341 *Mail Fraud*, which criminalizes the use of the mails to commit a
fraud, in this case defrauding the United States, specifically the IRS and Treasury by

---

[83] Money laundering experts have commented on the difference between Section 1956(a)(1) and 1956(a)(2)
"Section (a)(2)(A) criminalizes international money laundering and prohibits transfer outside the U.S. with intent to
promote carrying on of specified unlawful activity."…"by contrast, (a)(2) contains no requirements that the funds
transferred outside the U.S. constitute illicit proceeds" p. 850-851 NDL scholarship "Money Laundering Control Act
of 1986" Jimmy Gurule.  *See also* World Bank money laundering and terrorist financing definitions.

filing false income tax forms, annual 990s, and misleading applications for 501(c)(3) status;

(b) 18 U.S.C.A § 1343, *Fraud by Wire, Radio, or Television*, which criminalizes the use of wire, radio, or television communication to commit a fraud, in this case defrauding the United States, specifically the IRS and Treasury by filing false income tax forms, annual 990s, and misleading applications for 501(c)(3) status;

(c) 18 U.S.C. § 1952 *Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises* (the "Travel Act"), which criminalizes interstate or foreign travel to promote unlawful activity. The donors and tax-exempt entity officials routinely visit Washington, D.C., and travel all over America to either solicit or make tax-deductible contributions to promote wholesale violence and malicious property destruction. They also travel to Israel three or four times a year to, *inter alia*, meet with government officials and settlement leaders to see what their funding has accomplished in terms of more settlements, shopping malls, and housing developments, and no Palestinians. Encouraging and funding settlement expansion is always on their agenda;

(d) 18 U.S.C. § 2441, *War Crimes*, which criminalizes the commission of war crimes including torture, cruel or inhuman treatment, murder, mutilation, maiming, or intentionally causing serious bodily injury. Israeli war veterans who are members of Breaking the Silence have admitted that they did indeed commit war crimes as instructed by their commanders. In any case, this conduct has been thoroughly documented for at least 20 years in various UN Rapporteur reports and reports prepared by Amnesty International and various Israel-based NGOs. The sheer number of reports on this subject is staggering;

(e) 18 U.S.C. § 2339C, *Prohibitions Against the Financing of Terrorism*, which codifies into U.S. law the UN Convention against Terrorist Financing and prohibits U.S. nationals from directly or indirectly, by any means, funding acts abroad (i.e., the Middle East) intended to intimidate a population. As just one example of such financing, FDIF sent $60 million in one month (December 2014) to encourage and fund IDF criminal activities, including the commission of war crimes, attested to by members of Breaking the Silence;

(f) 18 U.S.C. § 960, *Expedition Against a Friendly Nation*, which criminalizes the furnishing of money or taking part in a military expedition against a state, colony, or people with whom the United States is at peace. The donors, tax-exempt entities, and their settlement beneficiaries have been engaging in such conduct for at least 30 years; and

(g) 18 U.S.C. § 956, *Conspiracy to Kill, Kidnap, Maim, or Injure Persons or Damage Property in a Foreign Country*, which criminalizes any conspiracy to commit any of the aforementioned crimes abroad. The U.S. tax-exempt entities, their donors, and their settlement beneficiaries have engaged in such conduct for at least 30 years.

72. To sum up, based on the U.S. criminal statutes recited herein, it appears that U.S. tax-exempt entities and their donors have violated no fewer than eight separate criminal statutes, if you include money laundering and federal perjury statutes. That is and should be compelling evidence to initiate an investigation of the tax-exempt entities and their donors. It is obvious that Treasury is *the agency* most qualified to deal with these statutory violations. It has a division, FinCEN, that specializes in domestic and foreign money-laundering activity. It also has dedicated and talented IRS agents who know how to audit complicated tax returns and supporting documentation. And, Treasury agents have years of experience in investigating individuals and entities which have promoted violence in the Middle East. And, courtesy of President Clinton's 1995 Executive Order, Treasury had the requisite and specific authority to

begin these investigation. And, most importantly, no other federal agency has the necessary law-enforcement tools available to shut these entities down, where appropriate, and strip them of their tax-exempt status. In addition, Treasury officials can designate the individuals and entities involved, freeze their bank accounts and levy significant fines and penalties on the entities, their accountants and donors, and even their bankers where appropriate.

73. The problem remains, however, that Treasury, for whatever reason, is reluctant to employ these law-enforcement tools when it comes to regulating pro-settlement 501(c)(3)s. That is the reason why the Plaintiffs have filed this lawsuit, and requested this Court to issue an appropriate order requiring senior Treasury officials to basically do their jobs. If they do actually perform the duties and responsibilities they have been assigned, they will recoup billions of dollars for the U.S. Treasury, and in the process promote the clearly-defined U.S. public policy described herein, which has consistently condemned settlement activity for 40 years.

## COUNT I: DECLARATORY JUDGMENT

74. There are at least 200, perhaps 250 pro-settlement 501(c)(3)s and foundations operating in America today. Based upon the sheer number of these entities and the limited information disclosed on their annual 990 forms re contributions and expenditures, it is impossible to describe herein all of the abuses that pro-settlement tax-exempt entities have engaged in. Therefore, the abuses listed in Part (d) herein are some of the more egregious examples of abusive conduct, but are probably the proverbial "tip of the iceberg."

75. This Complaint details: (a) why Treasury bestows tax-exempt status on deserving NGOs; (b) the tax regulations applicable to tax-exempt entities which elect to transfer funds overseas; (c) tax regulations pertaining to the deductibility of direct donations made to Israel-based charities; (d)

the criminal conduct which U.S. tax-exempt entities and donors have committed and funded;

and (e) the money laundering activity which the entities and donors engaged in.

### a) Granting of Tax-Exempt Status

76. Treasury has conferred tax exempt status on approximately 150 U.S. pro-settlement tax-exempt

entities like the Falic Family Foundation, FIDF, American Friends of Ariel, Gush Etzion

Foundation, American Friends of Har Homa, and Hebron Fund, are just examples of

organizations that violate Treasury regulations. Treasury has explained why organizations are

granted "tax-exempt" status, i.e., they provide "relief of the poor, the distressed, or the

underprivileged (Red Cross); lessen[ ] neighborhood tensions (religious interfaith dialogue

groups); eliminate[] prejudice and discrimination (NAACP, Anti-Defamation League);

[and]defend[ ] human and civil rights secured by law…." (ACLU, Southern Poverty Law

Center). As is obvious, if 501(c)(3)s actually engage in "charitable" and "educational" activity,

American society at large benefits immensely.

77. As shown infra, unfortunately, the charities referenced herein (replace all named herein with

referenced herein or just take out) have actually: (a) increased neighborhood tension by arming

settlers and encouraging them to annex the private property of their Palestinian neighbors; (b)

funded prejudicial and discriminatory practices (relief afforded solely to Jewish citizens); (c)

violated every human and civil rights statute or international convention adopted or enacted in

the last fifty years by the U.S. and Israeli governments or by the UN; and (d) funded settlement

expansion even after the 1993 settlement ban went into effect, which necessitated the forcible

expulsion of all non-Jews. They have exacerbated poverty and systematically created an

underprivileged class of people who are now confined to open-air prisons,[84] i.e., the local Palestinian population.

78. These charities, for approximately 30 years, have been able to fund criminal activity (arson, murder, malicious property destruction, theft of private property) because Treasury has maintained a double standard by not enforcing its own regulations governing U.S. tax-exempt entities that have funded settlement expansion in the OPT. Treasury has, as a result: (a) encouraged the proliferation of such entities; (b) financed the violent expulsion of Palestinians living near settlements; (c) encouraged the aggressive annexation of private Palestinian property; and (d) financed the ongoing demolition of Palestinian homes and ongoing physical attacks by settlers armed with automatic weapons purchased with funds supplied by U.S. entities/donors. Their agenda is to rid the West Bank and EJ of all non-Jews consistent with perceived biblical imperatives. They have been very successful in that endeavor, as detailed herein, primarily because of Treasury's abject and longstanding failure to monitor and prevent their criminal activities for at least the last 30 years.

### b) Treasury Regulations Pertaining to Tax-Exempt Entities

79. Treasury regulations afford an entity tax-exempt status if the entity engages in "charitable" activities, e.g., funding and operating reading programs like "Head Start" for inner-city kids. The concept of governmental subsidization of "charitable" activity is premised on the assumption that an entity which relieves a government agency of a financial obligation to fund public interest activities is entitled to tax-exempt status. For example, many civic-minded citizens today belong to and fund organizations dedicated to improving the lives of the homeless population by funding and setting up soup kitchens and homeless shelters.

---

[84] See *Palestine Today is an Open-Air Prison*, http://www.washingtonpost.com/wp-dyn/content/article/2009/01/30/AR2009013002809.html. Accessed December 3, 2015.

80. If tax-exempt entities, pro-settlement or otherwise, elect to fund "charitable" activities overseas, they have to satisfy other requirements. These entities must: (a) disclose to potential donors the specific overseas "charitable" causes that their donations will support; and (b) disclose any instances where they deviated from the specific "educational" and "charitable" activities that they described in their application for 501(c)(3) status.

81. Treasury's goal in adopting these regulations (C.F.R. 1.501(c)(3) et seq.) was to ensure that the U.S. "charitable" entity exercised total control over how the funds were spent overseas in order to avoid having those funds promote illicit activities like Middle-East violence. In 1995, to prevent that from happening, Treasury officials and the Clinton administration authored Executive Order 12947, which condemned and prohibited the funding of Middle-East violence because it frustrated U.S. foreign policy objectives. In addition, 18 U.S.C. 2339(c) has codified the UN Convention against Terrorist Financing into U.S. law, which prohibits U.S. nationals from funding violence abroad in order to intimidate a civilian population like the Palestinians.

82. All tax-exempt entities which elect to fund overseas "charitable" activities must determine: (a) that the entity receiving those funds would itself qualify as a legitimate tax-exempt entity under Treasury standards. *See* Rev. Rul. 63-252, 1963-2 C.B. 101; and (b) maintain strict control over the funds transferred overseas, with detailed record keeping. *See* Rev. Rul. 68-489, 1968-2 C.B. 210. The entities cannot promote or finance *racially* or *religiously* discriminatory practices, nor can they violate federal statutes in the process of raising funds and/or transmitting the funds overseas. They cannot fund overseas activities which violate the law of the host country (theft and malicious destruction of private property) or its clearly-defined public policy (Israel's Declaration and its 1992 BLHDR Statute), or defraud the IRS, i.e., encouraging their donors to take illegal tax deductions based on expenses generated in purchasing sophisticated military hardware or setting up sniper schools.

83. These entities are not allowed to be controlled by the overseas entity, i.e., the U.S. entity is merely a post office box, has no board of directors, and conducts no meaningful "charitable" activity here in America. They do, of course, maintain a bank account, but it functions as a "funnel," i.e., donations are deposited and then transferred 24 hours later overseas. In such a case, the overseas entity actually decides which "charitable" activities will be funded. As shown herein, a significant number of tax-exempt entities sending money to OPT settlements are controlled by their Israel-based sister entities, whose officials determine how and where the funds will be spent, for example, the purchase of sophisticated military hardware and sniper scopes.[85]

84. All tax-exempt entities, of course, are prohibited from: (a) lying or making misrepresentations on their application for 501(c)(3) status; (b) misrepresenting the overseas "charitable" causes they will be supporting; and (c) funding non-"charitable" activities, i.e., theft of private property, which is obviously not designed to promote "charitable" activities.[86] When the "charitable" funds are sent overseas to OPT settlements to finance the purchase of military hardware, violent settlers are then able to threaten and inflict physical assaults on their Palestinian neighbors, resulting in theft of more private property. Even though Treasury has known that funding criminal activity like ethnic cleansing and malicious property destruction is decidedly contrary to U.S. law and its clearly-defined public policy, U.S. taxpayers have been doing just that for the last 30 years. As a result, the Palestinian-American Plaintiffs named herein and their relatives have suffered drastic consequences, as described herein. American taxpayers named herein have also been injured by Treasury's failure to investigate and prevent the aforementioned criminal activities that the entities have financed or engaged in. As Plaintiff Several stated, the settlements

---

[85] This is in direct violation of the clear instructions on IRS Form 1023. See https://www.irs.gov/pub/irs-pdf/f1023.pdf, page 10.
[86] Id. p. 17.

are "(1) in violation of international law; (2) prevent the creation of a viable Palestinian state; (3) undermine America's interests in the region; (4) damage America's security;  and (5) create resentment and anger that threatens the lives of Americans who are bravely serving in the area."

### c) Treasury regulations pertaining to contributions directly made by U.S. taxpayers to Israel-based charities

85. The U.S.-Israel bilateral treaty allows Americans to take deductions for "charitable" contributions made to Israel-based tax-exempt entities.[87] However, there are two restrictions on "charitable" giving: (1) the taxpayer must have substantial income coming from Israel; and (2) he can only take 25% of his adjusted gross income.[88] Thus the deductions are *de minimis* unless the taxpayer is receiving a substantial salary ($750,000, for example) from Israel-based businesses. That is why U.S. pro-settlement taxpayers prefer to donate to U.S. tax-exempt entities, i.e., most U.S. donors earn their income in the U.S. Rather than making direct contributions to Israel-based charities, the taxpayers search for and work with friendly (i.e., pro-settlement) 501(c)(3)s and foundations here. The reason—those entities are not particularly concerned about compliance with Treasury regulations, but they are very much invested in pursuing the dream of a Zionist state, as evidenced by the disturbing recitals on their websites.[89]

86. In the case of universities located in Israel proper, it appears that Israel has a unique exemption under the law, and thus American taxpayers can make direct contributions to those universities. They are tax-deductible contributions in general, and are legitimate for the most part. However, to the extent such contributions go to universities like Ariel, which is located outside of Israel

---

[87] Article 15A(1) of the US-Israel Income Tax Treaty. *See* http://taxlawjournal.columbia.edu/article/the-"charitable"-deduction-games/, accessed December 8, 2015.
[88] Id.
[89] See, e.g., http://www.ginaplus.org/kshomron.htm, "Security for the Community" link, stating Karnei Shomron's plan to arm its settlers, train them to shoot, and move residents into strategic locations in order to "successfully connect all the hills."

proper and which has been built on "stolen lands," they are not tax deductible. The reason is that the establishment of settlements in the OPT and/or their expansion specifically contravene clearly-articulated U.S. public policy. Therefore, the taxpayers who have been writing off "Ariel University contributions" need to have their tax returns audited—they owe Uncle Sam a lot of money.

### d) Pro-settlement Tax-Exempt Entities Which Transmit Monies Overseas Have Flagrantly Abused U.S. Tax Laws And Treasury Regulations

87. There are a number of entities that transfer large amounts of money to OPT settlements on a regular basis, based upon numerous reports like the one prepared by Michael Several of settlementsinpalestine.org[90], and articles in the Washington Post, New York Times, Los Angeles Times, Haaretz, and Jerusalem Post, as well as annual 990 forms filed by tax-exempt entities. They appear to transfer approximately $1 billion a year to OPT settlements, with $100 million going to the Israeli army. No one, and that includes the IRS, however, knows the exact amount of monies that actually flow into the Israeli army's bank account on an annual basis, so that figure could be a gross underestimation. Solid evidence thereof is that IDF received $60 million in December 2014 alone from its sister 501(c)(3) entity, the FIDF.

88. The entities: (a) engage in money laundering activities; (b) conspire with their donors to defraud the IRS; (c) promote religious and racial discrimination; and (d) fund non-"charitable" activities such as the purchase of military hardware and the theft of private property. The settlement leaders use these funds to expand settlement perimeters by arming violent settlers who, with IDF/G4S assistance, terrorize the local Palestinian population and convince them to abandon

---

[90] See Financial Support of Settlements by U.S. Non-Profits Nov. 14, 2011
http://lajewsforpeace.org/Essays/Settlements/Reportfor2009.pdf, accessed December 4, 2015.

their homes and their 400-year-old olive groves.[91] It is a real problem, i.e., somewhere between 400,000 and 500,000 Palestinians no longer reside in the OPT because armed settlers have repeatedly assaulted and, in some cases, murdered them.[92] That is only one example of the criminal conduct that American taxpayers have been subsidizing for at least 30 years.

89.  The vast majority of these entities transmit millions of dollars overseas to OPT settlements on an annual basis. The Washington Post identified 28 separate tax-exempt entities that made a total of $33.4 million in tax-exempt contributions to settlements.[93] However, that is a gross underestimation of the amount of funds involved, i.e., as already noted, one tax-exempt entity alone, FIDF, sent $60 million in one month (December 2014) to fund the Israeli army.[94] FIDF raised that money during two gala celebrations (both celebrations were a total tax write-off) held in New York City and Hollywood.[95] Casino magnate Sheldon Adelson attended the Hollywood event and donated $5 million to Israel's army, and took a substantial tax write-off as a result. If FIDF's annual overseas transfers (approximately $100 million) are any indication of the tax-exempt entities' fundraising ability, at least $1 billion is being transferred to the settlements on a yearly basis, given the number of active pro-settlement entities. Because tax-exemption regulations were amended in 2008,[96] neither Treasury nor the IRS has any idea how much money

---

[91] There are significant sums involved. For example, settlers near Yanun seek to raise $3.5 million courtesy of internet donations, citing need for bulletproof cars, bulletproof vests, guard dogs, and a petting zoo. See http://touritamarsupportisrael.com/donation-select/, accessed December 9, 2015.
[92] *See* Haaretz Oct 20 2014, Israelis excel at camouflaging the expulsion of Palestinians.
[93] http://www.washingtonpost.com/wp-dyn/content/article/2009/03/25/AR2009032502800.html, accessed December 9, 2015.
[94] The donors to FIDF and the other entities named herein are too numerous to all name in this lawsuit. For example, media mogul Haim Saban chairs the annual FIDF Hollywood Gala, makes donations to FIDF, and is instrumental in soliciting donations. See http://www.hollywoodreporter.com/news/haim-saban-helps-raise-31m-837947 *and* http://www.hollywoodreporter.com/news/haim-saban-raises-34m-support-747379, accessed Nov 19, 2015.
[95] Id.
[96] See IRS 990 Form Schedule F line 3, "activities per region" (i.e., transactions on overseas activities are aggregated by region, not by country).

is actually going to the settlements, the reason being that tax-exempt entities now only have to identify the geographical region where the funds are going to, i.e., the "Greater Middle East."

90. U.S. Ambassador to Morocco Mark Ginsberg recognized the enormity of the problem—of the nearly $53 million given by the World Zionist Organization ("WZO") to small towns in Israel, 75% (about $40 million) of that went to West Bank settlements. [97] WZO's settlement division has quietly become the Israeli government's unofficial "go-to" Ministry for Settlement Construction. Its budget and funding sources (i.e., U.S. tax-exempt entities and under-the-table government funding), are a state secret. Even the Attorney General of Israel has been rebuffed in his attempt to secure such information. A number of Israeli politicians have confirmed that "under-the-table financing" is an ongoing and current problem today. [98]

91. The Efrat Development Foundation USA ("EDF") is a New York-based 501(c)(3) entity that states in its 2004 certificate of incorporation that it "is organized exclusively to enhance the quality of life for individuals residing in the town of Efrat, located in Israel" through "charitable" activities. However, Efrat is not located in Israel, but in the hotly-contested Etzion bloc of illegal settlements in the OPT. Moreover, it was built entirely on land owned by Palestinians, and like all OPT settlements, is a racially exclusive "Jewish-only" settlement based on land covenant restrictions recorded by RE/MAX officials years ago. That practice should alone serve to revoke the entity's tax-exempt status. However, EDF also acts as a "pass-through" entity to launder funds for Efrat's Israel-based fund, Keren Efrat. In this capacity it has provided funds for settlement expansion, infrastructure improvements, and the purchase of military equipment *to*

---

[97] http://www.huffingtonpost.com/amb-marc-ginsberg/its-really-the-settlement_b_5993010.html, accessed December 9, 2015.
[98] Sasson Report, available at
http://www.peacenow.org.il/eng/sites/default/files/Sasson_Report_EngSummary_0.pdf

*arm Efrat's 50-member extremist paramilitary organization.* In 2009, EDF disclosed that it used at least $36,000 in "charitable" donations to fund the activities of its paramilitary organization.[99]

92. The settlement of Ir David ("Elad") has an active fundraising arm in the US, and according to Friends of Ir David's 990 tax forms, it raised $8,700,000 in 2004, $1,200,000 in 2005, and $2,700,000 in 2006.[100] These funds paid for the demolition of inhabited Palestinian homes in EJ, which were justified by bogus structural reports prepared by Housing Ministry officials. These funds also paid for settlement expansion and the construction of new "Jewish-only" housing units built by construction companies like AFI and Veolia.

93. Many of these entities are not "charitable" organizations, but rather "funnels" or "pass-throughs."[101] Shuva Israel, e.g., is a 501(c)(3) tax-exempt charity which has raised more than $2.6 million since 2004 for illegal settlements in the Shomron area.[102] Shuva's CEO's suggestion is that "12,000 Christian Zionists sign up and give $12 per month, equaling $144,000 monthly ($1.728 million yearly) to support the Jewish community settlements in the eternal biblical heartland of Israel."[103] While IRS regulations require that charities show "full control of the

---

[99] See January 2010 letter from the American-Arab Anti-Discrimination Committee to the IRS requesting investigation of various U.S. tax-exempt entities, on file with the author. Because Efrat is one of the larger settlements, and because pro-settlement tax-exempt entity officials are very skillful in terms of dressing up military activities as "educational" in nature, that $36,000 figure is probably a gross underestimation. A meagre salary of $800 per year for each paramilitary soldier would alone amount to $40,000. Thus, the settlement would have no funds with which to purchase military hardware. Lying to the IRS is a criminal offense, of course, and could result in revocation of EDF's tax-exempt status. Its accountant also could be criminally prosecuted for conspiring to defraud the IRS.

[100] Id.

[101] See Hope Hamashige, Paul Lieberman, and Mary Curtius, "Bingo King Aids Israeli Right Wing," Los Angeles Times, May 9, 1996,http://articles.latimes.com/1996-05-09/news/mn-2155_1_bingo-hall.

[102] Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010.

[103] Alice Speri, Electronic Intifada, 30 July 2010 *Activists Work to Stop Tax-Exempt Donations to Settlements*. Ironically, the Christian holy city of Bethlehem has likewise not been spared from the zeal of these Christian Zionists. In 2002, the combination of physical closure and the curfew system devastated Bethlehem's social fabric. In that one year alone, the IDF imposed 156 days of 24-hour curfew. According to a recent UN report, urban Bethlehem is surrounded by a combination of nine settlements, a stretch of the separation barrier, roads restricted to Israelis, and a multitude of checkpoints, earth mounds, and road blocks. Bethlehem's centuries-old spiritual, cultural, and economic link to Jerusalem is being undermined. Only 10 percent of Bethlehem's businesses open in 2002 are still open today. It has "become an isolated town, with boarded-up shops and abandoned development projects." Palestine Inside Out p. 194.

donated funds and discretion as to their use," Shuva Israel is totally controlled by Israel-based settlers. It has only two board members, both Israeli citizens living in OPT settlements, just like Shuva's accountant. Its sole U.S. presence is a post office box in Austin, Texas. Thus, it is, as per Treasury regulations, "controlled" by its sister entity based in Israel, and on that basis alone its 501(c)(3) tax-exempt status should be revoked. Given the fact that Shuva is a funnel and controlled by its Israel-based sister entity, American taxpayers who made contributions to Shuva, and their accountants, can be prosecuted for income tax fraud. The Shuva entity represents a major problem because it is not, by any means, an isolated case of abusing tax-exemption regulations. Until, of course, an investigation is initiated and completed, Treasury will never know how many "Shuvas" are out there operating today in America.

94. The 501(c)(3) "Operation Lifeshield" has a laudable goal of building shelters in northern Israel to protect civilians from rocket attacks. However, it does not reduce in any way a financial burden imposed on any U.S. state or local agency. That is a *sine qua non* to establish a legitimate basis for 501(c)(3) status. Furthermore, Operation Lifeshield engages in religiously and racially discriminatory practices by building the shelters uniquely for "Jewish-only" communities. U.S. Tax Court opinions have consistently condemned this practice.[104] Of course, nothing prohibits Operation Lifeshield donors desirous of building shelters from making direct donations. However, in that case, they do not secure any tax deductions.

95. Many of these entities have violated one or more Treasury regulations in the past 30 years. Few if any of these entities, especially financial pass-throughs or funnels:

    (a)   Have ever determined and recorded in a corporate resolution that after its examination of the overseas entity's books and records, that the entity receiving the contributions would itself qualify as a tax-exempt entity under Treasury regulations; or

---

[104] See http://operationlifeshield.org/, *Bob Jones University v. U.S.*, 461 U.S. 574.

(b) Have maintained strict control over donor contributions once they are sent overseas. In fact, wealthy donors like Sheldon Adelson and Irving Moskowitz and Christian minister John Hagee, based on public statements they have made, actually dictate what specific activities their contributions will be used for; or

(c) Have disclosed to U.S. authorities or their donors that they have funded criminal activity abroad—the purchase of military hardware, settlement expansion, ethnic cleansing, theft of private property, and malicious property destruction.

96. All of these entities have promoted or financed practices that are: (a) illegal under the law of the host country where the funds are received, i.e., Israel (money laundering, theft of private property, wholesale violence, malicious property destruction); (b) violated Israel's Declaration, its 1992 BLHDL statute, its clearly-defined public policy and Israel's War Manual; and (c) racially or religiously discriminatory practices, i.e., the contributions are to be used for "Jewish-only" settlers. The problem is illustrated by the conduct engaged in by armed settlers living in the Nokdim settlement. They use these funds to threaten Palestinian farmers on a daily basis whose olive groves are now located in Nokdim proper due to settlement expansion. They even murder them, in some cases, for trying to access their olive groves. To state the obvious, the U.S. tax code was never intended to subsidize criminal activity, in America or abroad.

97. These entities and their donors have violated at least eight federal statutes in the process of transmitting funds overseas, including the money laundering statute 18 USC 1956(a)(2), the terrorist funding statute 18 U.S.C. § 2993, and Conspiracy to Defraud the US, 18 U.S.C. § 371. They violated those statutes every time they donated or sent funds overseas to promote wholesale violence and ethnic cleansing. They have also conspired to defraud the IRS in violation of 18 U.S.C. § 371 because they have encouraged their donors to take illegal tax write-offs and because the expenses incurred in purchasing military hardware have been listed on their

annual 990s either as an "educational" or "charitable" expense. Therefore, their donors have taken illegal tax deductions, which reduces Treasury's annual revenue base. As a result, American taxpayers end up financing the donors' political agenda.

98. Their illegal activities even today are being subsidized by the U.S. taxpayer, despite the fact that a lot of these entities no longer qualify for tax-exempt status. One reason being that its officials have committed perjury by violating the entity's sworn written pledge when applying for tax-exempt status that they would only fund "charitable" or "educational" activities. Facilitating the purchase of military hardware for violent settlers is obviously not a "charitable" activity. In some cases, like FIDF, these entities have transmitted funds directly or indirectly to the Israeli army, which has engaged in the wholesale killing of civilians.[105] Recently, Amnesty International confirmed that a Palestinian brother and sister, killed six weeks apart, were the victims of summary executions.[106]

99. Treasury claims that it takes a very vigorous and active role in terms of monitoring the activities of these entities, i.e., it "maintain[s] an ongoing examination program."[107] If it does so, it missed $1 billion in total transfers to the settlements in 2015 and at least $60 million in tax-deductible contributions to the IDF in a single month, December 2014. If those contributions had been sent to Disabled American Veterans instead, that activity would, of course, have been perfectly legal,[108] and thoroughly appreciated by that important organization.

---

[105] See Chris Hedges, A Gaza Diary, http://www.bintjbeil.com/articles/en/011001_hedges.html, and www.breakingthesilence.org.il, accessed December 14, 2015.
[106] http://www.maannews.com/Content.aspx?id=769295.
[107] Undersigned counsel has written Treasury twice concerning the abuses engaged in by tax-exempt entities, and this was their pattern response.
[108] With an annual budget of approximately $7.5 million, Disabled U.S. Veterans would benefit enormously from an 800% budget increase just from one month's worth of FIDF fundraising. It is not hard to imagine the increased level of comprehensive services DUSV could provide to injured U.S. servicemen and women with such a financial increase. Veterans have an unusually high rate of suicide (22 veterans kill themselves every day, per http://www.huffingtonpost.com/2013/02/01/veteran-suicide-rate_n_2599019.html). That increased funding would go a long way toward addressing that growing problem. See

100.    A specific example of how these entities have circumvented Israeli law and its clearly-defined

public policy and abused their tax exempt status concerns an illegal settlement known as

Maskiot, near Jordan. Two U.S. non-profits were used to raise funds for the continued

expansion of that settlement in order to circumvent Prime Minister Rabin's 1993 ban on further

expansion. Those U.S. nonprofits are the *One Israel Fund* (OIF) and *CFOIC*.[109] They both raised

substantial monies to keep the settlement expanding in specific violation of that settlement ban,

and, in the process, violated Israeli law, its clearly-defined public policy, as well as America's

clearly-defined public policy and the 1863 Lieber Code. As already noted, former Secretary of

State Baker remarked some 23 years ago that America's tax code would not be used to

"underwrite Israeli policies [i.e., illegal settlements and violent expulsion of non-Jews] that

fundamentally contradict America's own principles and long-stated policies."[110]

101.    As already noted, the majority of these entities have promoted wholesale violence and ethnic

cleansing by encouraging and funding settlement expansion. If Treasury actually invoked that

violation of its tax-exempt regulations, in the case of Ariel and Nokdim alone, it would be able

to recoup approximately $600-$800 million in illegal donations which have been diverted to

those settlements over the last 20 years.[111] Since there are approximately 140 pro-settlement tax-

exempt entities in America, if $600 million (the lower estimate) is the average 20-year cumulative

drain on the Treasury, then the total amount of lost tax revenues would be $42 billion, assuming

http://www.charitynavigator.org/index.cfm?bay=search.summary_&orgid=7589#.VkS0h7erTIU, accessed Nov. 12, 2015.
[109] One Israel Fund even explicitly stated on its website: "In light of the recent budget cuts that have been made to the IDF and the cutback of checkpoints allocated to protect these communities, the security resources and training that we provide is paramount to the future of these areas." See
https://www.oneisraelfund.org/projectsnew/default.asp?id=8 accessed November 3, 2015. See also
http://www.ginaplus.org/kshomron.htm, "Security for the Community" link, stating Karnei Shomron's plan to arm its settlers, train them to shoot, and move residents into strategic locations in order to "successfully connect all the hills."
[110] David Ignatius, How a U.S. Tax-Deduction Aids Israeli Settlements, March 26, 2009, Washington Post.
http://www.washingtonpost.com/wp-dyn/content/article/2009/03/25/AR2009032502800.html, accessed December 8, 2015.
[111] Estimating a moderate annual income from tax-deductible donations of $15-20 million per settlement.

63

only 50% of the entities have transferred funds overseas to promote settlement expansion. Unfortunately, neither Treasury nor the IRS are in a position to determine what the correct number is. Given this circumstance alone, i.e., Treasury does not even know how much funding OPT settlements secure every year, ordering Treasury and the IRS to make that determination as part of an investigation is perfectly appropriate and long overdue. Determining that number would be very important, for example, for members of Congress who are concerned about tax-exempt funding of criminal activities that frustrate foreign policy objectives in the Middle East. The investigation, of course, would not only focus on the amount of annual funding, but also on Treasury's failure to monitor and prevent criminal activities that these entities have been funding for at least 30 years. Treasury officials cannot claim that Congress has no right to know the nature and extent of these criminal activities, and the identity of the American taxpayers who have been funding the abhorrent criminal activity in the OPT for the last 30 years.

102.    According to IRS records, the Hebron Fund donated $861,000 to the settlement of Kiryat Arba in 2005[112], and $968,000 in 2006[113], ostensibly for social and "educational" wellbeing. However, HF's online mission statement makes it clear that these donations can only assist *Jewish settlers* inside the city. These settlers, unfortunately, are able to purchase military hardware and initiate a campaign of violent physical attacks on Palestinian homeowners as a result of that funding. In addition, Kiryat Arba received $730,000 in 2006 from a group known as "American Friends of Yeshiva High School – Kiryat Arba."[114] Such funding rewards the settlers and the IDF/G4S personnel for assisting them in expelling the local Palestinian population and annexing more private Palestinian property. All of these non-profits are involved in a very lucrative enterprise, i.e., settlement expansion. As an example thereof, the five or six housing

---

[112] http://www.washingtonpost.com/wp-dyn/content/article/2009/03/25/AR2009032502800.html.
[113] Id.
[114] Id.

developers who were hired by settlement officials to build the 26,000 new homes in the OPT generated gross revenues in the amount of $9.45 billion.[115]

103.    American Friends of the College of Judea and Samaria claim that their donations are used to address the needs of underfunded "educational" institutions in Israel. *However, the "educational" institutions supported are not located in Israel*, but, like Ariel, on private Palestinian property. Thus, U.S. taxpayers are unwittingly subsidizing aggravated trespasses by these "educational" institutions on private property, and, in the process, allowing them to participate in the commission of serious federal crimes, i.e., perjury, money laundering, IRS fraud, and financing terrorist activity abroad (see President Clinton's 1995 Executive Order 12947).

104.    The monies involved in assisting with the settlement enterprise are staggering. As cited in the Jewish Daily Forward newspaper, 3,600 Jewish organizations forward $1.7 billion, or 12% of their budgets, to Israel each year.[116] FIDF 2014 total charitable contributions to the Israeli army alone totaled over $105 million. That is enormous supplemental financial support for a foreign army, since their country is roughly the size and population of New Jersey. For 2013, FDIF's "Lone Soldiers" program provided financial, social, and emotional support to the 2800 foreigners serving in the IDF every year at a cost of $6,000 each to the U.S. taxpayer. These foreigners are mercenaries in every sense of that term. They, along with G4S personnel, have taken over many security assignments that IDF personnel used to perform. This allows IDF soldiers to assist armed settlers in demolishing Palestinian homes and olive orchards and terrorizing the local population.[117] Thus, the funds have subsidized wholesale violence, malicious property destruction, and comprehensive war crimes abroad.

---

[115] Based on RE/MAX Israel property listings.
[116] http://forward.com/news/israel/194978/26-billion-bucks-the-jewish-charity-industry-unco/, accessed December 9, 2015.
[117] For example, Khan Yunis is one of eight refugee camps in Gaza, surrounded on three sides by Israeli military positions staffed by G4S personnel and mercenaries. The presence of those forces frees up the IDF soldiers

105.    The Jewish National Fund ("JNF"), a global entity with annual revenues of over $2.2 billion, owns 13% of Israeli land, and plants forests to obstruct the ruins of ethnically-cleansed Palestinian villages (out of sight, out of mind).[118] JNF's funding builds settlement infrastructure improvements, evicts Palestinians from their homes in EJ, and restricts the use of its land (with RE/MAX officials' assistance) on a strictly racial and religious basis, i.e., only Jews can purchase the homes which terrified Palestinian families have abandoned.[119] Because it overtly supports racial and religious discrimination (i.e., "Jewish-only" land covenant restrictions), its application for renewal of UN observer status was properly rejected.

106.    There are other significant issues that Treasury has not addressed[120] given the billions of dollars flowing into the Israel-based NGO bank accounts ($1.729 billion in 2007). One issue involves FIDF and its sister NGO in Israel, which funds college scholarships for IDF veterans, not U.S. veterans. *Thus, U.S. taxpayers are actually funding the tuition charges that Israeli army veterans incur in attending the illegal Ariel University.* It is an illegal institution because the entire settlement currently sits on private Palestinian property, i.e., "stolen lands" according to Zahara Gal-on of the Israeli Meretz political party.[121] Since the settlement was built on private Palestinian property and its residents continue to annex additional private property, that conduct represents classic

---

stationed there to focus on offensive maneuvers such as firing down upon the roofs of the concrete shacks. When Khan Yunis opened in 1948, it was a vast tent city set up for 35,000 refugees. Although today it is roughly the same size, it now houses almost twice the number of refugees at 58,891. Each refugee has approximately 50 square feet of living space, the equivalent of a prison cell.

[118] Haaretz, Jewish National Fund, in Historic Unveiling of Finances, Holds $2 Billion in Land, http://www.haaretz.com/israel-news/business/.premium-1.664922. Accessed December 8, 2015.

[119] See https://electronicintifada.net/content/why-colorado-firm-selling-apartments-israels-illegal-settlements/14029 (the RE/MAX agent asked "are you Jewish?" and added "you have to check the properties—if their owners say they can sell an apartment to non-Jewish people."). That restrictive covenant practice should be a sufficient basis for revoking its 501(c)(3) status. U.S. Federal housing authorities routinely prosecute private housing providers for engaging in such activity.

[120] Israel Lobby p. 363 ("contributions from American individuals and American 501(c)(3)s to Israeli charities were unsupervised, and their ultimate use was difficult to trace and determine"). See also Bank of Jerusalem's guide for Israeli charities, "Help them Help You: A Recommendation for the Israeli Charity" available at www.bankjerusalem.co.il/indexE.php?page=588 (accessed March 28, 2007).

[121] http://mondoweiss.net/2012/07/settler-college-granted-israeli-university-status, accessed December 4, 2015.

settlement expansion, and it clearly violates U.S. public policy as has been articulated by Secretary Baker, numerous presidents, and their presidential spokespersons. The embarrassing result—Israeli army veterans, unlike millions of struggling U.S. college graduates, have no student loans to pay off courtesy of the U.S. tax code.

107.    There are other examples of the abuse of our tax laws. The Capital Athletic Foundation, although ostensibly supporting athletic endeavors, actually funded "sniper schools" and paramilitary activities in another illegal settlement called Beitar Illit.[122] Another entity, Amitz Rescue and Security, has raised money through two Brooklyn-based nonprofits. According to its website, it trains and equips paramilitary units located in OPT settlements, and encourages its donors to send "a tax-deductible check for night-vision binoculars, bullets, and guard dogs."[123] It is difficult to appreciate why settlers who claim they are peaceful and law-abiding citizens raising families in their community need this type of sophisticated military hardware. After all, the settlements are protected by the separation wall, thousands of concrete security barriers, 24/7 surveillance by settlers using Hewlett-Packard surveillance and tracking devices and Motorola's thermal imaging systems, and round-the-clock protection afforded by G4S personnel.  This is especially true since their Palestinian neighbors are unarmed, non-threatening farmers who are sincerely trying to figure out, by working with settlement officials, how they can harvest their olive groves, which are now located in the expanded settlement.

108.    Similar flagrant violations include:

---

[122] Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010.
[123] Id.

(a) In certain cases like American Friends of Bet El and American Friends of Shiloh, some of the entities have not even registered for tax-exempt status, yet today are soliciting tax-deductible contributions which will end up in settlement bank accounts.[124]

(b) The Hebron Fund, a 501(c)(3), makes the Hebron area totally unlivable for the 120,000 Palestinians living there. Officials have imposed and enforced a 9:00 am to 5:00 pm curfew for all non-Jews living there. Thus, Palestinian families are forced to remain indoors for at least 16 hours a day;

(c) Palestinian mothers and their children in Hebron are routinely pelted by rocks thrown by armed settlers when trying to access the local school. Thus the Hebron tax-exempt entities have been and are today funding wholesale violence.

(d) Friends of Ir David has donated $10,000,000 between 2004 and 2006 to reportedly fund architectural excavation projects in the Silwan area of EJ, which activity is a pretext for destroying Palestinian homes.[125] Since 1967, as a result of FID's significant financial assistance, at least 50% of EJ has now been trespassed upon and converted by "Jewish-only" settlers, which has all been made possible by donor Moskowitz and the U.S. tax code.[126] Thus, Jerusalem proper now has a substantial "Jewish-only" enclave which is growing on a daily basis.

(e) A Colorado-based entity named Christian Friends of Israeli Communities set up an "adopt a settlement" program, and secures contributions from church members for approximately 22 "Jewish-only" settlements.[127] The problem is that armed settlements use that funding to engage in wholesale violence and settlement expansion, which

---

[124] See Financial Support of Settlements by U.S. Non-Profits Nov. 14, 2011
http://lajewsforpeace.org/Essays/Settlements/Reportfor2009.pdf, accessed December 4, 2015.
[125] See http://www.washingtonpost.com/wp-dyn/content/article/2009/03/25/AR2009032502800.html.
[126] Id.
[127] See http://www.cfoic.com/what-is-settlement/, accessed December 9, 2015.

necessitates the removal of more Palestinian homeowners. CFOIC's banking activity is classic money laundering and has been going on for at least 20 years. That violation of a federal criminal statute alone should warrant a FinCEN investigation.

(f) Tax-exempt entities like the Steinmetz Foundation similarly adopt different brigades of the Israeli army,[128] and thus have aided and abetted the commission of war crimes. Whether it is a brigade in the Israeli army or a settlement in the OPT, funding these criminal activities violates numerous Treasury regulations, Israel's Declaration and its BLHDL statute, besides international principles embodied in the Hague and GCIV conventions. To make matters worse, the brigade that the Steinmetz Foundation adopted, known as the Givati Brigade, inflicted the most damage during the second Gaza invasion out of all of the brigades that went into Gaza.[129] No 501(c)(3) tax-exempt entity should be paying, directly or indirectly, foreign soldiers to commit war crimes and genocide against a local civilian population whose only crime is trying to access their olive groves.

(g) One non-profit group called Ir David (known by its acronym "Elad") finances archaeological digs and buys up Arab-owned properties, and has recently announced a plan to raze 22 Palestinian homes to make room for a history park in EJ[130]—a pretext to demolish the 22 Palestinian homes located on the property. Construction of the history park is obviously a pretext to confiscate more Palestinian property, because local officials have made no attempt to offer these homeowners alternative housing in East Jerusalem. The reason being is that they want a "Jewish-only" Jerusalem, just like Sheldon Adelson and Irving Moskowitz.

---

[128] http://mondoweiss.net/2015/12/diamonds-tiffanys-supplier, accessed December 14, 2015.
[129] http://www.btselem.org/gaza_strip/20120508_samuni_op_ed, accessed December 14, 2015.
[130] Tax-Exempt Funds Aid West Bank Settlements, NY Times July 5, 2010.

(h)  To deceive both U.S. and Israeli tax authorities, as well as NGO groups in Israel that monitor illegal property acquisitions, JNF set up organizations like Himnuta in 1938 and Elad in 1986, and have frequently used them to purchase homes in the OPT. As part of its deceptive practice, those homes are titled in the names of Himnuta and Elad without therefore showing JNF's involvement or its funding. Hence, JNF can plausibly claim, as it does today, that it is not active in terms of ethnically cleansing the Palestinian population in Silwan. Consistent with that deceptive practice, a 1992 official Israeli investigation found that Elad and other settler groups had *"made false affidavits, misused the absentee property law, and received illegal transfers of public property and tens of millions of shekels of public funds."*[131] Elad was even criticized by the White House because its "agenda by definition stokes tensions between Israelis and Palestinians in the Silwan area."[132] As already noted herein, 501(c)(3) entities are supposed to lessen, not increase, neighborhood tension.

(i)  The JNF has been criticized by the UN Economic Committee on Social Rights for violating the UN's  International Conventions on social rights and racial discrimination.[133] A more serious problem is that Treasury has no idea today how many billions of dollars are controlled or disbursed by JNF on an annual basis. Thus, Treasury has no idea as to how much of that money funded settlement expansion, malicious property destruction, ethnic cleansing, and wholesale violence in the OPT. This is not a minor issue, because that fund has assets totaling $2.4 billion, including approximately

---

[131] See http://imeu.org/article/elad-the-jewish-national-fund-the-us-taxpayer-subsidized-judaization-of-sil, accessed December 8, 2015.
[132] Id.
[133] Id.

13% of Israel's land.[134] That is another reason why Treasury should start an investigation of the activities of these entities.

(j)   In the case of Honenu, a recent Haaretz investigation shows that some of its funding has gone toward providing legal aid to Jews accused or convicted of terrorism, and supporting their families. Annual reports filed by the group with Israeli authorities show that Honenu received nearly 600,000 shekels ($155,000)—20 percent of its income— from U.S. sources last year. Among those who benefited from the group's support in 2013 were the family of Ami Popper, who murdered seven Palestinian laborers in 1990, and members of the Bat Ayin Underground, which attempted to detonate a bomb at a Palestinian girls' school in East Jerusalem in 2002. Honenu also raised money for Prime Minister Yitzhak Rabin's assassin, Yigal Amir, who is serving a life sentence for his crime. Honenu says it has provided aid to thousands of suspects, including Israeli police officers, soldiers and civilians.[135] It does not appear that Honenu officials offer similar free legal aid to the non-Jewish population, i.e., thousands of Palestinian political prisoners are currently incarcerated in prisons located in Israel proper based on bogus criminal charges. They were convicted based on "show" trials conducted by military commanders dedicated to the expansion of the Zionist state.

109.   Since the entities referenced herein have flagrantly abused their tax-exempt status, their activities should be investigated, and where appropriate, their tax-exempt status should be revoked. They have not only deceived their donors and violated Treasury's regulations, but violated clearly-defined U.S. and Israeli public policy. Former U.S. Secretary of State Jim Baker in 1992 told the Israeli ambassador that the U.S. tax code "was not going to underwrite Israeli

---

[134] http://www.haaretz.com/israel-news/business/.premium-1.664922.
[135] Haaretz investigation: U.S. donors gave settlements more than $220 million in tax-exempt funds over five years, December 7, 2015. http://www.haaretz.com/settlementdollars/1.689683.

policies [i.e., illegal settlements] that fundamentally contradict its own principles and long-stated policies."[136] Unfortunately, this is exactly what Treasury has been doing over the last 30 years, i.e., encouraging the precise result that President Clinton and Treasury officials were trying to prevent per his 1995 Executive Order 12947—stop Middle East violence by designating individuals who choose to fund that violence, and by freezing their bank accounts.

110.    Based on the authority that Congress delegated to Treasury, it is obvious that Treasury has the authority to investigate potential abuses of the tax-exempt entities and seek revocation of their tax-exempt status. Given the fact that the entities named herein have also defrauded the IRS and engaged in illicit money-laundering activity, it is even more compelling for Treasury to investigate these activities. Its FinCEN unit specializes in investigating illicit money laundering activity, but it has not been tasked with the responsibility of doing so in connection with the pro-settlement tax-exempt entities referenced herein. Based on Treasury's 30-year abysmal history of failing to enforce its own tax regulations, at least with respect to pro-Israel 501(c)(3)s, FinCEN will never receive that assignment without a federal court order.

111.    All of these notorious criminal activities have been engaged in with the express knowledge of Treasury. Yet its Office of Foreign Assets Control has failed to designate any of these tax-exempt entities or freeze the bank accounts of U.S. individuals who fund these entities and thus promote terrorist activity, i.e., rendering material assistance to entities located overseas that use violence against civilian populations for political purposes. *Query: Why haven't the senior IDF commanders who were responsible for the conduct of their troops, who intentionally murdered U.S. citizen Rachel Corrie in 2002, been designated by Treasury?* Rachel Corrie was run over twice by a large tractor operated by Israeli army soldiers while she was trying to save a Palestinian family's home from being demolished based on a bogus security rationale. That is another reason why American

---

[136] http://www.washingtonpost.com/wp-dyn/content/article/2009/03/25/AR2009032502800.html.

donors and tax-exempt entities like FIDF who fund the Israeli army are actually funding heinous war crimes.

112.  Treasury has the duty *inter alia* to maximize America's tax revenue base, to collect taxes, and has an obligation to investigate violations of any and all tax regulations. For example, all of these entities knowingly pledged to adhere to applicable Treasury regulations when they filed their applications for tax-exempt status under penalty of perjury. In their applications, they recited the "educational" and "charitable" activities that they would engage in overseas, but they never informed the IRS or Treasury that, *inter alia*, they would also be purchasing military hardware for the settlers and funding settlement expansion, malicious property destruction, and wholesale violence. Thus, besides violating U.S. money laundering statutes and defrauding the IRS, and sending billions of dollars overseas to promote settlement expansion, they also violated the federal perjury statutes, which provide for a five-year prison sentence and a substantial fine. Unless some tax-exempt entity officials are actually indicted and prosecuted by the Justice Department, this practice will continue unabated.

113.  Because OFAC was specifically authorized by Congress to ensure that the perpetrators of the activities described herein be sanctioned to the fullest extent of the law, it has a duty to at least investigate the funding of terrorist activity abroad, especially when it involves the murder of or assault upon U.S. Citizens. Just like OFAC, FinCEN has the same obligation with respect to investigating all entities, not just 501(c)(3)s, who are suspected of money laundering activity in America or overseas.

114.  It is obvious, based on the flagrant abuses detailed herein, that Treasury has failed to discharge various obligations owed to U.S. taxpayers, including the Plaintiffs named herein. For example, it is clear that Treasury has taken no steps to investigate these tax-exempt entities, their primary donors, and the criminal activities they have financed overseas. These activities not only

violate Treasury regulations but also serve to frustrate U.S. foreign policy objectives. Nor has it directed FinCEN to investigate the money laundering activities described herein. Unless Treasury is the subject of a Court Order requiring OFAC, FinCEN and the IRS to investigate the various criminal activities detailed herein, it will not do so on its own.

115.    Besides violating numerous Treasury regulations, numerous U.S. donors and tax-exempt entities have funded or actually engaged in war crimes and other atrocities documented in the UN special report authored by Special Rapporteur Richard Falk. Thus, there are a host of specific instances of terrorist activities funded by U.S. citizens that Treasury could investigate but chooses not to do so. Based on the evidentiary standard and the documentation which Treasury used to rationalize designating members of the Venezuelan military in April 2015 and recently the Hezbollah financier known as like Abd al Nur Shalan, Treasury officials could easily justify designating one or more of the tax-exempt entities and donors referenced herein, and freezing their bank accounts.

116.    But because Treasury employs a double standard when it comes to regulating pro-settlement tax-exempt entities, the 501(c)(3) entities' bank accounts, and those of their donors, will not be frozen, nor will the entities be stripped of their tax-exempt status. Treasury officials cannot deny that Treasury has the requisite authority to designate one or more of the individuals and entities identified herein, especially since they have financed ethnic cleansing abroad and engaged in money laundering. State Department officials have condemned ethnic cleansing for at least 40 years, insisting that it cannot be tolerated or condoned in any manner.[137] Since Treasury wrote the manual on preventing Middle East violence, i.e., President Clinton's 1995 Executive Order

---

[137] See "Bosnia and Herzegovina Human Rights Practices", U.S. Department of State report, March 1996, available at http://dosfan.lib.uic.edu/ERC/democracy/1995_hrp_report/95hrp_report_eur/Bosnia-Herzegovina, accessed December 10, 2015.

12947, and since it has 106,080 employees and an annual budget of $22.6 billion,[138] performing a comprehensive investigation of the atrocities described herein (all funded by the U.S. donors/entities) should not be an overwhelming task. A first step could be Treasury deciding on its own to reassign some of the 92,009 IRS employees to the IRS's Tax Exempt and Government Entities Division, which currently has 894 employees (0.8% of Treasury's workforce[139]) or ask Congress for additional funding.

117.     The Plaintiffs, of their own initiative and also through undersigned counsel, have on multiple occasions requested that Treasury investigate the aforementioned entities and, where appropriate, revoke their tax-exempt status.[140] To date, Treasury has done little more than acknowledge the communications.[141] *Furthermore, upwards of 90 similar requests were made to Treasury by the Arab-American Anti-Discrimination Committee (ADC) and its affiliates between 2009 and 2010.* In addition to ADC's campaign, Adalah-NY and at least five other organizations have made similar requests. Recently, in March 2015, Avaaz filed a detailed complaint justifying Treasury in stripping the tax-exempt status of the Hebron Fund.[142] Pictures attached thereto are shown in Exhibit B herein. The response has always been perfunctory and dismissive, i.e., "we aggressively enforce our tax regulations" (basically, "don't bother us"). Given this "don't bother us" attitude, without a Court Order, Treasury will not enforce its own tax regulations against U.S. pro-settlement donors/entities, even if that change in policy, i.e., aggressive enforcement of tax

---

[138] https://www.treasury.gov/about/budget-performance/budget-in-brief/Documents/Treasury_FY_2015_BIB.pdf, accessed December 15, 2015.
[139] See https://www.treasury.gov/about/budget-performance/budget-in-brief/Documents/Treasury_FY_2015_BIB.pdf, and www.irs.gov/Government-Entities/Tax-Exempt-%26-Government-Entities-Division-At-a-Glance, accessed December 15, 2015.
[140] See letters dated February 2, May 6, and August 6, 2015, on file with the Plaintiffs. Plaintiff Grant Smith has been filing similar requests for at least the past ten years.
[141] See responses dated April 22, 27, June 8, 11, and August 18, 2015, on file with the Plaintiffs.
[142] https://avaazimages.s3.amazonaws.com/HebronFundComplaint%20-%20Avaaz%20public%202.pdf, accessed December 15, 2015.

regulations, would result in Treasury recouping billions of dollars on behalf of the American taxpayer.

118.    IRS Commissioner Douglas Shulman, in January 2010, told National Public Radio in an extensive interview concerning tax-exempt entities "that if the IRS did find these organizations to be breaking tax law, it would disqualify them from exemption, as it does many organizations every year." Of course, if Treasury is unwilling to investigate these entities and their donors, as its abysmal 30-year track record reveals, the entities will never be "disqualified."[143] For at least 20 years, pro-settlement tax-exempt entities have sent millions of dollars overseas to promote wholesale violence and settlement expansion. In doing so, they relied on Treasury's obvious lack of zeal in enforcing its own tax regulations. The fact that $1 billion is now going to fund the settlements every year is stark evidence that they have been correct in that assessment. U.S. taxpayers have a vital stake in Treasury rededicating itself to properly monitoring the activities of tax-exempt entities funding the expansion of settlement activity in the OPT. The reason is that if the entities named herein were disqualified based on their 20-year track record of money laundering, ethnic cleansing, and racketeering criminal activity, consistent with IRS Commissioner Shulman's above-referenced statement, Treasury would be able to recoup approximately $1 trillion for the American taxpayer. By doing so, it would also send a powerful message to American individuals intent on funding violence abroad, i.e., your bank account will be frozen, your business activities will cease, and you will face certain criminal indictment.

119.    As a direct result of the funding they provided, tens of thousands of Palestinians have been murdered, permanently injured, witnessed the destruction of 900,000 olive trees[144], lost loved ones, lost bodily limbs and eyesight, have had their legs amputated and their homes burned

---

[143] See https://electronicintifada.net/content/activists-work-stop-tax-exempt-donations-israeli-settlements/8955, accessed December 4, 2015.
[144] See http://mondoweiss.net/2013/10/palestinian-equivalent-destroying, accessed December 8, 2015. See also Palestine Inside Out Kindle location 617.

down with civilian relatives inside. Ariel, just like all the other settlements, without receiving massive financial subsidies from their sister U.S. tax-exempt entities, could not have expanded from six tents and two outhouses to a city with 25,000 permanent residents who occupy first-class housing facilities, enjoy a state of the art medical facility and attend a major university. Ariel is now a vibrant, very livable city worth at least $20 billion. Its only problem is that it is located outside of Israel proper and on "stolen lands," i.e., private property owned by Palestinians. The fact that the entire Ariel settlement is located on private property has been confirmed by former Prime Minister Sharon and a number of prominent Israeli citizens and journalists. As already referenced herein, 165 academicians will not teach at Ariel University because the settlement is located on private property.

120.    As a direct result of the above-described criminal conduct, the donors, tax-exempt entities, and recipient settlements have inflicted enormous injuries on the Palestinian people. They intended to and have prevented the Palestinian native population from living in peace in their ancestral homeland, protecting their families, tending to their farms and olive orchards, and enjoying their neighborhood safe from violence, a clear violation of Israel's own Declaration, which is an identical recital of UN Charter principles. Israel's Declaration and its 1992 BLHDL statute unconditionally guarantee these fundamental rights to all "inhabitants" and "persons" residing in the OPT, whether a Palestinian national or not. They both are, still, a vital part of Israel's national legal system, and have never been rescinded, as confirmed by the February 2015 holding in *Corrie v. Israel*. Until such time that the Knesset enacts a statute which recites that Palestinians are not allowed to claim that they are either "persons" or "inhabitants" of the OPT, these rights remain in force.

WHEREFORE the Plaintiffs hereby request relief from this Court in the form of an order requiring Treasury to: (a) initiate an investigation into any and all tax-exempt entities based in America which

transmit $20,000 or more on an annual basis to any country in the world and, where appropriate, revoke the entity's tax-exempt status; (b) refer all tax fraud and money laundering findings to the IRS and/or U.S. Department of Justice for criminal prosecution; (c) order FinCEN to investigate the entities, including BL's U.S. subsidiary, and individuals who have engaged in the money laundering activities described herein; and (d) initiate a long-overdue investigation of all of the financial sponsorship of and commission of the violent activities alleged herein on the part of U.S. tax-exempt entities, their donors, and IDF/G4S personnel.

As a final request, since it appears both Bank Leumi and Bank Hapoalim were the preferred banking facilities used by the donors, the tax-exempt entities, and the settlements, Treasury agents should subpoena and examine all of their banking records pertaining to wire transfers made to settlement bank accounts and to the Israeli army's bank account in the last 40 years. Both Bank Leumi and Bank Hapoalim were vital players in terms of settlement expansion and the funding of wholesale violence, and without their banking services and acumen, the original hilltop tent encampments would not have been able to morph into permanent cities with concert halls, universities, and state-of-the-art medical facilities.

Respectfully Submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*


W. Jameson Fox, Esq.
D.C. Bar Admission Pending
wf@martinmcmahonlaw.com
*Counsel for Plaintiffs*

**EXHIBIT A**

**CUSTOMARY INTERNATIONAL LAW**

1. 1863 Instructions for the Government of Armies of the United States in the Field, General Order № 100 ("Lieber Code of April 24, 1863")

2. 1899 The Hague Convention of 1899

3. 1907 The Hague Convention of 1907

4. 1945 Charter of the International Military Tribunal – Annex to the Agreement for the prosecution and punishment of the major war criminals of the European Axis ("Nuremberg Charter")

5. 1945 United Nations Charter

6. 1946 Nuremberg Principles

7. 1948 Universal Declaration of Human Rights

8. 1948 Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention")

9. 1949 Geneva Convention relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention" or "GCIV")

    a. Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol 1)

10. 1957 Standard Minimum Rules for the Treatment of Prisoners

11. 1959 Declaration of the Rights of the Child

12. 1965 International Convention on the Elimination of All Forms of Racial Discrimination

13. 1966 International Covenant on Civil and Political Rights

    a. First Optional Protocol to the International Covenant on Civil and Political Rights

14. 1966 International Covenant on Economic, Social, and Cultural Rights

15. 1984 Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

16. 1986 Comprehensive Anti-Apartheid Act of 1986

17. 1989 Convention on the Rights of the Child

18. 1998 Senate Resolution of Ratification of the International Covenant on Civil and Political Rights

19. 2000 Optional Protocol to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflicts

20. 2004 Arab Charter on Human Rights

**EXHIBIT B**

**PHOTOGRAPHS FROM MARCH 3, 2015 AVAAZ.ORG COMPLAINT TO TREASURY RE HEBRON FUND**



An armed settler walks past a Palestinian on Shuhada Street, in the West Bank city of Hebron. http://www.theatlantic.com/international/archive/2014/06/the-shame-of-shuhada-street-hebron/372639/



Star of David constructed by Israeli settlers on Palestinian land in the Hebron hills. This marks territory, prevents grazing of Palestinian sheep, and was not stopped by the IDF. http://972mag.com/photo-settlers-build-star-of-david-on-palestinian-land/103466/



An Israeli Jewish settler throws wine on a Palestinian Muslim woman on Shuhada Street in Hebron, which has been extensively defaced with anti-Palestinian graffiti. Consumption of alcohol is forbidden to devout Muslims, and many consider physical contact with alcohol to be defilement. Anyone classified as ethnically Palestinian must obtain a special pass to walk on this street.
http://www.nytimes.com/slideshow/2009/09/13/world/20090913SETTLERS_6.html