**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUSAN ABULHAWA, AVRAHAM PELED, a.k.a. MIKO PELED, DOA'A ABU AMER, PEGGY AHWESH, JAMES ANDERSON, REV. DANNY AWAD, ALICE BACH, ANTOINE BOGHOSSIAN, GLORIA BOGHOSSIAN, TANIA BOGHOSSIAN, JOHN BOYD, MARINA BUHLER-MIKO, JAMES COBEY, JOHN DOE, ABDUR-RAHIM DUDAR, TY EBRIGHT, ABBAS HAMIDEH, STEVEN GOOSSEN, RAY GORDON, LINDA KATEEB, LINDA MANSOUR , DONNA NASSOR, ROBIN NICHOLAS, ALAN NOFAL, MICHAEL RABB, MARY SCHULTZ, LYNN SCHULTZ, MICHAEL SEVERAL, RICH SIEGEL, GRANT SMITH, MICHAEL SMITH, LOU STONE, ROBIE TENORIO, JOHN VAN WAGONER, LINDA VASQUEZ, WENDELL WOODS, and AHMED AL-ZEER | Case No. 1:15-cv-2186-RDM |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE TREASURY and UNITED STATES DEPARTMENT OF THE TREASURY SECRETARY JACOB LEW, in his official capacity, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT TREASURY'S MOTION TO DISMISS**

Defendant Treasury has moved to dismiss the Complaint filed herein on the basis that not a single Plaintiff has alleged a specific injury arising out of its failure to monitor and prevent the criminal activities engaged in by numerous pro-settlement 501(c)(3) entities it regulates. The motion should be denied for a number of reasons. First, as shown herein, a number of Plaintiffs have sustained specific injuries as a result of Treasury's adamant refusal to take its regulatory oversight

obligations seriously. Second, the instant litigation is unique in that it involves an administrative agency which has frustrated U.S. foreign policy objectives for decades. Third, for reasons which Treasury has not shared with the Court, it refuses to fulfill its legislatively-mandated oversight role in terms of regulating pro-settlement tax-exempt entities which have been, along with their donors, blatantly abusing the tax code. Finally, as detailed herein, Treasury officials have adopted a "double standard" when it comes to regulating these pro-Israel tax-exempt entities.

Given the serious allegations herein, Treasury has to concede that this case addresses more than minor bookkeeping offenses. These charities have: (a) filed misleading 501(c)(3) applications and incomplete annual 990s; (b) engaged in money laundering activity; (c) violated numerous Treasury tax-exemption regulations; and (d) violated at least seven federal criminal statutes, including the federal perjury statute. Their officials have committed perjury because they failed to inform the IRS when applying for tax-exempt status that they would be using charitable contributions to finance criminal activities abroad, e.g., engaging in trafficking of sophisticated military hardware for violent settlers. These officials encouraged the settlers to use such hardware to threaten, murder and maim their Palestinian neighbors to cause them to abandon their homes which had been in the family for three generations. To date, some 400,000 Palestinians have been forcibly evicted from the OPT.

Ironically, preventing arms trafficking was the specific goal of the Treasury Department when it coauthored President Clinton's Executive Order 12947 in 1995. Arms trafficking, as this Court knows[1], necessarily results in heightened tensions in every community it touches, including the Middle East. And it often leads to wholesale violence and the murder and maiming of innocent civilians—war crimes. Thus, Treasury's refusal to stop the wholesale violence being funded by these

---

[1] "The illicit trafficking of conventional arms is an important national security concern for the United States." U.S. Department of State Spokesperson Victoria Nuland at Arms Trade Treaty Conference, June 27, 2012 https://geneva.usmission.gov/2012/07/30/state-dept-on-outcome-at-arms-trade-treaty-conference/

501(c)(3)s *directly contravenes U.S. foreign policy objectives*. That is why it is difficult to conceive why senior Treasury officials have allowed, if not encouraged, the funding of this brazen criminal activity abroad.

## SUMMARY

As this Court knows, in order to secure mandamus relief, a party must: (a) convince the Court that there is a serious enforcement issue that the agency has not addressed, which issue comes within its jurisdiction; and (b) must allege, not prove at this procedural stage, that individuals have been harmed by the agency's failure to take remedial action to redress the issue. There is no question that non-enforcement of tax-exemption regulations is a serious issue which, *inter alia*, depletes Treasury's annual cash reserves by at least $500 million per year. Senior government officials like former U.S. ambassador to Israel Daniel Kurtzer have written about the consequences of non-enforcement of tax-exemption regulations.[2] It allows pro-settlement tax-exempt entities to fund criminal activities and frustrate longstanding U.S. foreign policy objectives. President Obama and senior Treasury and State Department officials have all repeatedly announced how important it is to achieve peace in the Middle East by shutting down charities which choose to fund violence in the area. The numbers alone should concern Treasury, i.e., they are staggering—$1.7 billion in tax-deductible laundered funds every year to charities overseas.

The agency's burden is twofold—to convince the Court that: (a) non-action on its part (failure to investigate clear abuses of the Tax Code) for the past ten years is in the best interest of the U.S. public; and (b) its failure to deter the criminal activities the 501(c)(3) entities have been financing has not resulted in injury to anyone. As shown herein, Treasury's non-enforcement of its own tax-exemption regulations has violated clearly-articulated U.S. foreign policy objectives and thus is not in the best interest of the U.S. public. And its inaction has harmed a number of individuals,

---

[2] *See* "Real Talk on Israeli Settlements," Daniel Kurtzer, https://www.foreignaffairs.com/articles/israel/2016-01-13/real-talk-israeli-settlements.

including the Plaintiffs. As recited in the Second Amended Complaint (hereinafter "Complaint"),

Plaintiff Abu Amer has lost 14 family members. Plaintiff Rev. Awad lost his church property.

Plaintiff Al-Zeer has lost his ability to practice law. Plaintiff Kateeb has lost two parcels of land, and

will likely lose four more, totaling over $1 million based on RE/MAX land values. Thus, Treasury's

adamant refusal to take its oversight duties seriously has already inflicted real harm on the Plaintiffs,

and will continue to harm them. For example, Plaintiff Kateeb will lose four more parcels of land

this year because armed settlers will be able to literally steal more of her property.

For the Court's edification, not a single authority cited in Treasury's legal memorandum: (a)

involves an administrative agency like Treasury which has frustrated U.S. foreign policy objectives

for at least 30 years; or (b) authorizes an administrative agency to condone the violation of seven

federal criminal statutes activity financed by entities that it supposedly regulates; or (c) excuses an

administrative agency for taking no action at all when it has been on notice for at least ten years

about a serious enforcement issue, having received approximately 100 complaints concerning that

issue; or (d) the administrative agency (the IRS) charged in its mission statement with the obligation

to maximize the U.S. government's tax revenues is not concerned with losing $500 million a year; or

(e) an administrative agency which consistently condones the financing of the murder and maiming

of U.S. citizens, i.e., Rachel Corrie, Mahmoud Shaalan, and Brian Avery. These U.S. citizens have

been murdered or maimed by the Israeli army, which is funded by a U.S. charity entitled Friends of

the Israel Defense Forces (FIDF). In 2014 alone, the Israeli army received $104 million from FIDF,

and its donors took the same amount in tax-deductible contributions.

Treasury's decision to ignore the criminal activities financed by the tax-exempt entities

referenced herein is nothing short of disgraceful. And its adamant refusal to investigate pro-

settlement tax-exempt entities is akin to: (a) the Securities Exchange Commission telling a Bernie

Madoff victim "look we just gave him a license as an investment advisor to buy and sell securities.

We have no responsibility to make sure he isn't cheating people;" or (b) allowing the Food and Drug Administration to say "sorry about the outbreak of salmonella in your community, but we just issue licenses to food processing plants—we do not monitor the licensees' activities;" or (c) the Michigan State Water Authority telling Flint citizens "sorry about the lead in your water, but we don't have any duty to make sure you have clean drinking water. We just license contractors to do the necessary work, we do not monitor their activities after issuing those licenses;" or (d) the Nuclear Regulatory Commission telling sick Americans in Richland, Washington "sorry to hear about the nuclear radiation leak in your community, but we just approve the issuance of licenses allowing people to build nuclear facilities. We have no duty to monitor a licensee's activity or protect adjoining landowners from radiation leaks." These examples, although exaggerated, are no more absurd than Treasury's adamant refusal to deter the financing of rampant criminal activity in the OPT.

## I.   CONTRARY TO TREASURY'S ASSERTIONS, PLAINTIFFS HAVE SUFFERED SPECIFIC INJURIES DUE TO ITS INACTION

As detailed herein, Treasury has failed to address the specific, discernable injuries arising from its inaction. Contrary to Treasury's assertions, Plaintiffs are not merely asserting a right to have the Government act in accordance with the law.[3] As was the case in *Osborn v. Visa Inc.*,[4] the Plaintiffs' allegations herein deal with specific injuries, i.e., I lost a loved one/I lost two houses/I lost a career/I lost my Church as a result of Treasury's inaction. They are not speculative allegations which are disguised as predictions. Plaintiffs' factual allegations, taken as true at this early procedural stage, are sufficient, as discovery has not yet occurred. As observed in *Osborn*, "In deciding that the Plaintiffs had failed to establish injury and redressability, the District Court (incorrectly) relied on cases that had been decided at summary judgment." *A rule 12(b)(6) motion, however, is not the occasion for evaluating the accuracy of an injury.* At this procedural stage, if Plaintiffs establish facts that are "specific,

---

[3] *Allen v. Wright*, 468 U.S. 737 (1984).
[4] 17-7004 (D.C. Cir. 2015).

plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage."[5]

Treasury has not addressed the injuries that the individual Plaintiffs have alleged in the Second Amended Complaint. These are actual injuries which are all redressable by this Court issuing an appropriate order compelling Treasury to investigate the criminal activities financed by the charities named herein. They and their donors have repeatedly abused the tax code, and Treasury is the only agency with the authority, the expertise, and the resources to prevent such abuse from recurring.

### a. Direct, actual injury

Plaintiff Linda Kateeb, a U.S. citizen, has been directly injured by Treasury's failure to investigate the 501(c)(3)s which fund the settlement known as Bet El. Plaintiff Kateeb's father had owned six plots of land in the West Bank, which were deeded over to Plaintiff Kateeb as a result of an estate proceeding in Ohio. New deeds were executed in her name, and they are in her current possession. However, when she went to have these new deeds recorded, her attorney told her that an Israeli settler organization had recently purported to purchase two of those plots. The sellers were violent Israeli settlers supported by funds provided by U.S. tax-exempt entities (most likely American Friends of Bet El Yeshiva or Christian Friends of Israeli Communities[6]) who had set up outposts on the land and claimed to have deeds which, under the circumstances, had to have been forged.

---

[5] *Id.*

[6] Treasury has argued that Plaintiffs do not adequately tie a specific tax-exempt entity to the damages they have suffered. This is the very reason why it is so important that Treasury's motion to dismiss be denied and that discovery be afforded to the Plaintiffs. At this point Plaintiffs do not know which entity funded specific wrongs done against them and their property, but the identity of the perpetrating entity is very likely to come out in discovery, as many of the tax-exempt entities style themselves as "American Friends of [insert settlement name here]" or have specific types of settlement activities which they support. If this Court requires Treasury to produce the tax filings and other documents it possesses regarding these entities, the flow of funds to certain violent settler groups will be clarified.

As a result of the forged deeds and the obvious fraud perpetrated on Plaintiff Kateeb, there are now armed settlers living on those two plots, who have no legally valid documentation warranting their occupation of the property or their ownership. Plaintiff Kateeb's land has been in her family for generations, and she has both an economic and emotional interest in retaining it. This interest is personal, legally protected, concrete, and particular down to the plot number and delineated square acreage of the land. This interest is actual—she has travelled overseas and visited the properties owned by her father. Her local attorney has worked diligently, but unsuccessfully, to regain possession of those two plots. The imminent damage to the remaining four plots is undeniable—the settlement of Bet El proclaims itself to be on the "front lines" of "regaining" land based upon ideological imperatives, and its armed and violence-prone settlers have shown themselves more than willing to engage in outright land theft.

### b. Causation

But for Treasury's failure to investigate American Friends of Bet El Yeshiva ("AFBEY") and other organizations involved, and revoke their 501(c)(3) status, Plaintiff Kateeb would today still own her father's land, and not fear further theft thereof. In rationalizing theft of private property, which is a crime under U.S. and Israeli law, Treasury seeks to characterize the OPT as some kind of wild frontier where all causal chains have become entangled in a morass of wholesale violence. Not only is such a condescending viewpoint misplaced,[7] Treasury fails to recognize that it is the agency that has made such violence possible.

---

[7] Treasury seems to be arguing "look, it's the wild west out there. Are you going to hold us accountable for failing to stop renegades and outlaws from hurting each other in some distant no-man's land?" This is a red herring for two reasons. First, Treasury itself has injected itself into the Middle East peace process by means of Executive Order 12947, OFAC's right of designation, and the vital role it plays in the war on terrorism. Second, Plaintiffs are not seeking to hold Treasury accountable for every act of violence which has befallen the Plaintiffs or their relatives. They are simply seeking Treasury's acknowledgment of its responsibility toward them as U.S. citizens in opening an investigation of the entities' role in financing criminal activities abroad. That financing, and Treasury's inaction, has harmed them in a direct, causal manner. Without the financing provided by 501(c)(3)s, most, if not all of these violent settlement communities would have been abandoned 40 years ago.

AFBEY and similar entities receive massive donations from wealthy donors in the United States. It then transfers those monies abroad into Bet El Yeshiva and other Israel-based charity bank accounts. Those monies are then given to settler officials who use them to: (a) set up armed militia units; (b) purchase military hardware including sniper scopes; and (c) illegally annex Palestinian land surrounding the settlement of Bet El, including two of the six plots owned by Plaintiff Kateeb. The settlers hire construction companies with those funds to erect concrete barriers, security cameras, alarm systems, land berms and infrastructure, and houses and apartments. They also need those funds to bribe army officials to accept false affidavits concerning the need for further confiscation of private Palestinian property. Settler officials prepare forged or counterfeit deeds that new purchasers can rely on to participate in sham transactions which provide a veneer of legality to the land theft.

That is exactly what happened with Plaintiff Kateeb's father's property. Because Plaintiff Kateeb is of Palestinian descent, she does not have access to Israeli courts to protest that criminal activity, i.e., theft of private property and criminal trespass. She has access to a biased military court whose judges and their relatives frequently own property in the illegal settlements. As a result, the judges readily accept settlement officials' affidavits claiming that her father's property had been taken for valid "security" purposes. That claim, based on a fraudulent affidavit, allows the area military commander to issue an order justifying the physical takeover of Mr. Kateeb's property.[8]

Although Treasury would want this Court to believe otherwise, there is a simple chain of causation under review. The theft of Mr. Kateeb's property would not have occurred but for Treasury's failure to deter the criminal activities funded by the tax-exempt entities, i.e., stealing private property and criminal trespass. If Treasury had investigated AFBEY, it would have learned that the "educational" or "charitable" donations were actually going to arm violent settlers and fund

---

[8] *See* The Role of National Courts in Applying International Humanitarian Law, Sharon Weill, 2014, p. 91.

the illegal theft of adjacent property owned by individuals like Plaintiff Kateeb's father. After

learning this, Treasury would have ample prove to revoke AFBEY's tax-exempt status and

recommend prosecution on money laundering charges. As a result of AFBEY losing its tax-exempt

status, the practice of transferring funds overseas to the settlers of Bet El would have come to a

screeching halt. No bank in America, not even Bank Leumi, would knowingly transfer funds to an

organization that was financing violence in the Middle East, in violation of Treasury and President

Clinton's Executive Order 12947 of 1995.

Following this causal chain out, if the settlers had not received funds from AFBEY or other

U.S. charities, they would not have been able to purchase sophisticated military hardware and

security equipment or construct permanent housing structures on the stolen land.[9] Without suitable

housing accommodations they would have been faced with the prospect of either squatting,

unarmed, in tents, without electricity, water, or sewage hookups, or else returning to their homes on

the Israeli side of the 1967 border. So the Court can appreciate the significance of this funding

source, after 1992, for a variety of reasons, including the Israeli ban on settlements and its

elimination of tax breaks for that activity, *the only source of funding for illegal settlements was America-based*

*donors and tax-exempt entities.* Had Treasury dealt with this important issue 20 years ago, i.e., tax

exempt entities funding the theft of private property and criminal trespass, the Plaintiffs would

never be able to claim standing, i.e., they never would have been injured.

Several other Plaintiffs bear mention because of the direct, actual injuries they suffered as a

result of Treasury's inaction. These very real current and future injuries are all capable of redress by

means of an order from this Court forcing Treasury to investigate the notorious tax code abuses

alleged herein. Plaintiff Hamideh is in a similar situation to Plaintiff Kateeb in that he is a U.S.

---

[9] Discovery herein will establish conclusively that a significant percentage, and in some instances, nearly 100%, of the funding that goes to arm and support illegal settlers comes from U.S. tax-exempt entities and their donors. No other country in the world, not even the State of Israel, permits tax deductions to be taken for donations to the settlements. On paper, even the U.S. does not permit such deductions.

citizen who has lost land, and risks losing more, to violent settlement expansion. Plaintiff Doa'a Abu Amer lost fourteen family members when the Israeli army bombed the daycare center in which they had taken refuge during Israel's 2014 Gaza bombing campaign. The Israeli army receives $100 million per year from the 501(c)(3) entity known as Friends of the Israel Defense Forces (FIDF). If Treasury had enforced its rules and regulations early on, the FIDF would not have been able to solicit contributions and send that money to a foreign army. The Israeli army in turn would not have had the financial resources to deploy its troops to indiscriminately bomb a densely-populated civilian urban center. As recognized in *Boim v. Holy Land Foundation for Relief and Development*[10], money is deemed to be fungible and therefore these contributions have facilitated Israeli army operations which have resulted in the murder and maiming of Plaintiff Abu Amer's family. Without this $1 billion influx ($100 million yearly for ten years), these operations would have been curtailed.

Plaintiff Ahmed Al-Zeer, a practicing attorney, was viciously beaten by violent settlers while on his own property outside the segregated settlement of Ofra. He suffered bleeding on the brain, a skull fracture, broken bones, other internal bleeding, and is now handicapped in a wheelchair. If Treasury had enforced its own rules and regulations years ago when these obvious tax abuses came to light, the American Friends of Ulpana Ofra and other U.S. charities would not have been able to send millions of dollars to the Ofra settlers. As a result, settlement officials would have never been able to construct and/or expand their settlement, and they would not have been able to purchase expensive military hardware for their militia unit. Militia members used that hardware when they viciously attacked Plaintiff Al-Zeer on his own land. But for the arms trafficking financed by U.S. charities, Plaintiff Al-Zeer would most certainly not be confined to a wheelchair, and would still be able to engage in his livelihood—practicing law.

---

[10] 549 F.3d 685 (7th Cir. 2008).

To further illustrate the very real injuries that these Plaintiffs have suffered, Plaintiff Reverend Danny Awad and his parish would not have lost the Christian center known as Beit el-Baraka, between Bethlehem and Hebron, were it not for Treasury's failure to enforce its regulations. He and his congregation lost the center as a direct result of a sham purchase transaction whereby a settler organization and its U.S. backers, the 501(c)(3) American Friends of the Everest Foundation (a corporation owned by billionaire Irving Moskowitz), created a phony Scandinavian Christian organization to secure ownership of the Christian center. If Treasury had investigated the Irving Moskowitz Foundation and the American Friends of the Everest Foundation, it could have revoked their tax-exempt status, for a number of reasons. First, like all the tax-exempt entities named herein, they have no control over the funds once they are sent overseas. Second, their contributions actually fund activities which the host country (Israel): (a) deems to be criminal in nature, i.e., theft of private property, criminal trespass, arms trafficking, and money laundering; or (b) have violated its clearly-defined public policy.[11] Those are not "charitable" activities like soup kitchens and homeless relief programs that 501(c)(3)s are supposed to engage in.

Without having that 501(c)(3) status bestowed on them by the IRS, these organizations would not have been able to solicit contributions and transfer funds to the settlement that they adopted. Without those funds, settler organizations could not have purchased Plaintiff Awad's religious center in order to secure housing for settlers and Israeli army personnel. A legitimate religious organization would have purchased it, and today Reverend Awad, his parishioners, and other Christians would still be able to enter the premises for retreat and worship. But such is not the case. If they attempt to enter the premises today, they are physically attacked by irate, armed Jewish settlers and fired upon by IDF soldiers. In fact, in just the last two months, three Palestinian

---

[11] *See* Complaint pp. 30-42

Christian worshipers who belong to Rev. Awad's congregation have been killed by IDF soldiers while peacefully protesting outside of the center property.

     **c. Plaintiffs' injuries are redressable if this Court grants the limited relief Plaintiffs seek, i.e., initiate an investigation re the financing of wholesale criminal activity abroad.**

     Treasury argues that: (a) Plaintiffs' injuries are the result of actions taken by independent third parties; and (b) such parties are "not now, and not likely ever to be, before this or any U.S. court."[12]  First, these are not independent third parties—they are joint ventures with U.S. charity officials. The Plaintiffs are complaining that their injuries have been made possible by financing provided by the tax-exempt entities which Treasury is supposed to regulate. While the settlers actually maim and murder the Palestinians, without the financing provided by U.S.-based 501(c)(3)s, this could not take place. Second, Treasury's prediction is patently false, and designed to mislead the Court. Unlike the court's predictions in *Khalaf*, several pro-settlement tax-exempt entities have already been or are currently being sued right here in this jurisdiction for various torts, including aggravated property trespass and war crimes.[13] In *Tamimi v. Adelson*, the tax-exempt entities named therein have accepted service of process, hired attorneys, and are defending their actions. So much for Treasury's unfounded prediction.

     Treasury's argument that it is the tax-exempt entities, and not Treasury, that are the ultimate perpetrators of criminal violence is a red herring. Not naming the entities as defendants in this case does not in any way excuse Treasury from doing its job or diminish the nature of the criminal activities which the tax-exempt entities have been financing for 30 to 40 years.[14] As should be obvious to Treasury, the Plaintiffs named herein are not in any way seeking to adjudicate rights of

---

[12] *Khalaf v. Regan*, No 83-2963, 1985 WL 392 (D.D.C. Jan. 8, 1985).

[13] *See Ahmad v. Christian Friends of Israeli Communities*, 1:13-cv-03376-JMF (S.D.N.Y. 2014) and *Tamimi v. Adelson*, 1:16-cv-00445 (D.D.C. 2016)  (Plaintiffs Abulhawa, Al-Zeer, Abu Amer, Hamideh, and Kateeb are also among the plaintiffs therein).

[14] Not only have these entities been financing serious criminal activity, their officials have also engaged in criminal activity, i.e., perjury and money laundering.

501(c)(3) entities identified in this litigation. The Plaintiffs are not requesting, for example, that this Court order Treasury to summarily revoke the status of all tax-exempt entities which send funds to Israel—they are seeking limited relief, i.e., initiate an investigation. The Supreme Court has ruled that a court is permitted to compel an agency to take action, but cannot determine what conclusion the agency should ultimately reach on the issue.[15] If Treasury were to do its job, however, and perform an investigation and determine which 501(c)(3) entities are actually funding violent settler activities abroad, including setting up armed militia units, then Plaintiffs' demand would be satisfied. *Query: does Treasury actually expect the American Friends of Bet El Yeshiva to intervene in this declaratory judgment action and claim that it is protecting its "right" to arm violent settlers or deal in arms trafficking, or substantiate its "right" to finance criminal trespass and illegal land theft (criminal activity under both Israeli and U.S. law) and ethnic cleansing (a heinous international crime)?*

Plaintiffs are accusing Treasury officials of facilitating the commission of the aforementioned crimes. It has failed to perform a duty that it owes to the Plaintiffs and all U.S. citizens, i.e., stop the funding of violence and arms trafficking in the Middle East and recoup $500 million in lost tax revenues. Just because the entities have not been named as defendants herein does not preclude Treasury from investigating them. After all, they filed sworn applications for tax-exempt status. The fact that they have financed violent criminal activity and arms trafficking increases the necessity that Treasury investigate this activity. Plaintiffs' grievance is twofold—the entities named herein are financing major criminal activity abroad, with U.S. taxpayer funds. And second, the agency responsible for deterring that criminal activity (the Treasury Department) has failed to do so, despite the fact that it is the only agency that has the necessary resources, expertise, and extraordinary powers to stop the funding of violent criminal activity in the Middle East.

---

[15] *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004).

Walking back the steps of causation as outlined above, if Treasury were to actually investigate the activity the tax-exempt entities are financing, the flow of funds would stop immediately. And without that funding, the violent criminal activity would necessarily stop as well, i.e., large sums of money are required to: (a) purchase sophisticated military hardware including sniper scopes; (b) train civilian settlers in the use of firearms and military tactics; and (c) hire a full-time settlement security coordinator who can supervise the local militia. Unlike *Allen*, redress here is far from being speculative. U.S. law-enforcement agencies, including Treasury, have had a surprising amount of success in cutting off the flow of funding to alleged charitable organizations determined to finance violence in the Middle East and violate Treasury and President Clinton's Executive Order 12947.[16] And U.S. courts have been quite receptive in terms of recognizing the validity of such suits. The irony should not be lost on this Court—cutting off such funding has been a paramount concern in America's war on terrorism, initiated by President Bush in 2001. The obvious question is: doesn't Treasury have a vital role to play in terms of stopping the funding of violence in the Middle East, even if that would involve prosecuting pro-Israel tax-exempt entities?

## II. PLAINTIFFS HAVE STANDING TO SUE BECAUSE THEY HAVE BEEN ADVERSELY AFFECTED IN FACT BY TREASURY'S INACTION

In attempting to convince this court that Plaintiffs lack standing to sue, Treasury ignores the principle of elementary justice that "one who is in fact hurt by illegal action should have a remedy."[17] Treasury is, essentially, saying: "Look, we don't deny that the action may be illegal. We don't deny that we are assigned the job of providing relief against illegal governmental action of the type here involved. But even though you are hurt, you are simply not deserving of relief." This contemptible attitude, more becoming of an organ of a Third World authoritarian regime than an agency of a

---

[16] *See, e.g., Boim v. Holy Land Foundation for Relief and Development,* 549 F.3d 685 (7th Cir. 2008). *See also* U.S. Department of the Treasury Office of Foreign Assets Control list of Specially Designated Nationals (SDN) and Blocked Persons (https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx).

[17] *United Properties Inc. v. Emporium Dept. Stores, Inc.*, 379 F.2d 55 (8th Cir. 1967).

democratic government, is directly at odds with the original intent behind the Administrative Procedure Act (APA).

The APA § 10(2)(a) provides that "any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof." Both the Senate and the House used the identical language in describing this subsection: "this subsection confers a right of review upon any person adversely affected in fact by agency action or aggrieved within the meaning of any statute." Thus, whenever the APA is applicable, a "legal right" is unnecessary to confer standing.[18]

Simply put, per the *Sanders* doctrine, one who is "adversely affected in fact" may challenge administrative inaction. Plaintiffs Al-Kateeb and Hamideh no longer have access to or even own their property, which had been in the family name for decades. And they are likely to lose more parcels of land. The settlers who stole their property were able to purchase sophisticated military hardware and receive military training courtesy of 501(c)(3) funding coming from America. The fact is that Plaintiff Al-Zeer can no longer practice law because he is confined to a wheelchair with severe head injuries sustained as a direct result of being attacked by armed irate settlers. Again, they were able to purchase sophisticated military hardware courtesy of 501(c)(3) funding coming from America. The fact is that: (a) Plaintiff Rev. Awad's Christian center in Bethlehem has been taken over by settlers and Israeli army soldiers because of U.S. 501(c)(3) entities' funding; and (b) Plaintiff Abu Amer will never again be able to embrace her fourteen deceased family members courtesy of funding provided by the U.S. tax-exempt entity FIDF.

---

[18] *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, S.Ct. 693, 84 L. Ed. 869 (1940) (finding a radio station "likely to be financially injured" by government action toward its competitor, even though lacking legal right, had standing).

III.  **TREASURY'S 30-YEAR FAILURE TO REGULATE PRO-SETTLEMENT TAX EXEMPT ENTITIES VIOLATES FUNDAMENTAL U.S. FOREIGN POLICY OBJECTIVES AND HAS RESULTED IN THE FINANCING OF ETHNIC CLEANSING, WHOLESALE VIOLENCE, ARMS TRAFFICKING, AND WAR CRIMES**

Per *Sierra Club v. Morton*[19], the fact of an actual injury is what gives a person standing to seek judicial review of agency in action, but "once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate."[20] He may also raise "any relevant question of law" respecting the agency's inaction.[21]

Thus, Plaintiffs herein, having suffered grave injuries stemming directly from Treasury's inaction, legitimately stand in the place of third persons and the general public. As such, this Court is requested to consider that: (a) these 501(c)(3)s have flagrantly ignored 40 years of clearly-articulated U.S. anti-settlement expansion public policy;[22] and (b) the widespread nature of the injuries that Treasury's inaction has inflicted on the Plaintiffs named herein. Many of these injuries have been outlined in *Tamimi v. Adelson*, and they all flow from the annual tax-exempt funding that Treasury refuses to cut off. The settlements could not have survived, let alone thrive, without the laundered annual $1.7 billion funding that they receive from U.S. based 501(c)(3)s and their donors. These injuries have already occurred and will continue to occur because of Treasury's refusal to enforce its own tax-exemption regulations. They include:

(a)  400,000 Palestinians have been ethnically cleansed from the OPT since 1967,[23] with at least 49,000 Palestinian homes have been either demolished or confiscated since 1967;[24]

---

[19] 405 U.S. 727.

[20] *See* 3 K. Davis, Administrative Law Treatise §§ 22.05, 22.07 (1958) (addressing the distinction between standing to initiate a review proceeding, and standing to assert the rights of the public or of third persons once the proceeding is properly initiated).

[21] *Sanders*, 309 U.S. at page 477, 60 S.Ct. at 698.

[22] *See* Second Amended Complaint pp. 26-30. Specifically in response to the filing of this instant lawsuit, the State Department responded to media inquiries with the statement: "This [Obama] administration, like every administration before it since 1967, views settlement activity as illegitimate and counterproductive to the cause of peace…The United States has never defended or supported settlements and activity associated with them and, by extension, does not pursue policies that would legitimize them." http://www.aljazeera.com/news/2015/12/sued-donations-illegal-israeli-settlements-151230080026247.html.

[23] Tamimi Complaint p. 5.

(b) At least 700,000 new, permanent "Jewish-only" settlers, trained in the use of sniper scopes and Hewlett Packard/Motorola surveillance devices have moved into the OPT with their families;[25]

(c) 56,000 new homes and apartment buildings for "Jewish-only" settlers have been built with U.S. tax dollars, along with a network of "Jewish-only" highways linking up the settlements and providing direct access to major urban centers like Tel Aviv and Haifa;[26]

(d) As detailed in four Israeli government reports (1992, 2003, 2005, and 2009), those structures were built on the basis of false affidavits, complete absence of approved architectural plans, illicit building permits, and violations of local zoning codes. Based on those reports, especially Israeli Special Prosecutor Talia Sasson's 1995 report which called for evacuation of illegal settlements, it is obvious that those structures were built, for the most part, on private Palestinian property. Treasury by refusing to enforce its own tax-exemption regulations is encouraging the ongoing illegal theft of private Palestinian property, courtesy of U.S. 501(c)(3) funding;[27]

(e) U.S. pro-settlement donors like Sheldon Adelson and Irving Moskowitz send upwards of $1 billion to Israeli settlements every year, and take huge illegal deductions on their 1040s for these charitable contributions. Those deductions cost the Treasury and U.S. taxpayers at least $500 million each year;[28]

(f) Until Treasury starts enforcing its tax-exemption regulations, these donations are deemed tax-deductible charitable contributions. Therefore, the U.S. taxpayer has been funding settlement expansion, wholesale violence, and arms trafficking in the OPT for at least 35 years. Even though that conduct violates numerous Treasury regulations, seven federal criminal statutes, and President Clinton's 1995 Executive Order 12947 (written by senior Treasury Department officials) re financing violence in the Middle East, the Treasury Department refuses to do anything about it;[29]

(g) For the last 30 years, banks Leumi and Hapoalim have wired substantial donations to "Jewish-only" settlements, which end up financing arms trafficking, ethnic cleansing, and setting up sniper and military tactics schools. This financing has resulted in wholesale violence being inflicted on the local Palestinian population, e.g., home demolitions and confiscations, live target practice directed at Palestinian farmers, poisoning water wells and livestock, and theft and destruction of private property. Treasury is apparently oblivious to the fact that two foreign banks openly admitted to running a $1.7 billion annual money-laundering scheme in the U.S.[30]

---

[24] Id. p. 12.
[25] Id. p. 12
[26] Id.
[27] Id. p. 165.
[28] Id. p. 114.
[29] Tamimi Complaint p. 22
[30] Id. p. 6.

Treasury is also oblivious to the fact that its failure to monitor the activities of one entity alone, the FIDF, has directly resulted in the subsidization of war crimes. This is not rank speculation. As recited in the book *Our Harsh Logic: Israeli Soldiers' Testimonies from the Occupied Territories, 2000-2010* and in other sources, over seven hundred Israeli war veterans have given sworn testimony concerning the war crimes and atrocities they committed in the OPT. Some, not all, of those war crimes and atrocities are listed below. With respect to war crimes, Senator Leahy has actually asked Secretary of State Kerry to investigate extrajudicial killings and other war crimes committed by the Israeli army in the OPT. These include:

(a) Soldiers ordered by their commanders to "fill Palestinian bodies with bullets," who did so, resulting in needless civilian deaths.[31] For example, Hiba Barghouthi lost her brother while he was back from the U.S. to visit family, and Doa'a Abu Amer lost 14 family members as a result of the war crimes repeatedly committed in Gaza;

(b) Impressionable 18-year-old recruits were told by commanding officers and clearly understood that moving up in the ranks was dependent on the number of "Palestinian kills" that they accumulated.[32] Thus, IDF personnel were encouraged and incentivized to murder as many Palestinian civilians as they could when they entered a Palestinian village at 2 a.m. looking for weapons. As detailed in *Our Harsh Logic*, the only "weapons" they ever found were knives and forks;

(c) Some of these soldiers laughed at traumatized Palestinian children seeing their mothers' body parts smeared all over the living room wall by dense inert metal explosives;[33]

(d) They told of a routine, daily practice of demolishing homes on a whim without any specific authority or order to do so;[34]

(e) They saw young, traumatized Palestinian children urinating or defecating in their pants as a result of either witnessing demolition of their homes or violent attacks on their parents;[35]

---

[31] Our Harsh Logic p. 79
[32] Id.
[33] Id. p. 40.
[34] Id. p. 47.
[35] Id. The extent of the mental and physical distress on children goes back to the late 1980s. The Swedish Branch of Save the Children released in May 1990 a thousand-page report that detailed the effects of the conflict on the children in the OPT. Between 23,600 and 29,900 children required medical treatment for their injuries received from IDF beatings during 1987-1988. Almost one third of the children were ten years or under. One fifth were five and under. One third suffered broken bones, including multiple fractures. The Israel Lobby and U.S. Foreign Policy, John J. Mearsheimer and Stephen M. Walt, 2007 p. 100. Another example of such violence occurred when IDF

(f)  They were told by their commanding officers to put the "rifle barrel between the teeth [of wounded Palestinians] and then shoot";[36]

(g)  The officers attest to the fact that there was wholesale looting, i.e., soldiers stole cash, family heirlooms, computers, and large amounts of valuables, jewelry for the most part, i.e., a consistent pattern of looting;[37]

(h)  They would spray herbicidal germination-preventing material on olive groves and other private Palestinian agricultural land near the separation wall, poisoning 293 acres of fertile agricultural property in December 2015 alone. That conduct constitutes malicious and wanton destruction of private property—a war crime;[38]

(i)  They often observed their colleagues, encouraged by senior officials, killing horses, sheep, and other livestock—needless and wanton slaughter of farm animals.[39] The soldiers knew that Palestinian shepherds and farmers depended on their livestock for their livelihood;

(j)  They were told to delay and sometimes prevent emergency vehicles and ambulances from going through checkpoints, virtually ensuring that any wounded Palestinians lying on the street would bleed to death.[40] In terms of vicious activity which have, in certain cases, caused IDF soldiers to have post-traumatic stress disorder, persistent nightmares, and commit suicide,[41] they were ordered to "throw grenades and then bullets in the head [of Palestinians]."[42] They were also told to inflict serious bodily harm, including the loss of eyesight—"aim for the eyes to take out an eye."[43]

(k)  Israeli soldiers were also ordered on occasion to prevent water trucks from accessing various Palestinian villages dependent on such supplies because they were not hooked up to any water system.[44] They told of Palestinian day laborers being crushed to death at various checkpoints while waiting for approval to enter a military zone or settlement to work.[45] In referring to the settlers who would go on violent rampages against their Palestinian neighbors, when asked about this practice, the soldiers responded "stopping

---

soldiers, taking target practice, shot ten-year-old Abir Aramin in the head while she was walking home from school, holding hands with her older sister. Her sister describes how she "suddenly flew out of her hand and lay bleeding on the ground." The General's Son: Journey of an Israeli in Palestine, Miko Peled, 2010 p. 148.

[36] Id.

[37] Id.

[38] http://www.haaretz.com/opinion/.premium-1.701213.

[39] Our Harsh Logic p. 186.

[40] Id.

[41] Terrorist attacks are not the most common cause of death for Israeli soldiers, whether committed by farmers or otherwise. These days, suicide is. From 1992 to 2005, more than 450 soldiers committed suicide, averaging more than one every two weeks. http://www.ifamericansknew.org/stat/suicideidf.html.

[42] Our Harsh Logic p. 77.

[43] Id. p. 102.

[44] Id. p. 247.

[45] Id. p. 250.

the settlers? The army can't do a thing."[46] "The settlers do whatever they want."[47] In fact, "our overall mission is to 'provide security' for the settlers' rampages,"[48] not to defend Israel.

(l)   Battalion commanders often gave orders to shoot to kill noncombatants like medical personnel trying to recover wounded or dead Palestinians. All of the soldiers repeatedly state that "I am ashamed at what I did."[49] As Israeli journalist Haggai Matar stated, none of Breaking the Silence members' allegations have proven to be wrong.[50] In fact, Chris Hedges, New York Times Pulitzer Prize winner, in his "Gaza Diary" specifically corroborated the routine practice of murdering 13-year-olds by IDF soldiers. Murdering and maiming Palestinians is an activity that is financed by donors like Sheldon Adelson and tax-exempt entities like FIDF. Just last year, Adelson gave FIDF $5 million. These donations unfortunately are all tax write-offs, and that is why Treasury loses $500 million a year because of its refusal to regulate tax-exempt entitles by enforcing its own tax-exemption regulations. [51]

The principle of *res ipsa loquitur* should not be lost on this Court. These atrocities speak for themselves, and have been directly funded by U.S.-based tax-exempt entities and donors. Even though Treasury has been authorized to monitor their activities, it refuses to stop these entities from financing the atrocities described above. These atrocities stand as a bitter indictment of Treasury's inaction. Today these tax-exempt entities are brazen in their explicit solicitation of settlement funding because they know that Treasury has a policy of non enforcement when it comes to pro-settlement tax-exempt entities. For example, they publicly solicit "tax-deductible donations" on their websites in order to set up shooting practice ranges for settlers to "successfully connect all the hills." The hills that the tax-exempt entities are referring to are the "Jewish only" settlements which have now been linked up by "Jewish only" highways which transportation network has all been paid for by the U.S. taxpayer.[52]

---

[46] Id. p. 324.

[47] Id. p. 344.

[48] Id. p. 288.

[49] Id., passim.

[50] http://972mag.com/why-do-so-many-israelis-hate-breaking-the-silence/114763/.

[51] http://www.bintjbeil.com/articles/en/011001_hedges.html.

[52] http://www.ginaplus.org/kshomron/foundation.htm "Security for the Community" link. *See also* http://www.kerenefrat.org/ (touting photographs of settlers engaged in paramilitary activity outside of the settlement); and http://idfprepacademy.org/ (the logo for a settler military training facility depicts the profile of a settler aiming at a target with an automatic weapon).

Because Plaintiffs rightfully stand in the place of the general public, their emotional damages are not simply the "psychological consequence presumably produced by observation of conduct with which one disagrees."[53] Plaintiff Abulhawa literally is not permitted back onto the property where her ancestral home stood for decades. Approximately 5.6 million other Palestinians are in the same predicament—they are not allowed back onto the properties where they or their family used to live.[54] This includes over 255,000 U.S. citizens and permanent residents.[55] A substantial portion of these dispossessed homeowners (at least 400,000) had their land taken from them by the 750,000 violent settlers who now live on their property. *These settlers received their funding ($1.7 billion in 2007) from the tax-exempt entities and donors named herein, funding Treasury refuses to stop.* Thus, there is a direct link between Treasury's history of 30 years of inaction and the injuries claimed herein by the Plaintiffs. It is obvious that Treasury has no interest in stopping this money-laundering activity and the arms trafficking the 501(c)(3)s finance of its own volition. That is why it needs to be ordered to do so.

Lastly, aesthetic injury has been recognized as a viable basis for standing.[56] The Palestinian and Palestinian-American Plaintiffs herein (Plaintiffs Abulhawa, Abu Amer, Ahwesh, Awad, Boghossian, Dudar, Hamideh, Kateeb, Monsour, Nassor, Nofal, and Al-Zeer) are no longer able to enjoy many of the natural resources, parks, historic sites, and traditional scenery of their homeland for recreational or aesthetic purposes. The reason—they have all been forcibly seized and are now occupied by violent settlers funded by the tax-exempt entities Treasury refuses to investigate. The Jewish American and/or Israeli-American Plaintiffs herein (Plaintiffs Peled, Ebright, Goossen,

---

[53] *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485-86 (1982).

[54] http://mondoweiss.net/2012/03/a-palestinian-student-asks-can-i-go-on-birthright/

[55] http://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml.

[56] *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973) (holding that a plaintiff who used natural resources for "recreational [and] aesthetic purposes" suffered a specific and perceptible harm from increased rail freight rates which would potentially lead to increased pollution).

Nicholas, Schultz, Schultz, Several, Siegel, and Michael Smith) are likewise inhibited in their ability to visit and enjoy these sites, sites which also have important spiritual and emotional significance to them.

One such tangible aesthetic injury suffered by Plaintiff Michael Several, a Jewish American,[57] was when he visited the west side of the Temple Mount in Jerusalem, known as the Wailing Wall. This wall is an important religious site in Judaism, and a pilgrimage to the site should have been an experience which carried profoundly positive spiritual and emotional significance. However, Plaintiff Several learned that the plaza which now serves as the staging area for entrance to the wall had been a residential area known as the "Mughrabi Quarter" where anywhere from 600 to 1,500 Palestinians had resided. Much to his horror, and in what amounted to the complete unravelling of the positive spiritual experience he had anticipated, he learned that Israeli soldiers had demolished the buildings so quickly that a 50-year-old Palestinian woman had literally been crushed to death.

That is the precise type of violence that Plaintiff Several condemns, and it is Treasury's policy of lax enforcement of the tax-exemption regulations, which has led to the death of thousands of Palestinians like that woman. Tax-exempt entities based in the United States have been sending substantial funds to settlers ($1.7 billion in 2007), who want to expand the settlement boundaries and in the process demolish or confiscate homes occupied by their Palestinian neighbors with utter disregard for human life. As referenced in the Complaint, Rachel Corrie was intentionally run over by an armed tractor operated by Israeli army soldiers. She was a 22-year-old American trying to stop the demolition of Palestinian homes, and paid for her dedication with her life. The soldiers who killed Corrie received financial support from the tax-exempt entity known as Friends of the IDF. Again, had Treasury acted upon any of the complaints received ten years ago, Rachel Corrie and other Americans would not have been murdered or maimed courtesy of 501(c)(3) funding.

---

[57] *See* Exhibit 1, affidavit of Michael Several.

IV.     **AUTHORITY IS PROPERLY VESTED IN THIS COURT TO GRANT THE
RELIEF SOUGHT BY THE PLAINTIFFS, I.E. ORDER THE
INVESTIGATION OF CRIMINAL ACTIVITIES ENGAGED IN BY THE
501(C)(3)S.**

Plaintiffs have at their disposal three avenues through which they may seek redress and

properly vest this Court with subject matter jurisdiction under Federal Question jurisdiction, 28

U.S.C. § 1331. First, Plaintiffs are entitled to a writ of mandamus under 28 U.S.C. § 1361, action to

compel an officer of the United States to perform his duty. Second, Plaintiffs are entitled to judicial

review of Treasury's inaction under 5 U.S.C. § 702, Right of Review. Third, this Court has

jurisdiction to review Treasury's pattern of inaction because it constitutes arbitrary and capricious

conduct. Courts do not allow an agency to adopt and adhere to a double standard, as discussed

herein.

    a.   **Plaintiffs are entitled to a writ of mandamus under 28 U.S.C. § 1361 because
Treasury owes them the duty to investigate the tax-exempt entities described
herein.**

Under 28 U.S.C. 1361, this Court has jurisdiction to issue a writ of mandamus to compel

Treasury to "perform a duty owed to the Plaintiff." This is appropriate where: (1) Plaintiffs have a

clear right to relief; (2) Treasury has the duty to act; and (3) there is no other adequate remedy.[58]

There is no other adequate remedy that the Plaintiff's can pursue because Treasury has the exclusive

authority to regulate tax-exempt entities. That is why it is so inexplicable, given Treasury's expertise,

its extraordinary authority, its skilled staff, and a unit that specializes in shutting off money

laundering and terrorist financing, that it refuses to enforce its own tax-exemption regulations.

Plaintiffs have the clear right to relief. As stated in section I(a) above, the Plaintiffs have

suffered direct and tangible injuries as a result of Treasury's inaction. Treasury cites *Walpin v. Corp for
Nat. and Com'y Serv.*[59] for the proposition that Plaintiffs do not have a right to continued employment

---

[58] *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005).
[59]  630 F.3d 184, 188 (D.C. Cir. 2010).

under the Inspector General Act, but Plaintiffs are not claiming a right to continued employment under that act. Plaintiffs are claiming the right to having Treasury perform the functions it has been tasked with under its statutory and regulatory mission. Treasury's failure to investigate the issue of pro-settlement tax-exempt entities conflicts with its clearly-expressed mission statement. In Section 2 of Chapter 12 of the congressional act establishing the Treasury Department, it is clearly laid out that "it shall be the duty of the Secretary of the Treasury to prepare plans for improvement and management of revenue…[and] to superintend the collection of revenue." The comptroller whom Treasury appoints to implement its mission is obligated to "provide for the regular and punctual payment of all monies which may be collected, and shall direct prosecutions for all delinquencies of officers of the revenue, and for debts that are, or shall be due to the United States."

A knowledgeable and veteran foreign policy professional, Daniel Kurtzer, former U.S. ambassador to Israel, stated it best by saying that "at the very least, the U.S. Government Accountability Office and the IRS should conduct a full investigation into the activities of these tax-exempt organizations, and should end the tax-exempt status of organizations that provide assistance to convicted murderers, in Israel or elsewhere."[60] What Ambassador Kurtzer was making reference to specifically was the 501(c)(3) entity "Honenu," which provides funds to defend settlers convicted of murder and arson, and to support their families once they are imprisoned. We are talking about U.S. tax dollars, i.e., Honenu's financial supporters (U.S. taxpayers) write off such contributions as being "charitable" in nature.

With regards to the IRS, there are a number of roles that it plays. One of them is to "help the large majority of compliant taxpayers with the tax law while ensuring that the minority who are unwilling to comply pay their fair share."[61] As shown herein, multi-billionaires like Sheldon Adelson and Irving Moskowitz have no intention of paying their fair share of American citizens' tax bill. For

---

[60] http://www.mei.edu/content/real-talk-israeli-settlements.
[61] https://www.irs.gov/uac/the-agency-its-mission-and-statutory-authority.

the last 20 years, at least, they have succeeded in having the American taxpayer underwrite their political agenda, i.e., the eviction of over 400,000 Palestinians from their homeland, engaging in money laundering, and financing arms trafficking. Such donors and tax-exempt entities have violated with impunity at least five federal tax regulations and seven criminal statutes, including the federal perjury statute. The IRS is tasked with carrying out the responsibilities of the Secretary of the Treasury under section 78.01 of the Internal Revenue Code. However, unless Treasury is ordered by this Court to examine the tax-exempt status of these entities and the criminal activities they finance, nothing will happen. The IRS obviously cannot, on its own, launch such an investigation.

Also, Treasury's Office of Foreign Assets Control (OFAC) and Financial Crimes Enforcement Network (FinCEN) are charged with investigating and prosecuting money-laundering activities. FinCEN routinely investigates failures to report suspicious activity on the part of banks, and investigates potential money laundering violations of the Bank Secrecy Act. Just recently, Sparks Nugget, Inc. reached a settlement with Treasury arising from its ineffective anti-money laundering program and a failure to report suspicious activities.[62] Sparks Nugget was fined $1 million. In the Complaint, Plaintiffs have alleged many specific money-laundering violations which have been committed by Bank Leumi. The complaint even lists the specific amounts transferred from U.S. tax-exempt entities to Israel-based settler organizations.

This is classic "suspicious activity," which would normally trigger the filing of suspicious activity reports. It is obvious that some $1.7 billion is going to the "Greater Middle East," i.e., Israel. The reason is that Treasury regulations were amended courtesy of AIPAC lobbying efforts in 2008 to not require tax-exempt entities to identify the specific beneficiary country. Moreover, Treasury does not know what the recipients of those wire transfers are actually doing with the money. Surely Bank Leumi should have filed a Suspicious Activity Report (SAR) some 20 years ago, at least, when

---

[62] https://www.fincen.gov/news_room/ea/files/Sparks_Nugget_EA.pdf.

they first started processing the wire transfers at issue. But nothing has been done by OFAC or FinCEN on this issue, because Treasury has neglected to assign them that task. Until such time that this Court orders Treasury to do something, nothing will happen, because Treasury fears reprisal from the Israel lobby. *See* section VII, *infra*.

Treasury's mission statement would be compromised if, as stated in its motion to dismiss, it has no intention of investigating the issues posed by pro-settlement tax-exempt entities and the financing of ethnic cleansing and arms trafficking. The mission of the Treasury Department is to "operate and maintain systems that are critical to the nation's financial infrastructure such as revenue collection." In the event that this Court grants Treasury's motion, that conduct will ensure that approximately $500 million in lost tax revenues will never be recouped by Treasury for the American people.

Treasury does not argue that Plaintiffs have not exhausted all other avenues of relief, therefore it has conceded this point. So what the Court is left with is the question as to whether Treasury owes the Plaintiffs a clear non-discretionary duty. Defendant has a clear duty to act. Investigation is a required duty, not discretionary. Like in all areas of discretion, investigatory discretion comes with an inherent reasonableness standard. Treasury misconstrues the binding caselaw on this point. *Barron v. Reich*[63] does not stand for the proposition that Treasury has the unfettered discretion to choose whether or not to do its job. In *Barron*, an investigation was indeed performed, contrary to Treasury's argument. And there was never a question in *Barron* as to whether the agency had the duty to investigate the issue under scrutiny, presumably because all parties agreed such a duty existed. The question in *Barron* was simply regarding the *scope* of the investigation.[64] Treasury is required by its mandate to investigate.

---

[63] 13 F.3d 1370, 1376 (9th Cir. 1994).
[64] *Id.*

Plaintiffs concede that Treasury has the discretion to decide how to carry out that investigation, but it must investigate. Treasury's argument that, per *Cobell v. Norton*, whether or not to investigate is left "entirely" to its discretion would set a dangerous precedent. For example, wholesale agency inaction could be excused on a routine basis by sending out a form letter to U.S. citizens complaining about a particular issue. Most Americans do not have the resources to pursue the matter further. An agency's interpretation of its own regulations is given controlling weight *unless it is plainly erroneous*. *Thomas Jefferson Univ. V. Shalala*,[65] Treasury's bald-faced argument that it is wholly within its rights to ignore the funding of wholesale violence, arms trafficking, and ethnic cleansing is as plainly erroneous as it gets, and is obviously nothing more than a convenient litigation position. But it is precisely this "convenient litigating position" that courts refuse to give substantial deference.[66] What is more, Congress has imposed explicit restrictions on the scope of the IRS's enforcement discretion. Treasury must examine *all* accounts, keep record of *all* debts due the United States, and direct prosecutions for *all* delinquencies.[67] This is a sacred trust vested in the Secretary of the Treasury and his subordinates by the American people. Thus, Treasury has breached the fiduciary duties it owed to Plaintiffs: (a) by not investigating tax-exempt entities which have flagrantly violated the terms of the 1995 Executive Order 12947 as well as various tax-exemption regulations and federal criminal statutes; and (b) by not investigating the donors who have taken illegitimate tax write-offs for at least 30 years.

**b. Plaintiffs are entitled to injunctive relief under 5 U.S.C. § 702 because there has been final agency action, or, in the alternative, there has been unreasonable delay.**

Under 5 U.S.C § 702, A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial

---

[65] 512 U.S. 504, 512 (1994).

[66] *Christopher v. Smith-Kline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012).

[67] https://www.treasury.gov/about/history/Pages/act-congress.aspx.

review thereof. The Administrative Procedure Act (APA) provides a right to judicial review for

"final agency action for which there is no other adequate remedy in a court."[68]

### i. Treasury has made a conscious decision not to investigate these activities based on its ten-year track record of inaction.

As alleged in the Complaint, Plaintiffs have filed many requests with the IRS to investigate

the tax-exempt entities referenced herein. Plaintiff Grant Smith, for example, has been filing and

documenting these requests for the past ten years. Organizations such as Avaaz have provided

copiously-researched reports documenting the atrocities funded by organizations such as the

Hebron Fund. The American-Arab Anti-Discrimination Committee embarked upon a campaign in

2009 where it and affiliate organizations sent over 90 such complaints in the space of just a few

weeks. The response is always perfunctory and dismissive in nature, claiming that Treasury agents

"aggressively enforce" tax-exemption regulations. However, despite these "aggressive" tactics,

Treasury has not revoked or investigated the status of any of the entities complained of herein, nor

has it acknowledged that it has a duty to investigate them, for example, citing a lack of experienced

agents to do so. For the Court's edification, in March 2016, the National Lawyers Guild filed a

complaint against the Jewish National Fund[69], and Treasury has not responded to that complaint.

The allegations in that complaint mirror the allegations herein. Therefore, Treasury's lax

enforcement of its own tax-exemption regulations has been and will be an ongoing problem, and

that problem, of course, means the promotion of arms trafficking and ethnic cleansing.

As stated previously, the principle of *res ipsa loquitur* has application here. While a certain

percentage of suspected tax-exempt entities may not actually be funding the atrocities complained of

herein, others, for example, openly advertise their participation in ethnic-cleansing activities. These

entities have been documented as providing funding for such activities for decades, and yet they still

---

[68] 5 U.S.C. § 704.
[69] http://www.nlginternational.org/newsite/wp-content/uploads/2016/03/JNF-IRS-COMPLAINT_CLEAN.pdf.

maintain their tax-exempt status. Thus, based on its ten-year track record of inaction at least with regards to the most brazen and hard-core extremist pro-settlement organizations, Treasury has made the decision not to investigate, whether formal or otherwise.

### ii. Even if there has been no final agency action, mandamus is appropriate where there has been unreasonable agency delay.

In the alternative, Treasury's delay amounts to constructive final agency action. Generally, under Section 704 of the APA, a court does not have jurisdiction over an administrative matter until the agency action is final. However, a court can have jurisdiction over a matter pending before an agency when a party claims that there has been an unlawful or unreasonable delay.[70] The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has also noted that the language of the APA indicates that Congress intended the courts to play a role in ensuring that agencies fulfill their obligation to act "within a reasonable time,"[71] and other circuits have noted that a claim of unreasonable delay qualifies for judicial review despite a lack of "final agency action."[72]

The D.C. Circuit, in *TRAC*, established guidelines to consider when determining whether an agency delay warrants mandamus compelling the agency to act. The court stated that "[i]n the context of a claim of unreasonable delay, the first stage of judicial inquiry is to consider whether the agency's delay is so egregious as to warrant mandamus."[73] The court then enumerated several factors, known as the *TRAC* factors, to consider when answering this question: (1) the time agencies take to make decisions must be governed by a "rule of reason;" (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the

---

[70] *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) (the Supreme Court stated that "when an agency is compelled by law to act within a certain time period, a court can compel the agency to act.")

[71] *Telecommunications Research & Action Center ("TRAC") v. FCC*, 750 F.2d 70, 77–78 (D.C. Cir. 1984).

[72] *See, e.g. Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003) ("An agency's failure to act … can become a final agency action in three situations: 1) if the agency "affirmatively rejects a proposed course of action; 2) if the agency delays unreasonably in responding to a request for action; and 3) if the agency delays in responding until the requested action would be ineffective.").

[73] *Id.* at 79.

enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.[74] Courts in this jurisdiction have determined an eight-year delay to be unreasonable.[75] In *TRAC*, the court decided that the delay did not warrant mandamus in light of the fact that mere economic interests were involved and that the agency had assured the court that it was working expeditiously to resolve the proceeding.[76]

In this case: (1) it is not reasonable that any decision to investigate should take as long as a decade; (2) Congress has not provided a timetable; (3) human health and welfare are at stake, and a delay of ten years should be unacceptable. Victims of settlers supported by The Hebron Fund are being harassed, spit upon, threatened at gunpoint, attacked, and, all too frequently, maimed or killed by violent settlers while Treasury deliberates; (4) expediting delayed action would only have a salutary effect on the situation. Due to agency delay, if the allegations are taken as true, as they must at this stage, the United States has lost some $500,000,000 per year in tax revenues over the past ten years, or a total of at least $5 billion; (5) the interests prejudiced by the delay include Plaintiffs' property, livelihood, health, and emotional well-being. As rightful representatives of the public interest, the interests prejudiced by the delay also include hundreds of thousands of Palestinians threatened with the loss of property, life, and limb by the day-by-day encroachment of armed settlers funded by the tax-exempt entities complained of herein; (6) Plaintiffs do not allege any complicity

---

[74] *Id.* at 80.
[75] *See Potomac Electric Power Co. v. ICC,* 702 F.2d 1026 (D.C. Cir. 1983).
[76] *TRAC* at 80-81.

with the offending entities or other impropriety lurking behind Treasury's lassitude. Plaintiffs' sole interest is to see that Treasury, the sole agency entrusted with the responsibility to monitor the entities' activities, perform its duty. Plaintiffs have been requesting action for at least ten years now, and the entities complained of herein have been operating for thirty years in some instances.

> c. **Plaintiffs are entitled to judicial review of Treasury's inaction because it has been arbitrary and capricious.**

APA section 706(2)(A) requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The term of art "arbitrary and capricious" has been defined in the context of an agency's interpretation of its regulations as "unreasonable" or "without determining principle."[77] The D.C. Circuit has determined an agency's "inability to understand the key regulatory materials" that were supposed to be guiding the agency's actions was sufficient for a finding of arbitrary and capricious behavior.[78] Here, Treasury is either willfully blind to or brazenly dismissive of its statutory and regulatory mandate to monitor and investigate tax-exempt entities. Whether intentional or not, the result has been an inability to understand this most basic duty. As such, its inaction is the result of an arbitrary and capricious agency decision, and must not be afforded deference by this Court.

## V. THE ARGUMENTS THAT TREASURY HAS OR WILL ADVANCE IN RELATION TO JUDICIAL DEFERENCE TO AGENCY DISCRETION HAVE BEEN HEARD AND REJECTED BEFORE

In general, as this Court knows, courts are obligated to defer to agency discretion in terms of an agency's decision to act or not to act, and when a certain period of time is unreasonable. However, there are certain important limitations which have been recognized by the courts which govern this doctrine and have application on the facts herein.

---

[77] *Williams v. Commonwealth of Va. Real Estate Bd.*, 57 Va. App. 108, 135, 698 S.E.2d 917, 930 (2010).
[78] *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Commission*, 768 F.3d 1205 (D.C. Cir. 2014).

First, courts have established, for example, that an agency's refusal to revoke a license is judicially reviewable under certain circumstances.[79] In *Transportation Intelligence*, the plaintiff radio system manufacturer's request for agency action took the form of a request to revoke a competitor's newly granted certification. In deciding that the court had jurisdiction in that case, it stated "hence, *a petition for reconsideration was TransIntel's only option and revocation its only remedy*." The court concluded that the regulations which governed the issuance of a license was a judicially manageable standard against which the court could judge the FCC's actions to determine whether they were arbitrary or capricious.[80]

In the same way, Treasury plays a vital role with respect to the granting of tax-exempt status—it is the only gatekeeper to the awarding of such a status, and it is the only regulatory body which has the authority to monitor their activity after 501(c) (3) status is confirmed. No other agency is involved in judging the merits of a 501(c)(3) application but Treasury. Thus, as is the case in other agencies, it has a unique role to play in terms of enforcement after tax-exempt status is conferred on a 501(c)(3) entity. With respect to the merits of the Complaint filed herein, the Court can examine 501(c)(3) caselaw (some of which has been provided to the Court) and the applicable rules and regulations to determine whether in fact Treasury has abused its discretion or was arbitrary or capricious in its ten-year refusal to investigate tax-exempt entities which have abused the tax code. The Plaintiffs have provided this court with numerous examples thereof.[81]

Second, prejudice inuring to regulatory beneficiaries makes the matter ripe for review.[82] Thus, exigent circumstances (like Plaintiff Kateeb's actual loss of two valuable parcels of land to the

---

[79] *See Transportation Intelligence, Inc. v. FCC*, 336 F.3d 1058, 1064 (D.C. Cir. 2003).

[80] *Id.*

[81] *See* Complaint ¶¶ 87-120

[82] *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21 ("courts are certainly not without power to address the interests of a regulatory beneficiary (properly before the court) when unwarranted agency delay prejudices those interests.") *See also Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C.Cir.1970) ("At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness

settlement of Bet El and the threatened, certain future loss of her remaining four parcels of land to the same settlement) can deem such delay the equivalent of a final denial of a taxpayer petitioner's request. This is especially the case when Treasury's adamant refusal to investigate tax-exempt entities which abuse the tax code flies in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of regulatory responsibility. Under such circumstances, this Court has the power to order the recalcitrant agency to act to carry out its substantive statutory mandates.[83] This is especially true when the relief requested is simply "do your job and initiate an investigation."

Third, an agency's argument that the realities of resource allocation require a certain plan of action is not a complete defense justifying dismissal of a lawsuit claiming a particular agency has failed to act on an important issue. Treasury does not argue, and it cannot, that Plaintiffs are requesting Treasury to allocate a certain amount of funds to monitor certain activity. Plaintiffs are simply requesting that Treasury do its job and investigate the obvious serious violations of its own regulations, not to mention several criminal statutes. However, this Court can order Treasury to review its resource allocation decisions. To the extent Treasury argues that it is not possible due to budget constraints to comply with its statutory mandate to monitor and investigate tax-exempt entities, courts are under no obligation to take the agency's representations at face value.

That is the reason why in a number of cases that agency officials have prepared a detailed submission under oath for the Court so that it can intelligently understand how the agency plans to address a significant enforcement issue or deal with resource allocation issues. The Plaintiffs herein continue to suffer direct injuries due to Treasury's decade of inaction. Thus this Court can compel Treasury to carry out its responsibility toward the Plaintiffs, and at the same time allow Treasury to deal with an important resource allocation issue. This is a balancing test the courts engage in every

---

to permit judicial review.") *and Cutler v. Hayes*, 18 F.2d 98, 5 U.S.C. 706 ("where injury likely will result from avoidable delay, then the deference [owed by the Court to the agency]…is sharply reduced").
[83] *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973) (en banc) (per curiam); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 594-595 (D.C.Cir.1971).

day. While a court cannot tell an administrative agency how to do a particular investigation, it can order the agency to initiate the investigation where, as in this case, clear abuse of the agency's own regulations has been shown. In fact, the criminal violations alleged herein alone are truly extraordinary in their scope—clear violations of seven federal criminal statutes.[84]

Fourth, delay, when done in order to avoid performing a duty, is not necessarily granted good faith deference.[85] Here, Treasury has allowed these tax-exempt entities to fund settler violence with impunity for, in some cases, 30 years. Plaintiffs herein have been complaining of Treasury's inaction for at least ten years. The damages inflicted by settlement expansion are real—ethnic cleansing, arms trafficking, criminal trespass, theft of private property, and murder and mayhem. Viewed in this perspective, Treasury's delay exceeds all bounds of reasonableness, and this Court is thus under no obligation to defer to its administrative expertise and judgment. Thus, this Court is well within its authority to require Treasury to act with greater dispatch and initiate an investigation into the criminal conduct financed by the 501(c)(3)s referenced in the Complaint.

Lastly, an agency's own regulations can be the basis to determine the merits of an agency's decision not to enforce its own regulatory scheme.[86] Because Treasury has adopted an extensive regulatory framework which tax-exempt entities are required to comply with, those regulations essentially become the "self-imposed constraints" which supply the "law to apply" in overcoming

---

[84] *See* Complaint pp. 42-49.

[85] *See Caswell v. A. Califano*, 583 F.2d 9 (1st Cir. 1978) (stating that "courts must normally defer to agency judgment to allow the evolution of procedures as needs arise. Yet equally clear is the Secretary's statutory duty to provide a hearing at a meaningful and reasonable time. His discretion would not encompass a system which routinely, as the district court found, schedules hearings at unreasonably distant times. Where the delays exceed the bounds of reasonableness, the Secretary may be judicially required to act with greater dispatch so as to meet his statutory obligation.") (internal quotations removed).

[86] *See Ctr. For Auto Safety v. Dole*, 846 F.2d 1532 (D.C. Cir. 1988) (holding that the regulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review of agency action).

the presumption against judicial review of administrative agency action, including nonenforcement decisions.[87]

Plaintiffs have identified herein the regulations which Treasury itself has promulgated with regards to tax-exempt entities (C.F.R. 1.501(c)(3) et seq.), and specifically those entities which elect to fund "charitable" activities overseas. Per Treasury's own regulatory framework, those entities must (a) disclose to potential donors the specific overseas "charitable" causes that their donations will support (arms trafficking); (b) disclose any instances where they deviated from the specific "educational" and "charitable" activities that they described in their application for 501(c)(3) status (setting up and funding a militia unit); (c) determine that the entity receiving those funds would itself qualify as a legitimate tax-exempt entity under Treasury's standards (Honenu—free legal aid to Jewish-only convicted criminals)[88]; and (d) maintain strict control over the funds transferred overseas, with detailed record keeping.[89] Treasury does not know who the recipients are of the $1.7 billion that is transferred annually to Israel-based NGOs.

Furthermore, the entities cannot promote or finance racially or religiously discriminatory practices, (i.e., Jewish-only housing accommodations), nor can they violate federal statutes in the process of raising funds and/or transmitting the funds overseas (money laundering, perjury). They cannot fund overseas activities, which violate the public law of the host country or its criminal statutes, e.g., criminal trespass and theft of private property. They are not allowed to be controlled by the overseas entity. They are prohibited from: (a) lying or making misrepresentations on their application for 501(c)(3) status, e.g. failing to tell the IRS that they would be using the charitable contributions to fund a local militia unit; (b) not disclosing the overseas "charitable" causes they will

---

[87] *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
[88] *See* Rev. Rul. 63-252, 1963-2 C.B. 101.
[89] *See* Rev. Rul. 68-489, 1968-2 C.B. 210.

be supporting, e.g. arms trafficking and ethnic cleansing; and (c) funding non-"charitable," criminal activities, i.e., criminal trespass, theft of private property and arms trafficking.[90]

It is clear that Treasury, like all administrative agencies, by seeking large congressional appropriations every year and by adopting a comprehensive set of rules and regulations, is essentially making the claim that it has the expertise (the IRS, OFAC, and FinCEN), experience, and broad authority over this area of law, to the exclusion of other government agencies. The flipside to this equation is that because Treasury has adopted these rules and regulations, it is now obliged to abide by these self-imposed constraints. This Court can therefore compel it to do so. After all, these are Treasury's own regulations. Treasury, as sole arbiter of the sought-after "tax-exempt" status, is vested with a unique responsibility toward the U.S. taxpayer and to any person, including the Plaintiffs identified herein, adversely affected by the criminal activities financed by tax-exempt 501(c)(3) entities.

That responsibility includes addressing the issues which the plaintiffs have alleged to be the case, which arises out of Treasury's adamant refusal to enforce its own regulations. To proclaim, as Treasury apparently has done so in moving to dismiss, that it is the only authority that can regulate these entities, but that it has no responsibility to do so, is difficult to comprehend. In fact no U.S. agency has ever articulated on the record the proposition that while it has a unique responsibility to grant a special status to an entity it regulates, it has no responsibility to monitor the activities of that entity even in the case of the entity financing criminal activity. Recent abject evidence of the consequences of taking such an irresponsible attitude is the Madoff scandal and the SEC's adamant refusal to investigate the numerous complaints made about his criminal activities. Apparently this is an ongoing problem.[91]

---

[90] *See* Complaint ¶¶ 79-84.
[91] *See Warren Chastises SEC for not halting Cohen's Fund role*, Renae Merle, Washington Post April 22, 2016.

## VI.  TREASURY HAS NOT DENIED, AND THEREFORE HAS CONCEDED, THE FOLLOWING ALLEGATIONS, WHICH INCLUDE VIOLATING SEVEN FEDERAL CRIMINAL STATUTES.

Nowhere in its motion to dismiss does Treasury state, and therefore it apparently does not dispute, the fact that a number of tax-exempt entities referenced in the Complaint have actually violated its tax-exemption regulations and related federal statutes. For example, Treasury does not dispute the allegation that Honenu National Legal Defense Organization provides legal aid to violent settlers accused or convicted of terrorism, and supports their families. Nor does it dispute that Christian Friends of Israeli Communities (CFOIC) sends money from the U.S. to fund the forcible expulsion of the local Palestinian population and settlement expansion.

Treasury does not dispute the fact that the entities complained of herein did not retain control of the funds once they go overseas. That would be an impossibility because Treasury officials amended the regulations which required that 501(c)(3)s identify the country where the funding is going and the purpose thereof. Treasury also does not dispute the fact that wholesale violence, arms trafficking, and ethnic cleansing have been financed over the years by these entities. Finally, Treasury also does not address a serious law-enforcement issue, i.e., most if not all of the entities referenced herein not only violated numerous tax-exemption regulations, but also at least seven federal criminal statutes, e.g., money laundering.

Treasury furthermore does not address the fact that for 10 years it has been requested to do its job. In other words, it concedes the fact that the Plaintiffs have exhausted their administrative remedies. As stated in paragraph 117 of the Complaint, that at least 90 complaints have been registered with it concerning this issue. Not a single legal authority cited by Treasury deals with such an egregious situation, i.e., 10 years of inaction and form letters being sent out informing complaining citizens that Treasury is doing its job.

**VII.    THE REALITY IS THAT TREASURY FEARS REPRISAL FROM THE ISRAEL LOBBY AND THE AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE IF IT INITIATES A FORMAL INVESTIGATION OF PRO-SETTLEMENT 501(c)(3) ENTITIES.**

There are a number of reasons to conclude that Treasury has adopted a "double standard," at least when it comes to regulating pro-Israel tax-exempt entities. This is not a novel argument when it comes to challenging agency action on the basis of arbitrary and capricious conduct. Other plaintiffs have complained about an agency maintaining a "double standard" in the context of arbitrary and capricious conduct. In *Sitz v. Kan. Dep't of Soc. & Rehab. Servs,*[92] for example, the plaintiff raised that issue. While the court affirmed the agency's ruling it did not reject the potential merits of the double standard argument. Rather, the court took issue with plaintiff's failure to specify the arbitrary and capricious conduct, i.e. no facts supporting the double standard argument. Likewise in *Lutheran Med. Ctr. V. Daines,*[93] the court accepted the double standard argument, but also concluded that the plaintiff failed to support the argument with facts. The plaintiffs in *Lutheran Medical* also argued that an administrative agency is not entitled to violate its own regulations. That of course is the precise argument raised herein. However, unlike the plaintiffs in both *Lutheran Medical* and *Sitz,* the Plaintiffs herein have cited abundant evidence that Treasury has adopted a double standard and has violated its own tax-exemption regulations in the process.

The Court simply has to look to Treasury's own tax-exemption regulations, relevant case law, and guidance provided by formal IRS rulings about the nature of charitable activities and an organization's right to secure tax-exempt status. Besides those sources, the Court can ascertain from congressional hearings what the congressional intent was with respect to granting tax-exempt status to different organizations. Reviewing those sources and the congressional hearings it is obvious that wholesale violence, ethnic cleansing, arms trafficking, and stealing private property are not viewed as

---

[92] 2003 Kan. App. Unpub. LEXIS 84.
[93] Lutheran Med. Ctr. v. Daines, 17 Misc. 3d 1109(A) (NY Sup. Ct.).

either "charitable" or "educational" in nature. And, tax exempt entities are not permitted by law to engage in money laundering or use contributions to set up local militia units abroad intent on maiming and murdering their neighbors. Finally, a tax-exempt entity cannot promote discriminatory practices based on religious or racial preferences. "Jewish only" settlements, housing accommodations, highways, restaurants, and museums make a mockery of this concept. All of these issues have been detailed in the complaint.[94]

As for the evidence of a double standard, if the Court reviews Treasury's list of designated terrorists, i.e. individuals and charities that have funded violence in the Middle East, it will readily see that Treasury OFAC officials have no problem investigating and designating Arab or Muslim charities suspected of funding violence in the Middle East. There are thousands of Arab or Muslim designees, including charities, on Treasury's list. One of the reasons is Treasury's extraordinary authority to rely on newspaper clippings and other news report sources as a basis for designation.[95]

At least four well-respected international newspapers, i.e., the *London Times*, *New York Times*, *Washington Post*, and *Ha'aretz*, have all reported on the tax code abuses and criminal activity that pro-settlement tax-exempt entities have engaged in. In fact, the *Washington Post* specifically published an article on its editorial page in December 2015 confronting the Obama administration over an obvious paradox. On the one hand, the Treasury Department is allowing tax-exempt entities and donors to take $1 billion worth of illegal tax deductions every year for supporting settlement expansion, arms trafficking, and ethnic cleansing. In stark contrast, both the Obama administration and the State Department have repeatedly condemned settlement expansion and the attendant ethnic cleansing. As Treasury knows, settlement expansion and arms trafficking would not be possible without the massive funding provided by these tax-exempt entities. Nor would construction of "Jewish-only" housing accommodations be possible without displacing the local Palestinian

---

[94] *See* Complaint pp. 56-77.
[95] *See National Council of Resistance of Iran v. Dept. of State*; 251 F.3d 192, 196 (D.C. Cir. 2001).

population. The settlers who engaged in that activity now claim that they own the homes and property that they stole from their Palestinian neighbors. This is the exact sentiment that has been expressed by the settlers who stole Plaintiff Kateeb's property.

As a further review of the designated list will reveal, Treasury has only designated one (1) Israeli individual as a terrorist (a mass murderer), and that occurred more than 20 years ago. Given the number of press clippings and 40 years of U.N. Resolutions condemning settlement expansion and wholesale ethnic cleansing, there is abundant, clear-cut evidence documenting the criminal activity that the 501(c)(3)s have been funding with U.S. taxpayer money. They have violated at least seven federal criminal statutes including money laundering and perjury. Money laundering occurs when an individual sends clean funds overseas to promote criminal activity like ethnic cleansing and arms trafficking. It should be obvious to senior Treasury officials that U.S.-based 501(c)(3)s sending $1.7 billion in laundered dollars to Israel-based NGOs every year to finance criminal activity is an issue that needs to be investigated.

Besides significant money laundering activity that has been going on for at least twenty years, U.S. taxpayers are also subsidizing another serious criminal offense, i.e. arms trafficking. As recited on page 2 *supra*, "The illicit trafficking of conventional arms is an important national security concern for the United States." The State Department and other U.S. law enforcement agencies have all condemned arms trafficking, for obvious reasons. As detailed in the Complaint, U.S. tax-exempt entities transmitted funds overseas knowing that settlement officials would use those contributions to set up an armed militia and hire a full-time security coordinator to train militia members in military tactics. These U.S. entities also knew that this massive funding ($1.7 billion annually) would be used to purchase sophisticated military hardware including sniper scopes, which can only lead to further violence. Settlers routinely use the sniper scopes to maliciously wound

Palestinian farmers trying to access their olive groves which have been absorbed into the ever-expanding settlement boundaries.

The entities and their donors knew that the armed settlers would use that military hardware to threaten, maim, intimidate, and, in some cases, murder their Palestinian neighbors. Based on recent news articles, State Department and Amnesty International reports, and at least fifty U.N. Resolutions, Treasury officials had to know: (a) that the pro-settlement 501(c)(3)s' number-one objective was always major settlement expansion; and (b) that settlement expansion could only occur if the local Palestinian population had been forcibly removed from the area. The reason being that new "Jewish-only" housing accommodations could not be built on state-owned property, as of 1992. Treasury appears to be oblivious to the consequences that flow from 501(c)(3)s financing criminal activity abroad, e.g., the wholesale violence that goes hand-in-hand with settlement expansion. Nor does Treasury appear to know how important the annual funding is coming from U.S. 501(c)(3)s.

The reason the U.S. tax-exempt entities' funding became so critical is that after 1992, the settlements' sole source of funding was U.S. tax-exempt entities and donors—*the entities and individuals that Treasury refuses to investigate.* It was in 1992 when Israel banned all settlement activity in the OPT, eliminated tax write offs for contributions to settlements, and banned the use of state-owned property for settlement activity.[96] As a result, settlement officials faced three distinct consequences: (a) no more friendly funding or property allocation from the Israeli government; (b) no other private property available for settlement growth save for private Palestinian property and; (c) settlement officials had to exclusively rely on U.S.-based tax-exempt entities and their donors to finance new settlements or expand current settlements. That is why Treasury should have implemented an aggressive and vigorous regulatory approach years ago, because these entities would be funding settlement expansion, and therefore, wholesale violence in the Middle East. For some

---

[96] Complaint ¶ 38.

reason, Treasury officials allowed that notorious activity to continue even though it was in direct contravention of U.S. foreign policy objectives and E.O. 12947 which senior Treasury officials authored.

Just as important, Treasury officials have also known for years that pro Israeli tax-exempt entities have been providing enormous funding for the Israeli army and had to know about the atrocities that the Israeli army was inflicting on the Palestinians on a daily basis in the OPT. Some ten to fifteen years ago, Ha'aretz editorials were condemning that activity almost on a daily basis. In 2001, New York Times Pulitzer Prize winning journalist, Mr. Chris Hedges, confirmed that killing Palestinian children was an ongoing activity. Moreover, these were not small sums; in fact the Friends of IDF, an U.S. based 501(c)(3) entity, sent $104 million in 2014 to the Israeli army.

As detailed in Count II in *Tamimi v. Adelson*, civil action number 1:16-cv-00445 now pending in this judicial district, 700 Israeli army veterans have all confessed to extensive war crimes. These have been outlined in section III, *supra*. As Treasury officials know only too well, the U.S. tax code was not enacted to finance a foreign army's operations, money laundering, ethnic cleansing, theft of private property, or the commission of war crimes as defined in both U.S. and Israeli statutes.

The obvious question that is now before this Court is, *given Treasury's adamant refusal to investigate notorious criminal activity, why would an administrative agency with an enormous budget, skilled personnel, abundant legal authority, and expertise in money laundering choose not to investigate these well-documented, flagrant abuses of the tax code?* The simple answer is that senior Treasury officials are fearful of the American Israel Public Affairs Committee (AIPAC) and other elements of the Israel lobby. That is why it has adopted a double standard when it comes to monitoring and preventing the criminal activities that pro-settlement tax-exempt entities have been financing for at least 20 years. It is common knowledge in Washington, D.C. that the Israel lobby effectively controls Congress, and this view is

shared by a majority of Americans. This has been well documented in the book entitled *The Israel Lobby* by Stephen Walt and John Mearsheimer and confirmed by U.S. government officials as well.

For example, Martin Indyk, former U.S. Special envoy for Israeli-Palestinian negotiations, remarked that "AIPAC is indeed a powerful lobby on behalf of Israel, and there is no doubt that its influence constrains what an administration can consider that it would do [on any issue]." This is not a novel revelation. Senator Fulbright, in 1963, came to the same conclusion while conducting hearings on the Israeli government's money-laundering activities undertaken on American soil to improve its image. Every year, the Washington Report on Middle-East Affairs (WRMEA) holds a conference titled "Israel's Influence: Good or Bad for America?" That is why both the Obama administration and State Department officials commented the way they did in response to the filing of this lawsuit. They both reiterated the party line—every U.S. administration has condemned settlement expansion and wholesale violence for the past forty years. That was of course a safe and nonthreatening position as to not offend AIPAC. According to former AIPAC employees,[97] no federal agency action (especially a decision to investigate sacred cows like pro-settlement tax-exempt entities) that affects Israel has not been vetted or approved first by AIPAC. Knowing that AIPAC and the Israel lobby wield enormous influence on Congress, Treasury officials are understandably concerned with the repercussions that will flow from its decision to formally investigate pro-settlement tax-exempt entities. That reality, of course, does not justify Treasury to cease or curtail its oversight functions.

The first consequence of such an investigation would be stopping $1.7 billion in laundered funds from going to Israel-based NGOs on an annual basis. Even though this activity is contrary to Israeli public policy,[98] certain Israeli government officials rely on these funds to support settlement expansion and ethnic cleaning. If Treasury actually decided to launch an official investigation into

---

[97] *See Rosen v. American Israel Public Affairs Committee, Inc. et. al*, 0256-09 (D.C. Sup. Ct. 2009).
[98] *See* Complaint pp. 30-42.

the abuses of the tax code and the criminal activity financed by these pro-settlement tax-exempt entities, Treasury knows that AIPAC would use its enormous legislative influence to severely cut its annual budget in retaliation. This is not idle speculation by any means. It is well known and has been extensively written about as to how congressional leadership has effectively constrained IRS oversight activities due to a lack of funding. One example thereof involves the House Judiciary Committee's decision to hold hearings in order to impeach IRS Commissioner John Koskinen. There is an active congressional movement to continue to slash IRS's budget, pass bills to ban employees' bonuses, and fire employees for misconduct.[99] The issue that congressional GOP leadership is looking into is why Treasury focused on conservative 501(c)(3)s for additional scrutiny. AIPAC will raise the same issue—why focus on pro-settlement tax-exempt entities.

Senior Treasury officials understandably expect more of the same if they decide to investigate pro-settlement tax-exempt entities and literally shut down a $1.7 billion money-laundering operation; therefore, unless Treasury is ordered by this court to initiate an investigation, nothing will ever happen. These tax-exempt entities will continue to engage in money-laundering activities, flagrantly violate at least five Treasury tax-exemption regulations and seven federal criminal statutes, and continue to promote settlement expansion, ethnic cleansing, theft of private property, and arms trafficking. This is why Treasury has to literally be ordered to investigate the funding of criminal activities by pro-settlement 501(c)(3) entities, all at the expense of the U.S. taxpayer.

## CONCLUSION

This Court has to make a difficult decision, i.e., does it kick the proverbial can down the street, or order the Treasury Department to investigate the documented abuses of the tax code committed by U.S. donors and tax-exempt entities as detailed in the Complaint. Apart from the

---

[99] *See, e.g., Impeach the IRS Director*, George F. Will, Washington Post Oct. 7, 2015.

reasons already articulated herein, there is an additional reason why it is necessary to order Treasury to enforce its tax-exempt entities regulation, and that is judicial economy. The National Lawyers Guild has confirmed that the issue of tax-exempt organizations financing wholesale violence and settlement expansion will be an ongoing serious issue that Treasury will be repeatedly asked to investigate.

On March 30, 2016, the Guild submitted a regulatory challenge to the IRS and, like the Plaintiffs herein, requested an investigation of the charitable status of the Jewish National Fund (JNF). The Guild claimed discrimination and contravention of U.S. foreign policy objectives, which Plaintiffs have alleged herein. This filing clearly illustrates that this will be an ongoing issue that this Court will have to face at least once more in the near future. In other words, if this Court does not order Treasury to start investigating pro-settlement 501(c)(3)s as a result of the instant litigation, the result will simply be the spawning of additional litigation. This judicial district will be inundated with identical lawsuits filed by the Guild and other parties concerning Treasury's ongoing failure to stop a longstanding $1.7 billion money-laundering scheme.

Lastly, Plaintiffs respectfully remind this Court that their request is not novel or complex. This is not rocket science. In December 2013, IRS Commissioner John Koskinen said, "if there are tax exempt entities that are abusing the law, we will shut them down."[100] Plaintiffs are simply asking Treasury to adopt the common-sense approach articulated by both former U.S. Ambassador to Israel Daniel Kurtzer and IRS Commissioner Koskinen with respect to the problems posed by non-regulation of these tax-exempt entities. In other words, "Treasury—do your job."

Respectfully Submitted,           1150 Connecticut Avenue, N.W. Suite 900
*/s/ Martin F. McMahon*           Washington, D.C. 20036
Martin F. McMahon, Esq.           (202) 862-4343
D.C. Bar Number 196642            mm@martinmcmahonlaw.com
Martin F. McMahon & Associates    *Counsel for Plaintiffs*

---

[100] http://www.c-span.org/video/?316689-1/irs-commissioner-nomination-hearing-day-1.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 27, 2016, I filed the foregoing PLAINTIFFS' MEMORANDUM IN

OPPOSITION TO DEFENDANT TREASURY'S MOTION TO DISMISS with the Clerk of

Court using the CM/ECF system, which will send notice of this filing to all parties registered

to receive such notice, including defense counsel.

*/s/ Martin F. McMahon*
Martin F. McMahon, Esq.