## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSAN ABULHAWA, *et al.*,

       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF THE
TREASURY, *et al.*,

       *Defendants*.

Civil Action No. 15-2186 (RDM)

## MEMORANDUM OPINION

Plaintiffs, a group of individuals sharing "mutual concerns" about Israeli settlements in

the West Bank and East Jerusalem, bring this "declaratory judgment" action against the

Department of the Treasury and Secretary of the Treasury Steven Mnuchin.[1]  They allege that the

Treasury Department has granted tax-exempt status under 26 U.S.C. § 501(c)(3) to

"approximately 200 U.S. pro-Israeli-settlement" organizations that "either fund[] or engag[e] in

. . . criminal activities abroad," and that, despite this "criminal conduct," the Department has

failed to "challeng[e] or [to] revok[e] [the organizations'] tax-exempt status."  Dkt. 7 at 4–5

(Am. Compl.).  According to Plaintiffs, this failure by the Treasury Department has led to—and,

absent correction, will continue to lead to—the infliction of an array of wrongs against the

Palestinian people.  *Id.*  As a remedy, Plaintiffs seek an order requiring the Treasury Department

"to . . . initiate an investigation into any and all tax-exempt entities based in America which

transmit $20,000 or more on an annual basis to any country in the world;" to "revoke the

---

[1]  The amended complaint names former Secretary of the Treasury Jacob Lew as a defendant in
this case.  Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of the
Treasury, Steven Mnuchin, is automatically substituted in place of Secretary Lew.

entit[ies'] tax-exempt status" where "appropriate;" and to "refer all tax fraud and money laundering findings to the [Internal Revenue Service] and/or U.S. Department of Justice for criminal prosecution." *Id.* at 74–75.

Three motions are currently before the Court. First, Defendants move to dismiss the first amended complaint for lack of Article III standing and for failure to state a claim. Dkt. 10 at 1–2. Second, Plaintiffs seek leave to file a second amended complaint, which would join five additional plaintiffs and detail the harms that they have allegedly suffered (or will allegedly suffer) due to Defendants' failure to monitor the actions of the U.S.-based tax-exempt entities. Dkt. 18. Finally, Sam Abrams, a U.S. taxpayer and resident of New York State, moves to intervene, asserting that, if the Treasury Department is required "to investigate pro-Israel charities," it should "also investigate . . . charities . . . hostile to Israel." Dkt. 13 at 2–3. In opposing the latter two motions, Defendants extend their jurisdictional defense to the claims that the five additional putative plaintiffs and Abrams seek to assert.

As explained below, the Court agrees that the existing Plaintiffs, the five additional putative plaintiffs, and Abrams all lack Article III standing. The Court, accordingly, will grant Defendants' motion to dismiss the first amended complaint for lack of jurisdiction, will deny Plaintiffs' motion to file a second amended complaint as futile, and will deny Abrams' motion for leave to intervene on the ground that neither he nor any other party has standing to assert his proposed claim.

## I. BACKGROUND

Because Defendants "challenge[] the adequacy of [the first amended] complaint and [exhibits] to support [Plaintiffs'] standing," the Court "accept[s] [their] well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in [Plaintiffs']

favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see also West v. Lynch*, 845 F.3d 1228, 1231 (D.C. Cir. 2017).  The same standard applies, moreover, to the Court's consideration of whether Plaintiffs' proposed second amended complaint contains allegations sufficient to establish Article III standing, or whether, instead, the proposed amendment is futile.  *See Williams v. Lew*, 819 F.3d 466, 471–73 (D.C. Cir. 2016).  Because the issues presented in Defendants' motion to dismiss and in their opposition to Plaintiffs' motion for leave to amend overlap, and because the proposed second amended complaint is identical to the first amended complaint, save for the addition of one paragraph that details the allegations of the five plaintiffs seeking to join the suit, *compare* Dkt. 7 *with* Dkt. 18-2, the Court will focus on (and cite to) the factual allegations set forth in the proposed second amended complaint.

A.      **Factual Allegations**

Plaintiffs, a group of thirty-seven individuals, "join[ed] in this litigation" due to their "concerns" over the "explosive settlement expansion" by Israelis in the West Bank and East Jerusalem.  Dkt. 18-2 at 1–3, 8 (Second Am. Compl. ¶ 6).  They allege that organizations in the United States that were granted tax-exempt status under 26 U.S.C. § 501(c)(3) based on their "'charitable' or 'educational' . . . nature[s]" actually serve as "financial 'pass-throughs'" from "wealthy U.S. donors" to Israeli entities committed to "the forcible expulsion of indigenous non-Jewish Palestinians," the "theft of private property," the malicious destruction of private property, and the "murder[]" of Palestinians.  *Id.* at 4–5.  Plaintiffs allege that the actions of these U.S. nonprofit organizations "violate[] numerous . . . [§] 501(c)(3) regulations" and "at least eight federal criminal statutes."  *Id.* at 5–6.  Plaintiffs also allege that, [d]espite the[se] rampant" violations of law, the Treasury Department has "not challenged or revoked the[] tax-exempt status" of the "approximately 200 U.S. pro-Israeli-settlement [§] 501(c)(3) [organizations]."  *Id.*

at 4–5.  And Plaintiffs further allege that, because the Treasury Department has failed to "investigate the criminal activities that these tax-exempt entities have been funding or engaging in for at least the last [forty] years," the entities continue "to openly solicit[] tax-deductible contributions" in order to fund "the various settlements they have chosen to adopt." *Id.* at 6.

Of the thirty-seven plaintiffs, the proposed second amended complaint contains specific allegations about only eight of them.  As they also alleged in the first amended complaint, Plaintiffs allege that "John Doe" "has been concerned about [the Treasury Department's] failure to monitor" the § 501(c)(3) organizations described above "for a number of years" and has "heard from various Palestinian friends and neighbors" about "the atrocities that are being committed" which, he asserts, are being "largely subsidized by the American taxpayer." *Id.* at 9 (Second Am. Compl. ¶ 7).  Plaintiffs allege that Susan Abulhawa is also "concerned about [the Treasury Department's] ongoing failure to . . . prevent the criminal activities engaged in by th[e] pro-settlement tax-exempt entities," and, more significantly, that Israel "[has] dislocat[ed]" her from the "patch of earth" in Jerusalem "where [her] family ha[d] dwelt for centuries." *Id.* at 10 (Second Am. Compl. ¶ 9).  They further allege that Michael Several "has visited Israel on many occasions and [has] seen first-hand what settlement expansion has meant to the ordinary Palestinian citizen." *Id.* (Second Am. Compl. ¶ 10).  And, they allege that Several, who has performed "significant research on U.S. donors and pro-settlement tax-exempt entities," "firmly believes that financial support rendered by" those entities has "promoted widespread violence against Palestinians" and has "perpetuated the environment and conditions that give[] rise to violent resistance to the Israeli occupation." *Id.* at 10–11 (Second Am. Compl. ¶¶ 10–11).

The proposed second amended complaint would add allegations about five more plaintiffs who seek to join the litigation.  Most notably, Plaintiffs allege (or, more precisely, seek

leave to allege) that putative plaintiff Linda Kateeb "owns six plots of land in the West Bank;"
that an "Israeli settler organization . . . supported by funds provided by U.S. tax-exempt entities"
recently "purported to purchase two" of her plots from "violent Israeli settlers who had set up
outposts on [her] land;" and that she "is worried that if [the Treasury Department] continues to
allow so-called tax-exempt funds to flow to the organization, she will lose her remaining four
plots of land." Dkt. 18-2 at 11 (Second Am. Compl. ¶ 13(a)). Plaintiffs also seek leave to allege
that Abbas Hamideh "similarly has lost, and fears that he will continue to lose, . . . family land in
the West Bank" if U.S.-based nonprofits "are permitted to provide funds to violent settlers." *Id.*
They seek leave to allege that Doa'a Abu Amer "lost fourteen family members when the Israeli
army bombed the daycare center [in Gaza] in which they sought refuge," *id.* at 12 (Second Am.
Compl. ¶ 13(b)), and that Ahmed Al-Zeer was "beaten by violent settlers while on his own
property outside [of a] segregated settlement" in the West Bank, *id.* (Second Am. Compl.
¶ 13(c)). Finally, Plaintiffs seek leave to allege that Danny Awad "lost the Christian center" he
managed in the West Bank due to an "illegal transaction" involving "a settler organization and
its U.S. backers." *Id.* at 12–13 (Second Am. Compl. ¶ 13(d)).

Aside from these paragraphs detailing plaintiff-specific factual allegations, *see id.* at 9–13
(Second Am. Compl. ¶¶ 7–13), the remaining 113 numbered paragraphs of the proposed second
amended complaint include a litany of allegations of wrongdoing by the U.S.-based § 501(c)(3)
entities that, Plaintiffs claim, the Treasury Department has failed to regulate. Among other
allegations, the proposed second amended complaint addresses the "history of settlement
expansion funded by U.S. donors and tax-exempt entities," *id.* at 15–25 (Second Am. Compl.
¶¶ 18–34); the "United States public policy regarding settlement expansion activity;" *id.* at 26–
30 (Second Am. Compl. ¶¶ 35–37), and the "statutory violations" that Plaintiffs contend that

"U.S. tax-exempt entities and their donors have all conspired to" commit, including money

laundering, wire fraud, racketeering, and "war crimes," *id.* at 42–50 (Second Am. Compl. ¶¶ 59–

73).  Plaintiffs claim that scores of § 501(c)(3) organizations have engaged in these purported

violations of law "with the express knowledge of" the Treasury Department and despite the

Department's duty "to ensure that the perpetrators of [such] activities . . . [are] sanctioned to the

fullest extent of the law." *Id.* at 72–73 (Second Am. Compl. ¶¶ 111, 113).

**B.**     **Procedural History**

Plaintiffs brought suit on December 16, 2015, Dkt. 1, and filed their first amended

complaint on February 5, 2016, Dkt. 7.  Then, on April 4, 2016—four days before Defendants

moved to dismiss the first amended complaint—Plaintiffs purported to file a second amended

complaint adding five plaintiffs.  Dkt. 9.  Plaintiffs did not seek leave of the Court or consent

from Defendants before doing so.  In their reply brief in support of their motion to dismiss,

Defendants argued that the Court "should disregard the second amended complaint" for failure to

comply with Federal Rule of Civil Procedure 15(a)(2), but, "[o]ut of an abundance of caution,"

they nevertheless addressed the merits, arguing that the additional plaintiffs and allegations

would not cure the jurisdictional defects they had identified.  Dkt. 16 at 3.  Recognizing their

procedural misstep, Plaintiffs then moved for leave to file their second amended complaint,

arguing that granting them leave to file the proposed second amended complaint would not

prejudice Defendants, would best serve judicial economy, and would be in the interest of justice.

Dkt. 18.

While the parties were briefing Defendants' motion to dismiss, Abrams moved to

intervene.  Dkt. 13.  He argues that, in the event that the Court "open[s] the floodgates" to

complaints like the one filed by Plaintiffs, he should be permitted to seek an order compelling

Defendants to "investigate the tax status" of "charities that are hostile to Israel." *Id.* at 2–3.  The

Court ordered Defendants to respond to Abrams's motion and, in particular, to address whether

Abrams has standing to intervene.  *See* Minute Order, May 21, 2016.  In response, Defendants

filed a memorandum arguing that Abrams lacks standing and that, accordingly, he should not be

permitted to intervene.  Dkt. 17 at 2.

## II.  LEGAL STANDARD

### A.    Motion to Dismiss Under 12(b)(1)

Because "[f]ederal courts are courts of limited jurisdiction, possessing only that power

authorized by Constitution and statute," *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quotation

marks omitted), they have "an affirmative obligation to consider whether the constitutional and

statutory authority exist for [them] to hear each dispute" brought before them, *James Madison

Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quotation marks omitted).  If

the "court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss

the action."  Fed. R. Civ. P. 12(h)(3).

"[D]efect[s] of standing" constitute "defect[s] in subject matter jurisdiction."  *Haase v.

Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  The "plaintiff bears the burden of . . . establishing

the elements of standing," and each element "'must be supported in the same way as any other

matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation.'"  *Arpaio*, 797 F.3d at 19 (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  Accordingly, "[t]o survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim

[of standing] that is plausible on its face."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)) (alterations in original).  "[T]hreadbare recitals of the elements of [standing], supported

by mere conclusory statements, [will] not suffice," *id.* (quoting *Iqbal*, 556 U.S. at 678) (second alteration in original), and the Court need not "assume the truth of legal conclusions" nor must it "'accept inferences that are unsupported by the facts set out in the complaint,'" *id.* (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).[2]

## B.    Motion for Leave to File an Amended Complaint Under Rule 15(a)

After a party has amended its complaint "once as a matter of course" pursuant to Rule 15(a)(1), it may only further amend "with the opposing party's written consent or the court's leave."  Fed R. Civ. P. 15(a)(2).  Although courts "should freely give leave [to amend] when justice so requires," *id.*, in "deciding whether to allow a party to amend a complaint, . . . courts may consider 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment,'" *Mahon v. Anesthesia Bus. Consultants, LLC*, No. 15-cv-1227, 2016 WL 1452333, at *9 (D.D.C. April 13, 2016) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  "Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss." *James Madison Ltd.*, 82 F.3d at 1099.

## C.    Motion to Intervene Under Rule 24(b)(2)

"Permissive intervention is governed by Federal Rule of Civil Procedure 24(b), which provides, in pertinent part, that . . . 'the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact.'" *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010) (second alteration in

---

[2]  Although a Court may "elicit information outside the pleadings" in "considering [a plaintiff's] standing under [Rule] 12(b)(1)," *Haase*, 835 F.2d at 908, the parties here have not requested that the Court do so.

original).  "In order to litigate a claim on the merits" under Rule 24(b), "the putative intervenor must ordinarily present: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action."  *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  "In exercising its discretion" to decide whether permissive intervention is warranted, the Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  "[P]ermissive intervention is an inherently discretionary enterprise," and district courts are afforded "wide latitude" in determining whether a third-party should be permitted to intervene.  *Nat'l Children's Ctr.*, 146 F.3d at 1046.

## III.  ANALYSIS

### A.    Motion to Dismiss Under Rule 12(b)(1) and Motion for Leave to Amend

The first two motions before the Court—Defendants' motion to dismiss and Plaintiffs' motion for leave to file the proposed second amended complaint—raise the same threshold question:  Are the factual allegations contained in either pleading, if accepted as true, sufficient to establish that at least one plaintiff or putative plaintiff has Article III standing to pursue this litigation?   If the first amended complaint fails this test, then it must be dismissed.  And, if the proposed second amended complaint fails the test, the proposed amendment would be futile and, thus, the motion for leave to amend should be denied.  The Court's task in answering these questions, moreover, is simplified by the fact that the proposed second amended complaint differs from the first amended complaint in only one meaningful way—the addition of allegations pertaining to the five additional plaintiffs that the proposed pleading seeks to join.  Because the Court concludes that, even if these additional allegations are considered, no plaintiff has standing to pursue this action, the Court can consider—and resolve—both motions together.

"Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc)). Among other things, this means that the Court lacks power to resolve a dispute unless at least one plaintiff has standing. *See Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015). And, at the motion to dismiss stage, it means that "the plaintiff must sufficiently allege a 'concrete and particularized' injury that is 'fairly traceable to the challenged action of the defendant' and 'likely' to be 'redressed by a favorable decision.'" *West*, 845 F.3d at 1230 (quoting *Lujan*, 504 U.S. at 560–61). "Injury in fact is the 'invasion of a legally protected interest which is . . . actual or imminent, not conjectural or hypothetical;'" the "'causal connection between the injury and the conduct complained of' must be" attributable to the defendant, "'and not the result of the independent action of some third party not before the court;'" and the injury must be redressable (or "'likely'" redressable) "'by a favorable decision.'" *Arpaio*, 797 F.3d at 19 (quoting *Lujan*, 504 U.S. at 561). Together, these three elements—injury in fact, causation, and redressability—constitute the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560.

1. *Injury in Fact*

Defendants concede that the lead plaintiff, Susan Abulhawa, has alleged a "concrete and particularized injury-in-fact"—namely, the loss of certain real property, Dkt. 10-1 at 14 n.2 — and they do not contest that the five plaintiffs added in the proposed second amended complaint have also alleged concrete injuries in fact, *see* Dkt. 16 at 4. The Court need not resolve the question whether Abulhawa, the five additional putative plaintiffs, or any of the remaining thirty-one plaintiffs have alleged cognizable injuries in fact, however, because none of the thirty-seven

plaintiffs and putative plaintiffs have alleged facts sufficient to meet the causation or

redressability prongs of the governing standard.  *See West*, 845 F.3d at 1235.

    2.  *Causation*

    Defendants argue that "[P]laintiffs cannot establish a causal link between an alleged

injury and the challenged conduct;" that is, they have not alleged facts sufficient to "show that

the alleged criminal activity" carried out by the U.S.-based nonprofits in coordination with

Israeli settlers "would not have occurred but for the grant of, and failure to investigate or revoke,

tax-exempt status by the United States."  Dkt. 10-1 at 15.  Plaintiffs disagree, arguing that a

"simple chain of causation" supports Kateeb's claim to standing and that this same reasoning

applies to other plaintiffs as well.  Dkt. 15 at 8.  As they explain the theory applicable to

Kateeb's claims, two plots of land located in the West Bank belonging to Kateeb were

purportedly sold to an "Israeli settler organization" by "violent Israeli settlers supported by funds

provided by U.S. tax-exempt entities (most likely American Friends of Bet El Yeshiva or

Christian Friends of Israeli Communities)."  *Id.* at 6.  "The theft of . . . Kateeb's property"—or,

at the time, her father's property—"would not have occurred" but for the following alleged

events: (1) the U.S. § 501(c)(3) "entities receive[d] massive donations from wealthy donors in

the United States;" (2) those entities "then transfer[ed] those monies abroad into . . . Israel-based

charity bank accounts;" (3) the Israel-based charities then transfered the "monies . . . to settler

officials;" (4) the "settler officials" then used the funds to "set up armed militia units;" and,

finally, (5) the militia units then injured Kateeb by "annex[ing]" her father's land.  Dkt. 15 at 8.[3]

---

[3]  Plaintiffs allege similar chains of causation for other plaintiffs.  For example, Amer alleges that
one U.S.-based § 501(c)(3) organization donated funds to the Israeli Defense Forces (IDF); the
IDF used those funds to "deploy its troops" for a bombing attack; and Amer's family sustained
injuries as a result of one of those bombing attacks. Dkt. 15 at 10.  Without the funds provided
by the U.S. § 501(c)(3) organization, Amer alleges, the IDF's "operations would have been

Most importantly for present purposes, all of this turned, in Plaintiffs' view, on the predicate that

the Treasury Department did not exercise its authority to revoke the tax-exempt status of those

§ 501(c)(3) organizations that provide funding to groups that support the Israeli settlers.  In short,

"[w]ithout having . . . [§] 501(c)(3) status bestowed on them by the [Internal Revenue Service],

these [U.S.-based] organizations would not have been able to solicit contributions and transfer

funds to the settlement[s]," which, in turn, would mean that those donated funds would not be

available "to arm violent settlers" or "fund the illegal theft of . . . property," and, accordingly,

Plaintiffs would not have been injured.  *Id.* at 8–9, 11.

Standing arguments of this type are not new.  Most notably, the Supreme Court

considered whether a similar "chain of causation between the challenged Government conduct

and the asserted injury" gave rise to constitutional standing in *Allen v. Wright*.  468 U.S. 737,

759 (1984).  There, "[p]arents of black public school children" alleged that "the Internal Revenue

Service (IRS) ha[d] not adopted sufficient standards and procedures to fulfill its obligation to

deny tax-exempt status to racially discriminatory private schools" and that, by this omission, the

IRS "harm[ed] them directly and interfere[d] with the ability of their children to receive an

education in desegregated public schools."  *Id.* at 739–40.  The parents' theory was that: (1) the

IRS's conferral of tax-exempt status on schools that were admitting only white students

"facilitate[d] the raising of funds to organize [such] schools and expand [the] existing schools;"

(2) white students left desegregated public schools in order to attend these white-only private

---

curtailed," and, possibly, he would not have sustained injuries due to the bombing attack.  *Id.*
Similarly, Al-Zeer alleges that, but for contributions funneled through an American § 501(c)(3)
to an Israeli settlement organization, the settlers never would have "been able to purchase [the]
expensive military hardware" they used to attack him.  *Id.*

schools; and (3) the black children of the plaintiff parents were thereby deprived of the opportunity to attend desegregated schools. *See id.* at 746, 758 (quotation marks omitted).

In rejecting this theory, the Supreme Court concluded that the "line of causation between [the IRS's] conduct and desegregation of [the black children's] schools [wa]s attenuated at best," *id.* at 757, and that the "links in the chain of causation . . . [we]re far too weak for the chain as a whole to sustain [the parents'] standing," *id.* at 759. The Court emphasized that the hypothesized chain of events "involve[d] numerous third parties"—for example, the "officials of racially discriminatory schools receiving tax exemptions and the parents of children attending such schools"—whose "independent decisions may not collectively have [had] a significant effect on the ability of public school students to receive a desegregated education." *Id.* at 759. Despite the "constitutional importance of curing" one of "the most serious injuries recognized in our legal system"—the "diminished ability to receive an education in a racially integrated school"—the Court concluded that it could not redress plaintiffs' injury because it was "not fairly traceable to the Government conduct . . . challenge[d] as unlawful." *Id.* at 756–57.

The same conclusion holds here. The chain of causation linking the Treasury Department's alleged "failure to monitor" the § 501(c)(3) status of U.S.-based charities and the injuries sustained by Plaintiffs "is attenuated at best," *id.* at 759, and, as in *Allen*, that chain relies on a series of speculative inferences about the "independent action[s] of some third part[ies] not before the [C]ourt," *id.* at 757 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976)). Plaintiffs speculate, for example, that (1) the donors to the U.S.-based § 501(c)(3) organizations made their contributions only because those entities are tax-exempt; (2) the U.S. charities would be unable to find alternative sources of funding; (3) the Israeli settlers could not obtain other sources of funding; and (4) absent the continued influx of funding from U.S.

13

charities, the Israeli settlers would be unable to acquire new land and might even give up the land that they currently possess.  At each of these links, a third-party actor could break the causal chain—a donor might decide to donate to one of the U.S.-based § 501(c)(3) organizations because he or she supports its goals, not because it is tax exempt; other donors might take the place of any donors who will contribute only to tax-exempt groups; the Israeli settlers may already possess the "weapons" and "equipment" that they need to remain in the disputed areas; or they may be committed to staying put, regardless of the support they receive from U.S.-based charities.  Although, in general, the Court "must take the complaint's allegations of facts, historical or otherwise demonstrable, as true," that presumption does not extend to allegations, like those at issue here, that speculate about future events and that purport to predict how third parties might someday react to changed circumstances.  *Arpaio*, 797 F.3d at 21 (quotation marks omitted); *Osborn v. Visa, Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015).

Plaintiffs' "reliance on the anticipated action[s] of unrelated third parties makes it considerably harder to show the causation required to support standing."  *Arpaio*, 797 F.3d at 20. "Although 'standing is not precluded' in a case that turns on third-party conduct, 'it is ordinarily substantially more difficult to establish,'" *id.* (quoting *Lujan*, 504 U.S. at 562), and the D.C. Circuit "ha[s] required 'substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation,'" *id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004)).  Here, Plaintiffs' theory of causation is based on speculation upon speculation about how third parties might act.

To be sure, the precise contours of Article III standing are "not susceptible of precise definition."  *Allen*, 468 U.S. at 751.  But, as the Supreme Court explained in *Allen v. Wright*, this

"hardly leaves courts at sea" because individual cases can often be resolved "by comparing the allegations of the particular complaint to those made in prior standing cases." *Id.* at 751–52. That observation is particularly apt here because *Allen* itself provides such a close comparator to the present case. Indeed, if anything, the chain of events that Plaintiffs posit is more attenuated and more uncertain than the one relied upon by the respondents—and rejected by the Supreme Court—in *Allen*.

This case also finds a close comparator in *Khalaf v. Regan*, No. 83-cv-2963, 1985 WL 392 (D.D.C. Jan. 8, 1985), a case that, like this one, was brought by a group of individuals seeking to challenge the tax-exempt status of a number of organizations that allegedly supported Israeli settlement efforts in the West Bank. As in this case, some of the plaintiffs alleged that they owned land in the West Bank that had "been confiscated by Israeli authorities" for use as "Jewish settlements" and that these "expropriations [had] been financed in substantial part with funds obtained from contributions to the subject organizations." *Id.* at *2. Relying on *Allen*, the district court concluded that the plaintiffs lacked standing, *id.* at *3, and the D.C. Circuit confirmed that "no sensible jurisprudence could allow th[at] case to proceed while disallowing for want of standing cases like *Allen*" and others, *Khalaf v. Regan*, No. 85-5274, 1986 U.S. App. LEXIS 33734 (D.C. Cir. Sept. 19, 1986). Five years later, the D.C. Circuit reaffirmed that conclusion in *Fulani v. Brady*, 935 F.2d 1324, 1328 (D.C. Cir. 1991). There, the D.C. Circuit cited *Khalaf* with approval and, more generally, observed that, "where a party is seeking simply to remove a third party's entitlement to a tax exemption, the exemption likely will not bear sufficient links of traceability . . . to the alleged injury to warrant standing under *Allen v. Wright*." *Id.* There is nothing about the present case that would warrant an exception to this general rule.

The Court, accordingly, concludes that Plaintiffs—in both their amended complaint and proposed second amended complaint—have failed to carry their "burden of . . . establishing the [causation] element[] of standing." *Arpaio*, 797 F.3d at 19.

3. *Redressability*

Both the first amended and proposed second amended complaints fail for a second reason as well:  Neither complaint alleges facts sufficient to meet the redressability prong of the standing test.  "Redressability examines whether the relief sought, assuming that the court chooses to grant it, w[ould] likely alleviate the particularized injury alleged by the plaintiff." *West*, 845 F.3d at 1235 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 663–64).  "The key word is 'likely,'" *id.* (quoting *Lujan*, 504 U.S. at 561), and thus "the prospect of obtaining relief from the injury as a result of a favorable ruling" cannot be "too speculative," *Allen*, 468 U.S. at 752.  As with the causation analysis, when redressability "depends on the unfettered choices made by independent actors not before the court[] and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing." *Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (quotation marks omitted).  "Courts do not lightly speculate how independent actors not before them might" act, and, "[w]hen conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237 (quotation marks and alterations omitted).

The starting point in the redressability analysis is necessarily the relief sought.  In this case, that relief is purely prospective.  Plaintiffs do not seek damages for any losses or injuries they have already sustained, but rather seek or order (1) "requiring [the] Treasury [Department] to . . . initiate an investigation into any and all tax-exempt entities based in [the United States,] which transmit $20,000 or more on an annual basis to any country in the world" and requiring

that the Department, "where appropriate, revoke the entit[ies'] tax-exempt status;" (2) requiring that the Treasury Department "refer all tax fraud and money laundering findings to the IRS and/or U.S. Department of Justice for criminal prosecution;" (3) requiring that the Treasury Department's Financial Crimes Enforcement Network "investigate the entities . . . who have engaged in [the alleged] money laundering activities;" and (4) requiring that the Treasury Department "initiate a long-overdue investigation of all of the financial sponsorship of and commission of the [alleged] violent activities . . .on the part of U.S. tax exempt entities, their donors, and [Israeli Defense Forces]."  Dkt. 18-2 at 77–78.

For those plaintiffs alleging past injuries—for example, the loss of property already taken or a physical assault already suffered—an order from this Court compelling Defendants to investigate the § 501(c)(3) status of U.S.-based charities will do nothing to redress their alleged injuries.  Even if Defendants were to revoke the § 501(c)(3) status of U.S. entities, if any, found to have financially supported illegal activity in the West Bank or East Jerusalem, those actions would not make Plaintiffs whole; neither the investigation, the revocation of tax-exempt status, nor even the prosecution of U.S. nonprofit organizations would result in the return of any illegally obtained property in the West Bank or East Jerusalem or in the payment of damages for physical assaults that occurred in those territories.  "Absent a sufficient likelihood that [they] will again be wronged in a similar way," Plaintiffs are "no more entitled to an injunction" or declaratory judgment than anyone else, and "a federal court may not entertain a claim by any or all citizens who no more than assert that certain" agency action—or inaction—is unlawful.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

For Plaintiffs alleging *future* injuries —for example, Kateeb's fear that "if [Defendants] continue[] to allow so-called tax-exempt funds to flow to [an Israeli settler] organization, she

will lose her remaining four plots of land," Dkt. 18-2 at 11 (Second Am. Compl. ¶ 13(a))—the redressability is a closer call, but only slightly closer.  It is conceivable, Plaintiffs argue, that if the Treasury Department investigates a particular U.S.-based § 501(c)(3) organization, the Department might revoke the organization's tax-exempt status, which might decrease the financial contributions made to that organization, which might lead to fewer funds sent by that organization to Israeli-based nonprofits, which might lead those Israeli nonprofits to reduce expenditures in support of West Bank or East Jerusalem settlers, who, in turn, might have fewer funds to take steps that might ultimately injure Plaintiffs.  But as this chain of inferences lays bare, the likelihood that the requested relief would actually redress an imminent harm to any of the plaintiffs is both speculative and remote.  It requires the Court to "pile conjecture on conjecture," *West*, 845 F.3d at 1237, forcing it to assume, for example, that donors would stop contributing funds to U.S.-based nonprofits stripped of their tax-exempt status; that Israel-based nonprofits would not find some other funding source to fill any gap created by a reduction in U.S. financial support; and, most importantly, that the individual actors—the settlers in the West Bank and East Jerusalem—would refrain from taking actions that could injure Plaintiffs.  Such "unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power." *Scenic America*, 836 F.3d at 50 (quotation marks omitted).

Plaintiffs can only "establish the redressability prong required for standing" if they can show that the "declaratory judgment sought w[as] the *sine qua non* for, or would 'significantly increase [their] likelihood' of" staving off the future injuries they detail in their proposed second amended complaint. *Hispanic Affairs Project v. Perez*, 15-cv-1562, 2016 WL 4734350, at *9 (D.D.C. Sept. 9, 2016) (quoting *Lichoulas v. FERC*, 606 F.3d 769, 775 (D.C. Cir. 2010)).  Even

accepting the allegations contained in Plaintiffs' proposed second amended complaint as true,

they have failed to satisfy the redressability requirement of Article III standing.

*     *     *

Because Plaintiffs have failed to allege facts sufficient to meet two essential elements of

constitutional standing, the Court will grant Defendants' motion to dismiss Plaintiffs' amended

complaint under Rule 12(b)(1).[4]  Dkt. 10.  For the same reasons, moreover, the Court will deny

Plaintiffs' motion for leave to file a second amended complaint, Dkt. 18, as futile.  *See James*

*Madison Ltd.*, 82 F.3d at 1099 ("Courts may deny a motion to amend a complaint as futile . . . if

the proposed claim would not survive a motion to dismiss.").

## B.     Motion to Intervene Under Rule 24(b)

Finally, the Court addresses Abrams's motion to intervene under Rule 24(b).  *See* Dkt.

13.  "In order to litigate a claim on the merits under Rule 24(b)(2), the putative intervenor must

ordinarily present," among other things, "an independent ground for subject matter jurisdiction."

*EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  This requirement stems

"from the basic principle that a court may not adjudicate claims over which it lacks subject

matter jurisdiction," and because the "typical [third-party] movant asks the district court to

adjudicate an additional claim on the merits."  *Id.* at 1046.  Although it "remains an open

question in this circuit whether Article III standing is required for permissive intervention,"

*Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013) (quotation marks and

---

[4]  Because the Court grants Defendants' motion to dismiss under Rule 12(b)(1) for lack of
subject matter jurisdiction, it need not—and should not—address Defendants' merits-based
arguments.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without
jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law,
and when it ceases to exist, the only function remaining to the court is that of announcing the fact
and dismissing the cause." (quotation marks omitted)).

alteration omitted), no amount of "flexibil[ity]" in the interpretation of Rule 24, *see Nat'l Children's Center, Inc*., 146 F.3d at 1045–46, can overcome the constitutional hurdle posed when *no* party to the litigation has standing and thus there is *no* "case or controversy" within the meaning of Article III.

Here, no one—not even Abrams—argues that Abrams has sustained, or is likely to sustain, (1) an injury in fact (2) that is fairly traceable to the wrong he alleges (3) that would be redressed by a favorable ruling.  To the contrary, Abrams asserts that "[i]t appears, based on precedent, that the [o]riginal [p]laintiffs lack standing to assert their claims in this Court," and he merely asks that, "if this Court is of a mind to open the floodgates," it should permit him to press his claim as well.  Dkt. 13 at 1–2.  As explained above, the Court agrees that Plaintiffs lack standing.  That conclusion, moreover, extends with even greater force to Abrams, who has not even alleged that he has suffered, or is likely to suffer, a particularized injury in fact, much less that any such injury is fairly traceable to the tax-exempt status of Doctors Without Borders or that IRS review of that organization's tax-exempt status would redress any such injury.  The "floodgates" will thus remain closed to both Plaintiffs and Abrams.

The Court will, accordingly, deny Abrams motion for permissive intervention.

## CONCLUSION

The Court will, accordingly, **GRANT** Defendants' motion to dismiss Plaintiffs' amended complaint, Dkt. 10, **DENY** Plaintiffs' motion for leave to file a second amended complaint, Dkt. 18, and **DENY** Abrams's motion to intervene, Dkt. 13.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 4, 2017