IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN ABULHAWA, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) Civil Action No. 15-2186 (RDM) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, *et al.*, | ) ) ) |
| *Defendants*. | ) ) |

**PLAINTIFFS' MOTION FOR RECONSIDERATION**

Come now the Plaintiffs herein and hereby ask the Court to reconsider its Opinion rendered on March 4th, 2017. The Plaintiffs believe that the Court has erred in deciding three different issues: First, the nature of the criminal activities engaged in by the settlers and financed by U.S tax-exempt entities. Second, the Court's adoption of a rigorous standard of proof in deciding the standing issue which is more appropriate for the Summary Judgment stage not the Motion to Dismiss stage.  Third the Court also failed to recognize that a Treasury investigation would redress Plaintiffs' injuries. For example, Plaintiff Kateeb could sue the entity that financed the illegal confiscation of her property once it was identified in discovery.

**I.     THIS COURT IN ITS RUSH TO JUDGMENT GLOSSED OVER IMPORTANT FACTS IN THE COMPLAINT.**

First, as recited in the Complaint, "the primary source of funding to expand settlement is U.S based 501(c)3 entities like the "friends of Ariel." (Amend. Compl. pg. 4).  Secondly the Plaintiffs allege that settlers used the military hardware [bought with U.S. funds] to threaten and intimidate the Palestine neighbors—in some case killing them in the hope they would abandon

1

their olive groves. (Amend. Compl. pg. 5). Third, most of the U.S. tax exempt entities are financial "pass throughs" and "funnels" that wealthy U.S. donors have abused for the last 30 years. *Id*. Their goal to fund the expulsion of non-Jews in the occupied territories. Fourth, most if not all have engaged in money laundering activity in violation of 18 U.S.C. 1956 (a)(2).

Fifth, even though war crimes have been financed by U.S. non-profits for 30 years, the Treasury Department Officials have not revoked their tax-exempt or designated them "as a terrorist organization." President Clinton issued Executive Order 12497 in 1995 which criminalized committing or funding violence in the middle east, with the consequence for doing so being designated as an international terrorist. The U.S. tax-exempt entities have violated at least 8 U.S criminal statutes. (Amend. Compl. pg. 6). Not a single officer in a U.S based pro-Israel tax-exempt entity has been designated a terrorist for funding violence in the Middle East. This is in stark contrast with the fact that thousands of Arabs and Muslims have been designated as terrorists based on newspaper clippings. Thus, the Treasury Department has adopted a "double standard' when dealing with 501(c)3 who are pro Israel. (Amend. Compl. pg. 6). These tax-exempt entities have defrauded the IRS because they encourage donors to take illegal tax write offs based on expenses incurred in buying military hardware.

Six, the injuries asserted by the Plaintiffs include the loss of the family home. In the words of Plaintiff Aublhawa "I want a court to hold accountable those who have financed my pain of separation and exile." Amend. Compl. ¶ 9. U.S. tax-exempt entities have financed settlement expansion and the destruction of her home. She wants to hold these tax-exempt entities accountable because they are responsible for the theft of her private property. Another concrete injury was suffered by an Attorney, Plaintiff Zeer. Zeer was viciously beaten by violent settlers from the Ofra settlement and as a result his brain bled internally causing brain damage.

Amend. Compl. ¶ 13(c). He is now handicapped and confined to a wheelchair, Ofra is one of many settlements funded by Ambassador Friedman. Without funding coming from the U.S friends of Beit-El Mr. Zeer would be still practicing today as an attorney.

Seventh, if the Treasury starts enforcing its own tax regulations governing tax-exempt entities it would be able to recoup billions of dollars in back taxes and penalties. Mr. Adelson has been laundering money for almost 30 years. The penalty for that crime is $500,000 for each transfer. If he only did 300 transfers in that many years he would owe the Treasury millions of dollars. Eighth, there has been a forceful expulsion of 400,000-500,000 Palestinians since 1967. A Harretz article cited the complaint noted that this is the equivalent of demolishing all the homes in California. *See* Amend. Compl. Ft. Nt. 11, 12. It is hard to determine the amount of property seized and destroyed because Israel does not make these facts public. Ninth, tax-exempt funds supporting settlement expansion and violence have been written about by the New York Times and at least ten other major newspapers. Eleventh, the settlers are very violent belligerent individuals who believe they own the property that they have illegally confiscated. As detailed in the complaint, the settlers mantra is "we killed Jesus and we are proud of it this is our land get the Fuck out of here." Amend. Compl. ¶ 26. Settlers told BBC camera crew members that "We are going to kill you and the Palestinians you Nazi you son of a shit this is my house this my land God gave it to me." *Id*.

The irony is that God did not give them the finances to buy military weapons to steal their neighbor's property—that is the job of the U.S tax-exempt based entities. A Jewish citizen, Mr. Sholman living in the Hebron area, described what Palestinians face every day "the settlers display pure rarefied unadulterated unreasoning human evil" Amend. Compl. ¶ 27. He stated

3

what is the major Complaint of the Plaintiffs: "they led peaceful impoverished lives until the settlers came, and since then there has been no peace." *Id*.

Twelfth, the extraordinary financial assistance by U.S. pro-settlement tax-exempt entities has become a real problem ---- total contributions to Israel NGO in 2007 was $1.729 billion. Amend. Compl. ¶ 29. It is now estimated that this figure is up to $2 billion if a 1% growth factor is applied. It is inexplicable to the Plaintiffs that the only agency with the authority, regulations and professionals who can do something about it work for the Treasury Department, whose inaction this Court has completely approved of. The Court made no mention of the fact that there is a huge revenue shortfall that is caused by this money laundering scheme, another reason why there needs to be an investigation.

There are a number of reasons why, as detailed in Section II, that these U.S. based 501(c)3's will lose their tax exempt status as a result of this Court ordering an investigation. Besides violating at least eight federal statutes and numerous Treasury regulations, these tax-exempt entities are given exemptions because they are meant to lessen the burden of the municipal agencies after they are established. Amend. Compl. ¶ 33. For example, helping with a serious homeless population. These nonprofits, however, don't build homeless shelters, and they don't set up soup kitchens—they function as mere financial conduits. How this Court can overlook that fact and the reality that the Israeli Army has received a billion dollars in the last ten years from the U.S. taxpayer is nothing short of amazing. As repeatedly explained in the Complaint, 18 U.S.C. 960 forbids U.S. citizens from funding a foreign militia unit and 18 USC 1956 prohibits them form engaging in money laundering. Amend. Compl. ¶ 71.

II. **THIS COURT MAY REVERSE A FINAL AGENCY RULING IF IT FINDS THAT THE AGENCY ACTION IS ARBITRARY OR CAPRICIOUS AND OTHERWISE NOT IN ACCORDANCE WITH LAW.**

Consistent with 5 U.S.C. 706(2)(a) the Court has the authority to set aside a final agency ruling if it finds that a ruling is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. That's the reason federal agencies are required to articulate reasoning for the final ruling must have a rational connection between the facts found and the choice made. Based upon numerous allegations made in the complaint, it is obvious that these tax-exempt entities have funded criminal activity. Based on the fact that this criminal activity funded by the 501(c)(3)'s is not accordance with the law, this Court can reconsider its decision.

Eight federal criminal statutes have been violated by these tax-exempt entities. As stated earlier herein, there was a statute on the book that declares that no American citizen can fund a foreign militia unit. 18 U.S.C. 960 is one of many criminal statutes that these entities have violated. They are not allowed, for example, to travel through America to raise funds to promote violence of overseas. 18 U.S.C. 1952. They are not allowed to fund genocide and ethnic cleansing not allowed to engage in money laundering 18 U.S.C. 1956. Money laundering can involve the transfer of clean funds overseas if the objective of these funds has any connection to criminal activity.

Here, there is a strong connection because 400,000 Palestinians have been removed from the occupied territories. That statute specifically recites that whoever transmits a monetary instrument or funds from the U.S. to a place outside the U.S. with the intent to promote or carry on unlawful activity shall be sentenced to a fine of no more that $500,000—double the value of the instrument, or be sentenced to 20 years in prison, or both. Given the fact the friends of the Israeli army transferred $100 million dollars means they can be fined up to $160,000 million

dollars for these transfers. Amend. Compl. ¶ 13(b). As this Court knows only too well, an individual cannot commit tax fraud. These tax-exempt entities have committed tax fraud because thy encourage donors to take illegal tax deductions premised on expenditures for military hardware. In the case of East Jerusalem, classic RICO racketeering activity has occurred. Irate settlers tried to strip a Palestinian family home of its air conditioning unit to try and show that they had abandoned the home. Amend. Compl. ¶ 62. Such ethnic cleansing is an almost daily occurrence in Jerusalem. Under 18 U.S.C. 1962 (c) this is illegal.

The specified unlawful activities which these funds are promoting are: murder (18 USC 1956 (c)(7)(b)(ii); destruction of property by means of explosion or fire; (*Id*.) crimes of violence; (*Id*.); offenses like war crime in which the US would be obligated to extradite the offender if found on U.S soil (1956(c)(7)(b)(vi)); offenses relating to destruction by explosives or fire of government property or property affecting interstate commerce; (18 U.S.C. § 1956(c)(7)(D); fire arms trafficking (*Id*.); conspiracy to kill, maim, or injure property in a foreign country (*Id*.); terrorist acts abroad against United States nationals (*Id*.); International terrorist acts transcending national boundaries (*Id*.). *See* Amend. Compl. ¶ 67.

III. **THIS COURT'S CONCLUSION THAT REDRESABILITY IS NOT SATISFIED ON OUR FACTS IS BASED ON AN ERRONEOUS FINDING THAT THE ISRAEL-BASED SETTLEMENTS ARE "INDEPENDENT ACTORS"**

It is difficult for the Plaintiffs on the facts alleged in their xomplaint to comprehend how this Court misread their complaint and summarily conclude, without any evidence at all, that settlements beneficiaries based in Israel are independent actors *vis-a-vis* U.S. based tax-exempt entities that sends millions of dollars every year to the settlements. Apparently, this Court concluded that the U.S. tax-exempt entities that send millions of dollars every year to the

settlements they have adopted have no interaction, control, or involvement with settlement officials—a complete misunderstanding of the complaint. First, as is obvious from the nomenclature, all these Israeli based settlements are closely affiliated with the sister 501(c)(3)'s, which are the "friends of" settlements X, Y, and Z. Taking the new ambassador to Israel (Mr. Friedman), as an example, he explains on his Friends of Beit-El annual 990 Treasury form that he sends $2.2 million dollars every year to support that settlement. His 501(c)(3) "friends of Beit-El" is the sole provider of funding for the 5,000 residents who live there, and he does not hide the fact that the funds are used to promote settlement expansion and ethnic cleansing. For the Court's edification, and as cited in the complaint, 400,000 Palestinians have been forcibly removed from the Occupied Territories, activity funded by American taxpayers like Ambassador Friedman. Amend. Compl. ¶ 18, 31.

The Court should also appreciate that these "friends of" organizations are in reality nothing but financial conduits i.e., they were not set up to perform charitable activities on U.S. soil like soup kitchens and homeless shelters. The sole function that they perform on U.S. soil is to solicit and gather funds to support the dual mission of all Israeli based settlements i.e., settlement expansion and ethnic cleansing of all Palestinians living in the area. *See* Amend. Compl. pg. 6. Of course that goal of settlement expansion automatically guarantees the illegal confiscation of private Palestinian property. As recited in the lawsuit, there is no other real property in the area available to steal.

After the property has been confiscated based on militia members terrorizing the local Palestinian population, the "Jewish only" residents build "Jewish only" homes, supermarkets, museums, schools, hotels even "Jewish only" highways. As numerous pre-occupation officials

make clear when soliciting funds on U.S. soil, none of these settlements have an independent income.

And it is quite obvious that none of these settlements have a local tax revenue base. The Court apparently did not read the complaint where it recites how important the funds are that originate in America. *See* Amend. Compl. ¶¶ 88, 89. Also, officials of these Israeli settlements routinely solicit funds, stressing the fact that it is urgent for additional donations. *See* Amend. Compl. pg. 63 Ft. Nt. 109: ("one Israeli fund explicitly stated on its website: 'In light of the recent budget cuts that have been made to the IDF and the cutback of checkpoints allocated to protect these communities, the security resources and training that we provide is paramount to the future of these areas.'").

They are basically the sole source of funding for the Israeli based settlements. Take for example the case of the "Friends of Ariel," its major supporter is Sheldon Adelson. That settlement started 40 years ago with five families and no amenities. It is now a thriving settlement with 25,000 residents with a major museum and major university/hospital complex. Amend. Compl. ¶ 21. Mr. Adelson recently gave Ariel $25 million dollars to construct a hospital for Jewish-only patients. There are no non-Jewish residents or homeowners in Ariel. *Id*. By contributing millions to the illegal settlement, Treasury officials condone his taking huge tax write-offs. As a result, the American taxpayer has been funding the growth of Ariel for approximately 40 years. That is prima facie evidence that Ariel is not an independent entity.

Not only is the American taxpayer funding settlement growth, he is also funding the Israeli army. In 2014, for example The 501(c)(3) "Friends of the Israeli army" sent $104 million overseas to finance the Israeli Army. Amend. Compl. ¶ 29. That is a clear violation of 18 U.S.C. 1956. As this Court hopefully knows, money is fungible. See the *Boim* litigation *Boim v. Holy*

*Land Foundation for Relief and Development*, 549 F.3d 685 (7th Cir. 2008). The Seventh Circuit in *Boim* concluded that when you send funds to an entity that engages in both criminal and charitable activities, you are donating money to an entity that is engaging in international terrorism. *Id*. That allows the Treasury Department to designate these entities and seize their bank accounts.

In the book "Our Harsh Logic," 700 Israeli army veterans have detailed with sworn testimony the war crimes they committed during 2000-2010. "For example, they were told" to fill Palestinian bodies with bullets." *See* "Our Harsh Logic." All of the large donors to the Israeli Army, like Mr. Adelson, take millions of dollars every year in tax deductions based on expenses incurred for settlement expansion, genocide, and the Israeli army as already recited. 18 U.S.C. 960 bars U.S. citizens from making contributions to a foreign army for obvious reasons. Based on the huge sums of money involved, this Court erred in concluding that the Israeli-based settlements are independent actors. The only reason why the "Israeli-based settlements" are growing is because they each receive $2-3 million dollars per year out of the $2 billion dollar money laundering scheme detailed in the suit, all funded by pro-occupation tax exempt entities based on U.S. soil.

The Court made another mistake in concluding that the Treasury Department will not revoke these entities' tax-exempt status. There are a number of problems with how these tax-exempt entities conduct their business. First, the only beneficiaries of the tax-exempt funds are members of the Jewish faith. In these Israeli-based settlements, residents go to "Jewish-only" schools, live in "Jewish-only" apartment projects, shop in "Jewish-only" malls, stay in "Jewish-only" hotels, and drive cars on "Jewish-only" highways. *See* Amend. Compl. ¶ 59, 69, 109. In *Church of Ehtereal Joy v. Commissioner*, 83 T.C. 20 (Tax. Ct. 1984), 501(c)(3) status was denied to a petitioner whose "available evidence [did] not show that petitioner's present or

9

planned activities serve public rather than private interests." *Church of Ehtereal Joy* at 4. The Court noted that "an organization is not operated exclusively for exempt purposes unless it is operated for the public rather than for the benefit of a private interest." *Id*. at 3. Funding "Jewish-only" institutions clearly does not benefit the public at large.

There is another case, *Bob Jones University*, which held that tax-exempt entities cannot fund charitable or tax-exempt entities focusing only on beneficiaries of a race or religious sector. *See U.S. v. Jones University*, 615 F.3d 544 (2012). That holding alone would require stripping all of these tax-exempt entities of their status. Again, they don't build homeless shelters for poor individuals living on the streets of America—in fact they don't perform any charitable activities on U.S. soil. When a non-profit only raises funds to be sent overseas it is a financial conduit, the Treasury Department routinely strips those conduits of tax-exempt status--unless it is a pro-Israeli tax-exempt entity. The same analysis applies to Christian Evangelical churches which raise funds and transfers these monies overseas to promote settlement expansion and ethnic cleansing. *See* Amend. Compl. ¶ 93. That is evidence that the Treasury Department applies a "double standard" when it comes regulating Pro-Israel tax exempt entities. Amend. Compl. pg. 6, ¶ 116.

There is another reason why these entities most certainly will be stripped of their tax-exempt status; they lack control over how the funds are used once they reach the settlements' bank accounts, which violates tax-exempt Treasury regulations. Also, none of these 501(c)(3)'s have made a finding that their tax-exempt entity overseas engages exclusively in nondiscriminatory charitable conduct. To state the obvious, purchasing M16's is not a charitable activity—it ends up financing violence. Moreover, that activity is a violation of President Clinton's 1995 Executive Order, E.O. 12947. Thus, the Court should appreciate that $2 billion is

sent overseas every year to promote violence, and no one, including Homeland Security, knows what these funds are used for other than settlement expansion and ridding the West Bank of all non-Jews.

There are other reasons [like failing to secure tax-exempt status] that would dictate that these entities will likely lose their tax-exempt status, i.e., they fund criminal activities. Amend. Compl. ¶¶ 87-104. They engage in arm trafficking and fund sniper schools and firing ranges in Beit-El. Amend. Compl. ¶ 82. For example, the settlers, with U.S. donations, purchase M16s, body armor, special ammunition, and stun grenades. All in an effort to protect themselves from Palestinian farmers whose only concern is to harvest their olive groves, which are unfortunately often located in an expanded settlement area. If the Court does not recall, a famous lobbyist, Jack Abramoff, was sending money overseas to his favorite settlement for "educational" activities. His accountant informed him that he needed some documentation proving that the deductions were lawful. Although it may shock the Court, the Chief Rabbi told him that he would print up sniper school's stationery. So Mr. Abramoff was writing off thousands of dollars in tax deductions which went to fund sniper schools. If the Court does not know it, there are various "Friends of" settlement organizations whose officials explain how a person can send in X dollars and ensure that militia members have jeeps and sophisticated military hardware, as well as how the donor can take a tax write offs. Amend. Compl. ¶ 6. Thus, its a virtual certainty that if Treasury does an investigation, most if not all of these entities will be deprived of their tax-exempt status—and that will have profound consequences.

Unfortunately, this Court has concluded that an investigation will not matter, because these overseas settlements are "independent actors" and will continue to grow and arm militia members and steal Palestinian property, even if they have no means of financing this activity.

That is simply another conclusion that the Court reached without any evidence. For example, Bank Leumi will stop sending funds abroad to an entity that is being investigated by the Treasury Department for money laundering and financing ethnic cleansing. (*See* NY Magazine 2017; *see also U.S. v. Bank Leumi Le-Israel B.M. et al*, 2:14-cr-00731-UA (D.C. Cal. 2014)). Also, once donors who realize that the organization that they give money to is being investigated, they will stop giving donations. Donors have alternative entities to fund, and would be afraid that they could be sentenced to six years in jail like Jack Abramoff if their charities are investigated for criminal activity and lose their status. Once word gets out, i.e. tax fraud, and a single tax-exempt entity is stripped of its status, the $2 billion dollar money laundering scheme will come to a screeching halt. Thus, there definitely is a linkage between a Treasury Department investigation and stopping genocide and ethnic cleansing.

   The Court should ask what would be the result if the $2 billion dollar cash flow is stopped: Israeli settlements have hired security coordinators who train militia members in military tactics; they would have to be laid off. All settlements have teachers for children in Hebrew-only schools; they would have to be laid off and the schools closed. The Israeli army veterans who guard some of the settlements would not be paid. There would be no money for purchasing sophisticated military surveillance hardware equipment, and there would be no money paid for a legislative body in these settlements. Ariel's mayor regularly visit the United States to raise funds—as a result of cutting off Ariel's funding, no more such trips would be financed. There would be no money available to Ariel for a $25 million dollar hospital complex for Jewish-only patients.

   As is obvious, the Court does not appreciate that these settlements are dependent on their survival without the annual funding by the U.S. tax-exempt entities. To make matters worse,

Israeli tax authorities, as of 1992, forbid charitable donations to settlements; this is the same year the Israeli government outlawed settlements. How would the army make up a shortfall of $100 million every year? Who would teach the settlers in sniper school and on the firing ranges how to operate sniper scopes? Where would money come from to build "Jewish-only" highways? Where would money come from to build waste processing plants that serve the various settlements—for example the Tovlan facility. *See* Amend. Compl. ¶ 45.

So the bottom line is that each settlement, if the Treasury Department clamps down, would have to find $2-3 million of alternative income to fund the operation of the settlement on an annual basis. Thus the funding provided by these tax-exempt entities is vital to settlements' growth and municipal operations like trash pick-up. These settlements have no ability to use U.S. financial aid, they receive no help from the Israeli government, and as a result of this investigation there would be no more billionaire funding—the sole source of income for these settlements, typical of the relationship Mr. Adelson has with Ariel. He has been funding Ariel for at least 30 years—it is definitely not an independent entity. Without the tax-exempt funding, the harm caused to the Plaintiffs by these settlements would thus cease.

## IV. THIS COURT FAILED TO APPROPRIATELY APPLY THE ARTICLE III STANDING REQUIREMENTS TO THE COMPLAINT

As noted by the Court, Article III of the Constitution requires both that "the plaintiff must sufficiently allege a 'concrete and particularized injury' that is 'fairly traceable to the challenged action of the defendant' and 'likely' to be redressed by a favorable decision." *West*, 845 F.3d at 1230 (internal citations omitted). In this case, the Court did not address the injury in fact portion of the standing analysis, but noted that the Defendants "do not contest that the five plaintiffs added in the proposed second amended complaint have also alleged concrete injuries in fact."

13

In the "causation" analysis, the Court denies a causal link to the Plaintiff, relying heavily on *Khalaf v. Regan*, No. 83-cv-2963, 1985 WL 392 (D.D.C. Jan. 8, 1985). That case, however, is easily distinguished because the Plaintiffs there alleged the monies went to the State of Israel, not the settlements directly. Therefore, you could not convince the Court that it would be possible as the result of a Treasury investigation to influence the policies and activity of the Israeli government. The case is also distinguished from *Khalaf* because it was not explained to the Court there how pro-settlement tax-exempt entities violated numerous tax exempt regulations. *See* Amend. Compl. pg. 56-63, ¶¶ 87-101.

In *Khlalaf*, the Court also noted that "they are each the direct and proximate result of actions taken by independent third parties." *Id*. As already shown *supra*, however, the settlements are not independent, and are wholly reliant upon the funds they receive from U.S. tax-exempt entities. In fact, as alleged on pg. 61 of the Complaint, wealthy prominent donors like Hagee, Moskowitz and Adelson can dictate what their funds will be used for. *See Amend. Compl.* ¶ 95. Without these funds, the settlements would have no other source of income to pay for Jewish-only housing facilities, Jewish-only schools, Jewish only hospitals, militia groups, military hardware, and municipal activities like waste disposal.

The Court also rejects Article III standing on the causation prong because of Plaintiffs' "chain of events" causation argument, citing *Allen v. Wright* to support its argument. 468 U.S. 737, 759 (1984) (a case where the Supreme Court rejected standing on the basis that giving tax-exempt status to private schools caused white students to leave desegregated public schools, injuring black children of the plaintiff parents who were deprived the opportunity to attend desegregated schools). *See id.* at 746, 758. What the Court fails to consider in its memorandum opinion, however, is that "[t]he fact that the potential injury would be the result of a chain of

14

events does not always preclude standing." See *15-101 Moore's Federal Practice – Civil § 101.40*:

> For example, in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, the Supreme Court held that an organization would be affected by a chain of third-party responses to an Interstate Commerce Commission rate decision satisfied the injury-in-fact component of standing…However, it is not the only case in which allegations were held sufficient to satisfy the injury-in-fact requirement even though the injury was dependent on a chain of events. The probability of each individual event occurring and whether the events' occurrence is spatially and temporarily determinate.

*Id*. (*citing United States v. SCRAP*, 412 U.S. 669, 688-690 (1973) (allegations that rate increase would cause increased use of nonrecyclable commodities, resulting in use of more natural resources to produce such goods, come of which might be taken from area in which plaintiff's members lived, and resulting in more refuse that might be discarded in national parks area, "if proved, would place [plaintiff's members] squarely among those persons injured in fact by the Commission's action.") and (*Florida State Conference of N.A.A.C.P. v. Bowning*, 522 F.3d 153, 1162-1164 (11th Cir. 2008). Indeed, in the recent case of *Osborn v. Visa Inc.*, the D.C. Circuit reversed a District Court decision finding that "the plaintiffs had failed to plead adequate facts to establish standing" based on a chain of causal events, noting that the allegations were well pled despite the chain of causation analysis employed. 797 F.3d 1057, 1064, 1069. (D.C. Cir. 2015).

When determining standing based on an analysis of future injuries, the future injury must be substantially probable. There is currently a split among circuits in applying the Qualitative approach vs. the quantitative approach. *See NRDC v. EPA*, 464 F.3d 1, 6-7 (D.C. Cir. 2006) (noting conflict among circuits). Under a qualitative approach, the requisite probability of harm varies with the severity of the harm. Any scientifically demonstrable increase in the threat of

death or serious illness may be sufficient under this approach. *See Id.*; *see also 15-101 Moore's Federal Practice – Civil § 101.40*. As alleged by the plaintiffs in the complaint, the threat of death or serious injury as a result of the actions of settlements funded by U.S. tax-exempt entities is immense—thus lending strength to their having Article III standing. *See* Amend. Compl. ¶ 68.

A plaintiff seeking relief against the defendants' future conduct must show that he or she faces a real and immediate threat or similar injury in the future. *See Los Angels v. Lyons*, 461 U.S. 95, 109-111 (1983). In the Complaint, Plaintiff Kateeb has clearly demonstrated that she is almost certainly going to lose the rest of her property in the Occupied Territories to settlement growth if the tax-exempt entities continue to send funds to the settlements. *See* Amend. Compl. ¶ 13(a). Economic harm, such as the loss of property, "is a classic form of injury-in-fact." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005). Furthermore, "a rule 12(B)(1) motion, however, is not the occasion for evaluating the empirical accuracy of an economic theory." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065-66 (D.C. Cir. 2015).

As explained more fully *supra*, the Plaintiffs injuries would also be redressed if the settlements stopped receiving funding from tax-exempt entities, which would occur if the Treasury investigated the entities. Thus Plaintiffs have also satisfied the redressability clause. Accordingly, Plaintiffs meet the Article III standing requirements, and dismissing the case on a basis of a lack of standing is therefore improper. The Court should thus reverse its order and have the case proceed.s

**V.     Conclusion**

This Court has failed to assume for purposes of this motion the merits of the allegations contained in this lawsuit. That's why in this motion it is pointed out what vital facts the Court has failed to acknowledge. For example, to state the obvious, the U.S. Tax Code was never

intended to subsidize criminal activity in America or abroad. *See* Amend. Compl. ¶ 96, pg. 61. There is obvious evidence about the nature of the problem that the Court has simply glossed over. For example, ¶ 104, pg. 65: "The monies involved in assisting with the settlement enterprise are staggering. As cited in the Jewish Daily Forward newspaper, 3,600 Jewish organizations forward $1.7 billion, or 12% of their budgets, to Israel each year." These funds go directly to the settlements, and to the Israeli army. For example, "FIDF 2014 total charitable contributions to the Israeli army alone totaled over $105 million. That is enormous supplemental financial support for a foreign army, since their country is roughly the size and population of New Jersey." Amend. Compl. ¶ 104.

Additional evidence as to the gross annual revenue stream is referenced in ¶ 105, re: The Jewish National Fund (JNF). That fund restricts the use of its land, approximately 20% of land in the OPT on a strictly racial and religious basis—only Jews can purchase the homes. JNF has overtly supported racial and religious discrimination, i.e. Jewish only land covenant restrictions, and is the perfect example of an entity whose activity should be examined by Treasury. The abuses that these tax-exempt entities have engaged in have been detailed in ¶ 107. For example, the Capital Athletic Foundation [Jack Abramoff] funded sniper schools and paramilitary activities.

Another tax-exempt entity, Amitz, has raised money through two Brooklyn based nonprofits. Amend. Compl. ¶ 107. According to its website, it trains and equips paramilitary units and encourages its donors to send "a tax-deductible check for night vision binoculars, bullets, and guard dogs." As is obvious, there is a real problem that the Treasury Department has failed to confront that has damaged this Country's foreign policy objectives and has resulted in wholesale violence in the Occupied Territories—which conduct President Clinton declared to be

illegal 22 years ago. Isn't it about time that Treasury investigated this egregious criminal activity? Unless this Court orders Treasury to do so, nothing will happen.

Respectfully Submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing Plaintiff's Counsel's Motion for Reconsideration has been made through the Court's electronic transmission facilities on the 3rd day of April, 2017.

Respectfully Submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiffs*